APPEAL NO. 08-2310

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

ELEANOR MCCULLEN, JEAN BLACKBURN ZARRELLA,
CARMEL FARRELL, ERIC CADEN, AND GREGORY A. SMITH,
*Plaintiffs-Appellants*,

v.

MARTHA COAKLEY, Attorney General
for the Commonwealth of Massachusetts,
*Defendant-Appellee*.

───────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CIVIL CASE NO. 08-10066-JLT
(HONORABLE JOSEPH L. TAURO)

───────────────

## APPELLANTS' OPENING BRIEF

───────────────

Michael J. DePrimo, Bar # 74378
Attorney at Law
P.O. Drawer 2440
107 Parkgate Drive
Tupelo, Mississippi 38803
Telephone: (662) 491-2000
Email: michaeldeprimo@gmail.com

Philip D. Moran, Bar # 23517
Philip D. Moran P.C.
265 Essex Street, Suite 202
Salem, Massachusetts 01970
Telephone: (978) 745-6085
Facsimile: (978) 741-2572
Email: philipmoranesq@aol.com

Benjamin W. Bull, Bar # 1132885
Alliance Defense Fund
15100 North 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

Table of Authorities ................................................................................v

Jurisdictional Statement ..........................................................................1

Statement of the Issue .............................................................................1

Statement of the Case .............................................................................1

Statement of Facts ..................................................................................1

Summary of the Argument......................................................................5

Argument.................................................................................................8

I.      BUFFER ZONES MAY NOT BURDEN MORE SPEECH THAN
        NECESSARY ................................................................................8

        A.      *Madsen v. Women's Health Care*......................................8

        B.      *Schenck v. Pro-Choice Network, Inc.*...............................9

        C.      *Hill v. Colorado*.............................................................11

        D.      Other Buffer Cases ..........................................................12

II.     THE ACT IS UNCONSTITUTIONAL ON ITS FACE ..............13

        A.      Standard of Review ..........................................................13

        B.      The Competing Interests at Stake.....................................13

                1.      The interests of speakers and *listeners* on public streets and
                        sidewalks ...............................................................14

                        a.      The Act regulates speech on public ways.....................14

                        b.      The Act burdens peaceful speech ..................14

i

c.    The Government's ability to restrict speech in a "quintessential" public forums is limited ....................16

2.    The Commonwealth's Interests .............................17

3.    The Act does not distinguish between willing and unwilling listeners ....................................................................18

4.    Classifying the Act ................................................19

a.    The Act is content based as drafted .............................19

b.    Doubling the size of the zone was arbitrary and capricious ...................................................................20

c.    The zone causes public safety hazards .........................20

d.    The statute is significantly underinclusive ..................21

e.    The exemption for RHCF employees/agents was unnecessary ...................................................................21

f.    The alleged vagueness of the prior statute was pretext ....................................................................22

g.    The record lacks substantial evidence from unbiased sources ....................................................................23

h.    The claimed "emergency" in the Preamble was non-existent ...................................................................23

5.    The Act is content based as interpreted ...................24

6.    The Act cannot withstand strict scrutiny ...............26

C.    The Act flunks the Time, Place, and Manner Test...........27

1.    The legal standard ................................................27

2.      The Act does not pass constitutional muster ..........................29

D.     The Act is Substantially Overbroad ...................................................34

1.      Virtually all lawful conduct is banned from the zone.............35

2.      The Act sweeps within its ambit a large amount of
        constitutionally protected conduct ..........................................37

3.      The Act places a chilling effect on protected speech .............40

4.      The competing interests favor speech.....................................40

E.     The Act is an Unlawful Prior Restraint..............................................40

1.      The plain text of the Act demonstrates an unlawful prior
        restraint....................................................................................40

2.      The Act is a prior restraint as interpreted by the Attorney
        General ....................................................................................44

F.     The Act Constitutes Viewpoint Discrimination and Violates the Right
       to Equal Protection ............................................................................44

1.      The text of the Act discriminates according to viewpoint......44

2.      The Act violates the Equal Protection Clause ........................46

G.     As Interpreted, the Act is Vague and Ambiguous ............................49

III.    THE LEGISLATIVE RECORD IS INSUFFICIENT.................................50

A.     Standard of Review ..........................................................................50

B.     Legislative Findings Are Not Binding on the Court.........................50

1. Record evidence of unlawful conduct is lacking .........................51

       2. Prolife conduct at RCHFs was lawful..........................................52

   C.     Complained of Conduct is Constitutionally Protected.....................53

   D.     Eye-Witness Testimony Does Not Support a Large Fixed Buffer ...55

   E.     Difficulty Enforcing a Floating Buffer Does Not Warrant an Expanded Fixed Buffer .....................................................................58

   F.     Much of the Evidence was Stale ......................................................59

Conclusion .............................................................................................60

Certificate of Compliance .......................................................................61

Certificate of Service ..............................................................................63

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Almeida-Sanchez v. United States*,
    413 U.S. 266 (1973)......................................................................8, 58

*Ark. Writers' Project, Inc. v. Ragland*,
    481 U.S. 221 (1987)......................................................................45

*Ashcroft v. American Civil Liberties Union*,
    542 U.S. 656 (2004)......................................................................59

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*,
    490 F.3d 1 (1st Cir. 2007)...............................................40, 41, 44

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 68 (1963)........................................................................41

*Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*,
    482 U.S. 569 (1987)......................................................................38, 39

*Bl(a)ck Tea Soc'y v. City of Boston*,
    378 F.3d 8 (1st Cir. 2004).......................................... 23, 27, 42, 60

*Boos v. Barry*,
    485 U.S. 312 (1988)...................................... 14, 15, 16, 22, 45, 55

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973)......................................................7, 34, 39, 40

*Brown v. City of Pittsburgh*,
    543 F. Supp. 2d 448 (W.D. Pa. 2008) ........................................31

*Carey v. Brown*,
    447 U.S. 455 (1980)......................................................................26

*Carlson v. California*,
    310 U.S. 106 (1940)......................................................................33

*Casey v. City of Newport*,
    308 F.3d 106 (1st Cir. 2002)............................................................6, 28, 29

*City of Chicago v. Morales*,
    527 U.S. 41 (1999)..............................................................................34, 36

*Clark v. Jeter*,
    486 U.S. 456 (1988)....................................................................................46

*Cohen v. California*,
    403 U.S. 15 (1971)......................................................................................18

*Commerce Ins. Co. v. Comm'r of Ins*.,
    852 N.E.2d 1061 (Mass. 2006)...................................................................25

*Connick v. Myers*,
    461 U.S. 138 (1983)....................................................................................58

*Cornelius v. NAACP Legal Defense and Educ. Fund, Inc*.,
    473 U.S. 788 (1985)....................................................................................19

*Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*,
    477 F.3d 807 (6th Cir. 2007) ......................................................................53

*Edwards v. City of Santa Barbara*,
    150 F.3d 1213 (9th Cir. 1998) ....................................................................13

*Edwards v. South Carolina*,
    372 U.S. 229 (1963)....................................................................................58

*Fantasy Book Shop, Inc. v. City of Boston*,
    652 F.2d 1115 (1st Cir. 1981).........................................................40, 42, 43

*First Unitarian Church of Salt Lake City v. Salt Lake City Corp*.,
    308 F.3d 1114 (10th Cir. 2002) ..................................................................38

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992)............................................................................15, 25

*Frisby v. Schultz*,
    487 U.S. 474 (1988)....................................................................6, 15, 28, 39

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972).......................................................................37, 39, 49

*Groh v. Ramirez*,
    540 U.S. 551 (2004)....................................................................................59

*Halfpap v. City of West Palm Beach*,
    2006 U.S. Dist. LEXIS 97428 (S.D. Fla. 2006) ....................................13, 31

*Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*,
    9 F.3d 1295 (7th Cir. 1993) .......................................................................58

*Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*,
    452 U.S. 640 (1981).......................................................................14, 36, 41

*Hill v. Colorado*,
    530 U.S. 703 (2000)........................................................................... *passim*

*Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*,
    4 F.3d 1103 (3d Cir. 1993) ........................................................................17

*Lehman v. City of Shaker Heights*,
    418 U.S. 298 (1974)....................................................................................37

*Loper v. N.Y. City Police Dep't*,
    999 F.2d 699 (2d Cir. 1993) .......................................................................35

*Lovell v. City of Griffin*,
    303 U.S. 444 (1938)....................................................................................33

*Madsen v. Women's Health Center, Inc.*,
    512 U.S. 753 (1994)........................................................................... *passim*

*Martin v. City of Struthers*,
    319 U.S. 141 (1943)....................................................................................33

*McGuire v. Reilly*,
    260 F.3d 36 (1st Cir. 2001)................................................................ *passim*

*McGuire v. Reilly*,
    386 F.3d 45 (1st Cir. 2004)............................................................3, 24, 48

*McGuire v. Reilly*,
    544 U.S. 974 (2005)...................................................................................3

*McIntyre v. Ohio Elections Comm'n*,
    514 U.S. 334 (1995)............................................................................33, 35

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)................................................................................17

*Melear v. Spears*,
    862 F.2d 1177 (5th Cir. 1989) ...............................................................58

*Members of City Council v. Taxpayers for Vincent*,
    466 U.S. 789 (1984)................................................................................28

*Menotti v. City of Seattle*,
    409 F.3d 1113 (9th Cir. 2005). ..............................................................23

*Metromedia, Inc. v. City of San Diego*,
    453 U.S. 490 (1981)................................................................................51

*NAACP v. Button*,
    371 U.S. 415 (1963)................................................................................43

*Naser Jewelers, Inc. v. City of Concord*,
    513 F.3d 27 (1st Cir. 2008).....................................................................13

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998)................................................................................35

*New York ex rel. Spitzer v. Cain*,
    418 F. Supp. 2d 457 (S.D.N.Y. 2006) ....................................................31

*New York ex rel. Spitzer v. Operation Rescue National*,
    273 F.3d 184 (2d Cir. 2001) ........................................................31

*Org. for a Better Austin v. Keefe*,
    402 U.S. 415 (1971)...................................................................15

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
    460 U.S. 37 (1983).........................................................14, 16, 26

*Police Dep't v. Mosley*,
    408 U.S. 92 (1972)..............................................................46, 58

*RAV v. City of St. Paul*,
    505 U.S. 377 (1992)...................................................................44

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997)...................................................................59

*Ridley v. Mass. Bay Transp. Auth.*,
    390 F.3d 65 (1st Cir. 2004).........................................................19

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988)...................................................................43

*San Antonio Ind. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973).......................................................................46

*Schenck v. Pro-Choice Network of Western New York, Inc.*,
    519 U.S. 357 (1997)............................................................ *passim*

*Schneider v. New Jersey (Town of Irvington)*,
    308 U.S. 147 (1939)...................................................................33

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991)...................................................................54

*Stanley v. Georgia*,
    394 U.S. 557 (1969)............................................................15, 16

*Sullivan v. City of Augusta*,
  511 F.3d 16 (1st Cir. 2007)......................................................................50

*Terminiello v. City of Chicago*,
  337 U.S. 1 (1949)...................................................................................54

*Thornhill v. Alabama*,
  310 U.S. 88 (1940)............................................................................22, 25

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.*,
  393 U.S. 503 (1969)................................................................................58

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994)...........................................................................45, 51

*United States v. Bedford Assocs.*,
  713 F.2d 895 (2d Cir. 1983) ...................................................................17

*United States v. Grace*,
  461 U.S. 171 (1980)................................................................................16

*United States v. O'Brien*,
  391 U.S. 367 (1968)...........................................................................42, 43

*United States v. Playboy Entm't Group, Inc.*,
  529 U.S. 803 (2000)......................................................................6, 26, 54

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
  425 U.S. 748 (1976)................................................................................35

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982)................................................................................34

*Village of Schaumburg v. Citizens for a Better Env't*,
  444 U.S. 620 (1980)................................................................................35

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989)...............................................................6, 27, 28, 45

## <u>Statutes</u>

18 U.S.C. § 248 .................................................................................29

28 U.S.C. § 1292 .................................................................................1

28 U.S.C. § 1331 .................................................................................1

28 U.S.C. § 1343 .................................................................................1

42 U.S.C. § 1983 .................................................................................1

Mass. Gen. Laws ch. 265: Section 13A -13K.................................29

Mass. Gen. Laws ch. 265: Section 35 ...............................................29

Mass. Gen. Laws ch. 265: Section 43 ...............................................29

Mass. Gen. Laws ch. 265: Section 43A ............................................29

Mass. Gen. Laws ch. 266: Section 120E1/2(b)...........................1, 2, 29

Mass. Gen. Laws ch. 269: Section 1 .................................................29

Mass. Gen. Laws ch. 272: Section 53 ...............................................29

## JURISDICTIONAL STATEMENT

This action was filed pursuant to 42 U.S.C. § 1983, alleging violation of First and Fourteenth Amendment rights.  Subject matter jurisdiction in the District Court existed under 28 U.S.C. §§ 1331 and 1343(a)(3)-(a)(4).  Appellate jurisdiction to review denials of injunctive relief exists under 28 U.S.C. § 1292(a)(1).

Denial of Plaintiffs' request to enjoin the challenged Act was entered on August 22, 2008.  *See* Addendum A.  Timely notice of appeal was filed on September 16, 2008.  Joint Appendix (hereafter, "App.") at 16.

## STATEMENT OF THE ISSUE

The Commonwealth enacted a law of general application that prohibits peaceful speech on public streets and sidewalks within a radius of 35 feet from abortion clinics.  Does the Act on its face pass muster under the First and Fourteenth Amendments?

## STATEMENT OF THE CASE

This is an interlocutory appeal from an order by the United States District Court for the District of Massachusetts denying Plaintiffs' request for injunctive relief.  The decision is reported at 573 F. Supp. 2d 382 (D. Mass. 2008).  In this appeal, Plaintiffs/Appellants (collectively referred to as "McCullen") challenge the facial constitutionality of Mass. Gen. Laws ch. 266: Section 120E1/2(b) as

amended in 2007 (hereafter, "the Act").  The Act establishes a fixed buffer zone with a radius of 35 feet from any portion of an entrance to, exit from, or driveway of non-hospital reproductive health care facilities ("RHCFs").  *See* Addendum B. It is a violation of the Act to engage in peaceful speech within the zone, even if the speaker remains stationary, and even if the speech is deliberately invited by a willing listener.  It is likewise a violation to distribute a leaflet, say a prayer, or offer information about alternative sources of help and support.

McCullen filed a complaint in January, 2008, challenging the Act on its face and as applied.  App. at 19.  In April, the District Court denied McCullen's motion for preliminary injunction without prejudice. The Court conducted a bench trial on McCullen's facial challenge on a stipulated trial record on May 28.  Addendum A at 3.  On August 22, 2008 the Court issued a Memorandum holding the Act constitutional on its face and denying McCullen's request for injunctive relief.  *Id.* This appeal followed.

## STATEMENT OF FACTS

In 2000, the Commonwealth passed the Massachusetts Reproductive Health Care Facilities Act, Mass. Gen. Laws ch. 266, § 120E1/2 (hereafter, "Prior Act" or "floating buffer law").[1]  App. at 46.  The Prior Act made it unlawful to knowingly approach within 6 feet of another person without consent for the purpose of

---

[1] *See* Addendum A at 5-11 and *McGuire v. Reilly*, 260 F.3d 36, 39-40 (1st Cir. 2001) for the full history of the 2000 bill.

2

passing a leaflet or handbill, displaying a sign, or engaging in oral protest, education, or counseling. *Id.* The Prior Act applied only within an 18-foot radius of RHCFs.

In a constitutional challenge thereto, the district court entered a preliminary injunction barring its enforcement. On appeal, the First Circuit vacated the injunction because the floating buffer was less restrictive than the statute upheld in *Hill v. Colorado*, 530 U.S. 703 (2000). *See McGuire v. Reilly*, 260 F.3d 36, 49-51 (1st Cir. 2001) ("*McGuire I*"). The First Circuit remanded the case to determine whether the floating buffer had been unconstitutionally applied. The district court entered summary judgment for the Commonwealth after finding no constitutional violations. That ruling was affirmed. *See McGuire v. Reilly*, 386 F.3d 45 (1st Cir. 2004) ("*McGuire II*"). Certiorari was denied. *McGuire v. Reilly*, 544 U.S. 974 (2005).

In 2007, the Massachusetts legislature commenced new hearings on activities at RHCFs. App. at [1-51] 198-248. It thereafter took action on a new bill (SB 1353) that repealed the floating buffer law and substituted the Act in its place. App. at 43. The Act states in pertinent part,

Subsection (b):

No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of thirty-five feet of any portion of an entrance to, exit from, or driveway of a reproductive health care facility, or within the area within a rectangle created

3

by extending the outside boundaries of any entrance to, exit from, or driveway of, a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway. This subsection shall not apply to the following:

persons entering or leaving such facility;

employees or agents of such facility acting within the scope of their employment;

law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment;

persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

*See* Addendum B.  Two months later, the Attorney General issued an interpretation of the Act.  *See* Addendum C.

Appellant Eleanor McCullen is a grandmother who opposes abortion and does whatever she can to help young and vulnerable pregnant women.  App. at 48-51.  She offers literature to persons approaching RHCFs (hereinafter "clinic patients") to educate and inform them of alternatives to abortion.  *Id.* at 49.  She also offers a shoulder to cry on.  *Id.* at 50.  Over the years, many women received McCullen's offers of information and, as a result, chose to give birth.  *Id.* at 49-50.

McCullen desires to communicate from a distance in which she can speak in a normal conversational tone and make eye contact.  *Id.* at 50-51, 54.  Because she cannot always identify clinic patients until they are near the RHCF, McCullen must

4

station herself on public ways near the path of patients and in close proximity to

entrances and driveways in order to communicate effectively. *Id.* at 51-53.

## SUMMARY OF THE ARGUMENT

The Act is a major overhaul of the "no approach without consent" law

adopted seven years earlier. Unlike its predecessor and the statute upheld in *Hill*,

the Act establishes a "speech-free buffer zone," *see Madsen v. Women's Health

Center*, *Inc.*, 512 U.S. 753, 768 (1994), that applies to *invited and uninvited

approaches alike*, regardless of how peaceful and welcome the speech is. If "it is

difficult, indeed, to justify a prohibition on all *uninvited* approaches of persons

seeking the services of the clinic, regardless of how peaceful the contact may be,

without burdening more speech than necessary to prevent intimidation and to

ensure access to the clinic," *id.* at 774 (emphasis added), how much more so to

justify one that prohibits *invited* approaches. Yet that is the case here.

The effect of the Act is plain. Under the Act it is a crime to engage in any

expressive activity on the public ways inside the expanded buffer zone during

RHCF business hours. Gone is McCullen's ability to speak face to face with a

willing listener. Gone is McCullen's ability to speak from a conversational

distance. Gone is McCullen's ability to stand in the zone to peacefully pray or

hold a sign. Gone is McCullen's ability to offer leaflets near the path of patients

entering RHCFs. Gone is McCullen's ability to even quietly meditate on the

public sidewalk. Gone is the ability of an incoming patient to invite McCullen to give her information. Each of these activities was freely permitted in *Hill*, 530 U.S. at 707-27, and *McGuire*, 260 F.3d at 49. None of them are permitted here. The Act thus presents First Amendment issues far different from those in *Hill* and *McGuire*.

As set forth below, the Act suffers from several constitutionally fatal maladies. First, the Act is a content-based restriction on speech that does not serve a compelling state interest. *See United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000). Second, even if this Court believes the Act is content neutral despite *Hill*, the Act still fails because it is not narrowly tailored. As numerous Supreme Court and First Circuit cases make clear, "narrow tailoring" requires government to target the exact evil it seeks to remedy. *See*, *e.g.*, *Frisby v. Schultz*, 487 U.S. 474, 485 (1988); *Ward v. Rock Against Racism*, 491 U.S. 781, 800 n.7 (1989); *Casey v. City of Newport*, 308 F.3d 106, 115 (1st Cir. 2002). The Commonwealth did not do this.

The Commonwealth's asserted interests are protecting access to RHCFs and reducing violence. Yet, the Act restricts entirely peaceful behavior even when it occurs 35 feet away from entrances and cannot interfere with access. Moreover, the Act forbids discussion between WILLING speakers and listeners within 35 feet of RHCFs even though such discussions are not the cause of the Commonwealth's

alleged concerns. If the Commonwealth desires a narrowly-tailored law, it must focus on unwanted communication at very close distances, or on obstruction that occurs at points of entry, as did *Hill* and *McGuire*. Put simply, the Constitution doesn't permit the unnecessary silencing of peaceful and welcome speech.

Third, the Act is substantially overbroad because it applies to all persons regardless of the lawfulness of their activities and therefore has an illegitimate sweep. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). Fourth, it constitutes an impermissible prior restraint because it bans *all* modes of communication inside the zone. *See Hill*, 530 U.S. at 734. Fifth, the Act is viewpoint discriminatory because it impermissibly allows persons with pro-choice viewpoints to access the zone when others cannot. *See McGuire I*, 260 F.3d at 42-43.

Finally, the severe restrictions placed on speech are based on a legislative record that is insubstantial compared to the "extraordinary" records of abusive conduct that supported targeted injunctions at specific individuals who had repeatedly broken the law in *Madsen* and *Schenck v. Pro-Choice Network of Western New York, Inc*., 519 U.S. 357, 383 (1997). The record contains no eye-witness police accounts of detaining, impeding, blocking, stalking, harassing, trespassing, threatening, or violence. *See infra* at pp. 51-58. Instead, police witnesses complained of difficulty under the old law determining whether an approach was without consent.

The record indicates that the buffer law was revised to make it easier for police to enforce.  But, the First Amendment forbids that type of regulatory approach, i.e., free speech may not be sacrificed on the altar of more efficient law enforcement.  *See*, *e.g.*, *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) ("The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards.").

## ARGUMENT

## I.    BUFFER ZONES MAY NOT BURDEN MORE SPEECH THAN NECESSARY.

The Supreme Court has reviewed three abortion-related buffer zones. *Madsen* and *Schenck* were injunctions targeted at *specific individuals* in light of their prior misconduct.  *Hill* was a law of general application.  As shown below, buffer zones may not burden more speech than necessary to achieve the government's asserted goals.

### A.    *Madsen v. Women's Health Center*

In 1994, the Supreme Court in *Madsen* upheld a state-court injunction creating a 36-foot buffer zone on the public ways surrounding an RHCF.  512 U.S. at 776.  The large buffer was crafted by the state court to "protect[] *unfettered ingress to and egress from the clinic*, and ensur[e] that petitioners *do not block*

8

*traffic*" after its effort to tailor a narrower injunction proved futile and the court "seem[ed] to have had few other options to protect access given the narrow confines around the clinic." *Id.* at 758-59, 769 (emphasis added).

It was designed to prevent further violations of court orders *on a record of repeated and egregious lawless conduct* where the "number of people congregating varied from a handful to 400" and "repeatedly had interfered with the free access of patients and staff." *Id*. at 758, 769. However, the Court struck down that portion of the buffer that extended to private property because it could not be sustained "on the record before [the Court]," stating, "the buffer zone fails to serve the significant government interests." *Id*. at 771. It also struck down an injunction directed at picketing, saying, "[t]he record before us does not contain sufficient justification for this broad a ban. . . ." *Id.* at 775. Consequently, each portion of the buffer stood or fell as a result of the factual record. The record here is a far cry from the record in *Madsen*.

### B.     *Schenck v. Pro-Choice Network, Inc*.

In 1997, the Court decided *Schenck*. Prior to entry of an injunction, four medical clinics were subjected to "numerous large-scale blockades in which protestors would march, stand, kneel, sit, or lie in parking lot driveways and in doorways." 519 U.S. at 362. "Protesters trespassed onto clinic parking lots and even entered the clinics themselves," and "crowded around cars or milled around

doorways and driveway entrances in an effort to block or hinder access to the clinics." *Id.* at 362-63. "Protesters sometimes threw themselves on top of the hoods of cars or crowded around cars as they attempted to turn into parking lot driveways." *Id.* at 363. The size of the protests overwhelmed police resources. *Id.*

Noting that, like *Madsen*, the lawless conduct contained in the record was "extraordinary," *Schenck*, 519 U.S. at 383, the Court opined, "[a]s in *Madsen*, the record shows that protesters purposefully or effectively blocked or hindered people from entering and exiting the clinic doorways . . . . Based on this conduct . . . the District Court was entitled to conclude . . . that the only way to ensure access was to move *all* protesters away from the doorways." *Schenck*, 519 U.S. at 380-81 (italics in the original).

Although it upheld 15-foot fixed buffers, the Court struck down 15-foot floating buffers on the ground they unconstitutionally prevented speakers from communicating at *a normal conversational distance*. *Id.* at 377. That was not inconsistent. The Court upheld the fixed zones because they were "necessary to ensure that people and vehicles trying to enter or exit the clinic property or clinic parking lots can do so." *Id.* at 380. It struck down the floating buffers because they did not aid ingress and egress and therefore burdened more speech than necessary. The egregious factual record in *Schenck* is not present here.

10

### C.    *Hill v. Colorado*

In 2000, the Supreme Court considered a law of general application in *Hill* regulating the location of speech on public streets and sidewalks outside medical facilities.  The Court framed the issue as "whether the First Amendment rights of the speaker are abridged by the protection the statute provides for the *unwilling* listener."  530 U.S. at 708 (emphasis added).  The Court analyzed the statute to determine whether it reflected "an acceptable balance between the constitutionally protected rights of *law-abiding speakers* and the interests of *unwilling listeners*" by examining "the competing interests at stake."  *Id*. at 714 (emphasis added).

In upholding the statute, the Court concluded it was narrowly tailored to restrict only *unwanted* speaking approaches.[2]  *Id*. at 707-08, 727-28.  In doing so, the Court emphasized the following factors: the law applied to all speakers, *id*. at 708, 723-24; the law applied outside all facilities where incoming patients might be upset by unwanted approaches, not just a subset (RHCFs) of those facilities, *id*. at 715, 728-29; the law clearly distinguished between unwanted speech – which was limited – and speech to willing listeners, which remained unlimited, *id*. at 707-09; the law allowed even unwanted speech to occur inside the zone from the "normal conversational distance" of 8 feet, *id*. at 726-27 (quoting *Schenck*, 519 U.S. at

---

[2] As here, *Hill* did not have a legislative record demonstrating extraordinary abusive conduct, as did *Madsen* and *Schenck*.  *See Hill*, 530 U.S. at 709-10.  Also, as here, there was no evidence that the sidewalk counselors who brought suit were ever abusive or confrontational.  *Id.* at 710.

377);  the law permitted a speaker to stand still inside the zone and speak without restriction, *id*. at 727; and the law permitted a speaker to stand still inside the zone and display signs and/or offer leaflets and handbills without having to retreat, *id*. at 726-27.   To date, *Hill* is the only Supreme Court decision addressing the constitutional limitations on a buffer zone statute at RHCFs.

In stark contrast to *Hill*, the Act here forbids all of the above regardless of how peaceful the speaker or welcome the message.  All of the factors that justified the narrow restriction in *Hill* require invalidation of the Act here.

### D.     Other Buffer Cases.

Shortly after the High Court's decision in *Hill*, Massachusetts adopted the Prior Act.  As noted *supra*, that law was upheld in *McGuire I and II*.  The *McGuire* court emphasized that the Prior Act only limited speakers from approaching unconsenting listeners, it did not prevent speakers from holding their ground, and it was less restrictive than the statute in *Hill*.  *McGuire I*, 260 F.3d at 41, 40, 46, 49. Constitutionally speaking, the Act is miles apart from *McGuire* and *Hill*.

McCullen is aware of only one abortion-related law of general application subsequent to *Hill* that created a fixed buffer of more than 15 feet.  That law created a 20-foot fixed buffer zone on the public ways around health care facilities. Relying upon *Hill*, *Schenck*, *Madsen*, *Frisby*, and *Ward* the federal district court

enjoined its enforcement because it unnecessarily burdened free speech.[3]  *See Halfpap v. City of West Palm Beach*, 2006 U.S. Dist. LEXIS 97428 at *33-73 (S.D. Fla. 2006) (unpublished).  A pre-*Hill* law that prohibited only demonstrations within an 8-foot fixed buffer zone was upheld on the ground it complied with the requirements laid down in *Schenck*.  *See Edwards v. City of Santa Barbara*, 150 F.3d 1213, 1216 (9th Cir. 1998).

## II.    THE ACT IS UNCONSTITUTIONAL ON ITS FACE.

### A.    Standard of Review.

The Court reviews conclusions of law *de novo*.  *Naser Jewelers, Inc. v. City of Concord*, 513 F.3d 27, 32 (1st Cir. 2008) (citation omitted).

### B.    The Competing Interests at Stake.

This case in large measure is controlled by *Hill*.  "Before confronting the question whether the [Act] reflects an acceptable balance between the constitutionally protected rights of law-abiding speakers and the interests of unwilling listeners, it is appropriate to examine the competing interests at stake." *Hill*, 530 U.S. at 714.

---

[3] *See* Final Judgment, App. at 304.  The ruling was not appealed.

13

**1.     The interests of speakers *and listeners* on public streets and sidewalks.**

**a.     The Act regulates speech on public ways.**

First, the Act encompasses all public streets and sidewalks within a 35-foot radius of non-hospital RHCFs, areas that "have immemorially been held in trust for the use of the public." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quotation marks and citation omitted). "[T]ime out of mind," streets and sidewalks have been used for "assembly, communicating thoughts between citizens, and discussing public questions." *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quotation marks and citation omitted).

"The First Amendment protects the right of every citizen to reach the minds of willing listeners and to do so there must be opportunity to win their attention." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981) (quotation marks and citation omitted). McCullen's ability to communicate effectively with persons in the regulated zones, particularly the ability to distribute leaflets, "is unquestionably lessened by [the Act]." *Hill*, 530 U.S. at 715. Even the rights of incoming *clinic patients* to receive information are restricted by the Act.

**b.     The Act burdens peaceful speech.**

Second, "leafletting, sign displays, and oral communications are protected by the First Amendment." *Id.* "[T]he First Amendment reflects a profound national commitment to the principle that debate on public issues should be

14

uninhibited, robust, and wide-open." *Boos*, 485 U.S. at 318 (quotation marks and citation omitted). "The fact that the messages conveyed by those communications may be offensive to their recipients does not deprive them of constitutional protection." *Hill*, 530 U.S. at 715. People on public sidewalks and streets do not have a right to avoid all unwanted communication. *Frisby*, 487 U.S. at 486; *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 420 (1971).

In public debate, our "'citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.'" *Schenck*, 519 U.S. at 373 (quoting *Boos*, 485 U.S. at 322). Consequently, the testimony of the Attorney General[4] that demonstrators display "discomfiting pictures of aborted fetuses" and shout "baby killers" and "murderers," which "spark[s] reaction and response" is unavailing because "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (citations omitted).

Furthermore, because the Act applies to willing and unwilling listeners alike, the rights of listeners and recipients of leaflets are greatly impacted. It is "well established that the Constitution protects the right to receive information and ideas," and this right "is fundamental to our free society." *Stanley v. Georgia*, 394

---

[4] App. at 174, 176.

U.S. 557, 563 (1969). Young vulnerable women have the right to receive information about abortion from counselors who have no economic interest in abortion. Experience has proven that many women suffer regret and would not have chosen abortion had a prolife counselor been there to give them information, aid, and comfort. *See* App. 70-84. It is unconstitutional for the Commonwealth to decide which speakers these patients can hear and which they cannot.

### c. The Government's ability to restrict speech in "quintessential" public forums is limited.

"Third, the public sidewalks, streets, and ways affected by the [Act] are 'quintessential' public forums for free speech." *Hill*, 530 U.S. at 715. A public forum occupies "a 'special position in terms of First Amendment protection'" where "the government's ability to restrict expressive activities 'is very limited.'" *Boos*, 485 U.S. at 318 (quoting *United States v. Grace*, 461 U.S. 171, 180 (1980), and *id.* at 177). "In these quintessential public forums, the government may not prohibit all communicative activity." *Perry Educ. Ass'n*, 460 U.S. at 45. "[I]t is difficult, indeed, to justify a prohibition on *all* uninvited approaches of persons seeking the services of the clinic, regardless of how peaceful the contact may be, without burdening more speech than necessary to prevent intimidation and to ensure access to the clinic." *Madsen*, 512 U.S. at 774 (emphasis in original). "Absent evidence that the protesters' speech is independently proscribable . . .

16

[such a] provision cannot stand." *Id*. It's obviously *much more* difficult to prohibit *invited* approaches, as the Act does here.

### 2. The Commonwealth's Interests.

"It is a traditional exercise of the States' 'police powers to protect the health and safety of their citizens.'" *Hill*, 530 U.S. at 715 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996)). "That interest may justify a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests." *Hill*, 530 U.S. at 715 (citations omitted). "[R]ules that provide specific guidance to enforcement authorities serve the interest in evenhanded application of the law." *Id*.

The legislative bill underlying the Act recited the Government's interest as protecting the right of "pedestrians" to "travel peacefully on Massachusetts streets and sidewalks" and to set out "clearly defined boundaries" to "improve the ability of safety officials to protect the public." App. at 168. In its Proposed Findings of Fact,[5] the Commonwealth identified its interests as preserving public safety and access to health care in areas "immediately outside RHCF entrances and driveways" and "those locations . . . very close to clinic entrances and driveways." App. at 294-97. The targeted areas of the Act fall far short of accomplishing the

---

[5] A party's proposed findings of fact constitute binding admissions. *See*, *e.g.*, *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1127 (3d Cir. 1993); *United States v. Bedford Assocs.*, 713 F.2d 895, 905 (2d Cir. 1983).

17

Commonwealth's asserted goal of protecting the rights of *all* pedestrians on *all* streets and sidewalks throughout Massachusetts. On the other hand, the zone burdens more speech than necessary to ensure access at areas "immediately outside RHCF entrances and driveways." *Id.*

### 3. The Act does not distinguish between willing and unwilling listeners.

It is "important when conducting this interest analysis to recognize the significant difference between state restrictions on a speaker's right to address a willing audience and those that protect listeners from unwanted communication." *Hill*, 530 U.S. at 715-16. "The right to free speech, of course, includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speaker's message may be offensive to his audience." *Id.* at 716. In "a public forum, one of the reasons we tolerate a protester's right to wear a jacket expressing his opposition to government policy in vulgar language is because offended viewers can 'effectively avoid further bombardment of their sensibilities simply by averting their eyes.'" *Id.* at 716 (quoting *Cohen v. California*, 403 U.S. 15, 21 (1971)).

The statute in *Hill* applied only to communications directed at an unwilling listener.[6] *Id.* at 716-17. But, the Act makes *no distinction* between willing and

---

[6] *Hill* does not hold that there is a right to avoid unpopular speech in a public forum. 530 U.S. at 718 n.25.

unwilling listeners.  This is a significant departure from *Hill*.  Government has *no interest whatsoever* in prohibiting speakers from communicating to willing listeners especially where, as here, the record contains no eye-witness police testimony evidencing substantive evils such as detaining, impeding, blocking, stalking, harassing, trespassing, threatening, or violence.  *See infra* at pp. 51-58.

### 4.     Classifying the Act.

#### a.     The Act is content based as drafted.

At first blush, the Act appears to be content neutral because it does not specifically mention a particular subject or viewpoint.  But, looking merely at the bare text is insufficient because "[t]he recitation of viewpoint-neutral grounds may be a mere pretext for an invidious motive.  In practical terms, the government rarely flatly admits it is engaging in viewpoint discrimination." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86 (1st Cir. 2004) (citing *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc*., 473 U.S. 788, 811-13 (1985) (reasonable grounds for speech restrictions "will not save a regulation that is in reality a facade for viewpoint-based discrimination")).  So it is here.  The legislative history and statutory exemptions reveal the Act was motivated by viewpoint discrimination. There are at least seven reasons for this.

**b.    Doubling the size of the zone was arbitrary
and capricious.**

First, the Legislature doubled the size of the fixed portion of the zone from

18 feet to 35 feet.  App. at 44, 46.  In 2000, the legislature determined that an 18-

foot fixed buffer was sufficient to protect its interests.  *Id*. at 46.  In the intervening

seven years between enactment of the old and new buffer laws nothing changed.

The legislative record contains no testimonial or documentary evidence indicating

the original 18-foot fixed buffer was insufficient to serve the Commonwealth's

claimed interest in public safety.

Moreover, the Commonwealth admits that the alleged problems the statute

was designed to remedy are *immediately adjacent to* RHCF driveways and

entrances.  App. at 294-98.  It was not reasonable to push demonstrators 35 feet

away from areas claimed to be problematic.

**c.    The zone causes public safety hazards.**

Second, the asserted purpose for the Act is public safety.  App. at 168.  Yet,

the fixed zone is so large that the buffer line can reach into the middle of the street

where abortion opponents can be struck by moving vehicles.  *See* App. at 52, 67,

264-272.  The Commonwealth apparently had no problem placing the physical

safety of abortion opponents at serious risk despite its claim that the Act was

designed to serve public safety.  The Act *causes* public safety hazards.  Claims of

public safety were largely pretext.

20

### d.    The statute is significantly underinclusive.

Third, the statute in *Hill* applied to all health care facilities and not only those that performed abortions.  The Supreme Court found that fact significant in determining content neutrality, noting that the "the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive."  *Hill*, 530 U.S. at 731.  Here, the buffer zone applies only to non-hospital RHCFs even though the asserted purpose of S. 1353 is to protect *all* pedestrians on *all* public streets and sidewalks throughout the Commonwealth. *See* App. at 168.  The Act is therefore greatly underinclusive.  This raises an inference that the real target of the Act was speech at RHCFs.

### e.    The exemption for RHCF employees/agents was unnecessary.

Fourth, there was no legitimate basis for giving RHCF employees/agents special exemption from the Act.[7]  Unlike the prior statute, which allowed anyone and everyone to enter the 18-foot fixed zone, the "no enter zone" under the Act is virtually empty of people.  Therefore, the physical safety of patients is not at risk.

The Attorney General testified that demonstrators display "discomfiting pictures of aborted fetuses" and shout "baby killers" and "murderers," which "spark[s] reaction and response."  App. at 174, 176.  Shielding patients from such

---

[7] RHCF employees and agents entering and leaving the clinic are covered by the second exemption.

21

speech, and not patients' physical safety, appears to be the reason for exempting escorts. But, "direct impact of speech" upon the listener is a primary effect that cannot be used to justify a time, place, and manner regulation, because content-neutral regulations must be justified *without reference to content. See Boos*, 485 U.S. at 321.

After passage of the Act, a Planned Parenthood security guard testified that, "[p]atients and their companions *still hear the protestors, view their signs, and become frustrated and upset*, but there has not been the same level of tension as there was before the [Act] took effect. Because there are fewer people in the path to the door, *it is easier for people to enter more quickly*." App. at 124 (emphasis added). Granting exemption to RHCF agents so they can help patients avoid non-violent and non-threatening speech is unconstitutional. *See Schenck*, 519 U.S. at 373; *Boos*, 485 U.S. at 322). The Commonwealth is using private individuals to do indirectly what it cannot do directly—shelter people from speech that may be unwanted or unpopular. This is impermissible.

### f.   The alleged vagueness of the prior statute was pretext.

Fifth, of major concern to supporters of the Act, was alleged vagueness of the floating buffer law. App. 96-117. But, *McGuire I* described the original buffer statute as "careful craftsmanship," "clearly marked," and "precisely focused." 260 F.3d at 49. Thus, vagueness could not have been a valid basis for the Act.

22

**g.    The record lacks substantial evidence from unbiased sources.**

Sixth, as shown *infra* at Section III pp. 51-58, there is scant objective evidence in the record from unbiased sources demonstrating a need for an expanded buffer.  If the problems alleged by the Commonwealth were serious and recurring there should be a record of arrests and convictions.  But, there isn't.  *See id.* The lack of unbiased evidence together with a lack of arrests and convictions raises an inference that the Government's goal was to suppress unpopular speech.

**h.    The claimed "emergency" in the Preamble was non-existent.**

Finally, the Act was enacted on an emergency basis when nothing in the record indicates an emergency.  The matter before the Legislature was not like *Bl(a)ck Tea Soc'y v. City of Boston*, where there were heightened security concerns in light of 9/11.  378 F.3d 8, 10 (1st Cir. 2004).  Nor was it like *Menotti v. City of Seattle*, a case that warranted a one-time emergency order establishing a "no entry" zone because of widespread violence, riots, assaults, arson, and vandalism.  409 F.3d 1113, 1120-23 (9th Cir. 2005).  The claimed emergency here was nothing but a pretext to suppress unpopular speech as quickly as possible.

The pattern that emerges is easy to see.  The Commonwealth enacted an "emergency" law to "fix" a problem that didn't exist.  The only explanation for the expanded buffer zone is invidious discrimination toward the views of abortion

opponents. This renders the Act content based notwithstanding its declared content-neutral purpose.

### 5. The Act is content based as interpreted.

As interpreted by the Attorney General's Office,[8] the Act is undoubtedly content based because it expressly bans from the zone all "abortion and partisan speech." *See* Addendum C. This is unlike the ban on "abortion and partisan speech" in the prior statute that only construed the term "scope of employment" in the second exemption. *See McGuire II*, 386 F.3d at 52-53 and n.1 (finding that "the Attorney General has clearly construed the exemption to exclude pro-abortion or partisan speech from the term 'scope of their employment.'"). The Attorney General's construction of the term "scope of employment" in *McGuire* did not altogether prohibit RHCF employees/agents from speaking about abortion and partisan matters in the zone. It merely stated that, if they did, they were not protected by the exemption and, therefore, could not make unconsented approaches to unwilling listeners.

In this case, the Commonwealth again construed the RHCF employee/agent exemption to prohibit abortion and partisan speech. *See* Addendum C. To that extent, it is supported by *McGuire*. But, the Commonwealth did more – it

---

[8] Throughout its opinion, the District Court relied on a letter issued by the Attorney General's office interpreting the Act, yet did not consider the interpretation in analyzing the statute for content neutrality. Addendum A at 32-36. This was error.

construed the fourth exemption as expressly prohibiting *anyone* from speaking about abortion and partisan speech inside the zone. *Id*. Because this exemption bans *only* abortion and partisan speech, it is a content-based restriction on speech. *Cf. Hill*, 530 U.S. at 723 (the statute "places no restrictions on – and clearly does not prohibit – either a particular viewpoint or any subject matter that may be discussed by a speaker").

In evaluating the Commonwealth's facial challenge, the Court "must consider the [State's] authoritative constructions of the [statute], including its own implementation and interpretation of it."[9] *Forsyth County*, 505 U.S. at 131 (listing cases). But, this applies only if the interpretation places limits on a statute that *avoids* constitutional infirmity. *See McGuire I*, 260 F.3d at 47. Here, rather than bringing the Act into constitutional compliance, the Attorney General's interpretation makes it unconstitutional. Nevertheless, in Massachusetts "the duty of statutory interpretation rests in the [state] courts," not enforcement agencies. *Commerce Ins. Co. v. Comm'r of Ins.*, 852 N.E.2d 1061, 1064 (Mass. 2006) (citation omitted). The Attorney General's interpretation of the Act is not binding and should be rejected.

---

[9] The District Court characterized as "largely irrelevant" facts offered by McCullen demonstrating how the Act was implemented and enforced. Addendum A at 4.

### 6.    The Act cannot withstand strict scrutiny.

Whether as drafted or construed, the Act is content based because it targets abortion-related speech (as construed both abortion and partisan speech). "'The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" *Hill*, 530 U.S. at 723 n.31 (quoting *Carey v. Brown*, 447 U.S. 455, 462 n.6 (1980)). A content-based restriction "can stand only if it satisfies strict scrutiny" and thus is only constitutional if it is "narrowly tailored to promote a compelling Government interest." *Playboy Entm't Group, Inc.*, 529 U.S. at 813. Content-based restrictions "rarely survive constitutional scrutiny." *McGuire I*, 260 F.3d at 43.

To justify a content-based exclusion, the Commonwealth must show that its regulation is *necessary* to serve a compelling state interest and it is the least restrictive means of achieving that interest. *Perry Educ. Ass'n*, 460 U.S. at 45 (citation omitted). At trial, the Commonwealth conceded that the reach of the statute is unnecessary. App. at 301: (THE COURT: "Is it your position that 36 feet (sic) may not have been necessary but it was a permissible choice for the Legislature to make?" MR. SALINGER: "Absolutely, Your Honor"). Moreover, the Supreme Court has used only the terms "legitimate interest" and "strong interest" to describe the government's interest in protecting the health and safety of

26

women accessing health care facilities. *Hill*, 530 U.S. at 715 (legitimate interest); *Madsen*, 512 U.S. at 767-68 (strong interest). The Act is a content-based restriction on speech that cannot survive strict scrutiny. It therefore is unconstitutional.

### C.    The Act Flunks the Time, Place, and Manner Test.

#### 1.    The legal standard.

Assuming, *arguendo*, the Court finds the Act content neutral, it still is unconstitutional. "Reasonable restrictions as to the time, place, and manner of speech in public forums are permissible, provided those restrictions 'are justified without reference to the content of the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information.'" *Bl(a)ck Tea Soc'y*, 378 F.3d at 12 (quoting *Ward*, 491 U.S. at 791). "To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799 (citation omitted). A content-neutral regulation that entirely forecloses a means of communication must be the least restrictive or least intrusive means of serving the statutory goal. *Hill*, 530 U.S. at 726.

"A [regulation] is narrowly tailored if *it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.*"  *Frisby*, 487 U.S. at 485 (emphasis added) (citing *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 808-10 (1984)).  *See also Ward*, 491 U.S. at 799 n.7 (describing "the essence of narrow tailoring" as "focus[ing] on the source of the evils the [government] seeks to eliminate . . . and eliminates them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils").  "[T]he narrow-tailoring test requires the district court to consider whether the regulation challenged on First Amendment grounds sweeps more broadly than necessary to promote the government's interest."  *Casey*, 308 F.3d at 114.  "[C]ourts are not merely to defer to the government's subjective judgment."  *Id.* (quotation marks and citation omitted).

*Casey* is instructive.  There, the Court analyzed a "no sound amplification" restriction in a city-issued business license under the time, place, and manner test.  308 F.3d at 109-116.  The Court held that *the burden is on government* to bring forth facts proving the regulation *burdens no more speech than necessary*, which is not to say the government must show that it chose the least restrictive means of achieving its interest.  *Id.* at 115 (citing *Ward*, 491 U.S. at 802).  This is especially true where existing laws are sufficient to meet the government's concerns, as they

28

are here.[10]    *Id*.    Further, where the regulation bans an entire mode of communication, as the Government does here by making large portions of public forums "speech-free zones," the burden is on the Government to demonstrate why less restrictive alternatives are inadequate.  *Id*.  This the Commonwealth cannot do.

### 2.    The Act does not pass constitutional muster.

The Act is radically different from the statute in *Hill*, as a side-by-side comparison demonstrates.  The 8-foot floating buffer statute in *Hill* regulated only the display of signs, leafletting, and oral speech.  530 U.S. at 726.  Here, the Act regulates *all* of McCullen's expressive activities and *all* those of virtually everyone else because they may not use the zone for *any* purpose other than travel.  *See* Addendum B.  The sweep of the Act thus is much broader than *Hill*.

---

[10] *See*, *e.g.*, Mass. Gen. Laws ch. 266: Section 120E1/2(e) (making it unlawful to obstruct, detain, hinder, impede or block another person's entry to or exit from a RHCF); 18 U.S.C. § 248 (making unlawful the use of force or threats of force, or any physical obstruction, or any intentional injury, intimidation or interference, or any attempts to injure, intimidate or interfere with any person obtaining or providing reproductive health services, or to damage or destroy the property of a RHCF); Mass. Gen. Laws ch. 269: Section 1 (unlawful assembly); ch. 272: Section 53 (breach of the peace and disorderly conduct; ch. 265: Section 13A -13K (assault and battery);  ch. 265: Section 35 (throwing or dropping objects on the public way); ch. 265: Section 43 (stalking); and ch. 265: Section 43A (criminal harassment).  It is these types of unlawful activities that a buffer zone should be designed to prevent.  *See*, *e.g.*, *Schenck*, 519 U.S. at 381 (the "goal [of the buffer] is to ensure access" and "to keep the entrances clear").

In *Hill*, the High Court found that signs could easily be read from a distance of eight feet and that a demonstrator could stand anywhere in the zone to display it. 530 U.S. at 726.  By contrast, the 35-foot *radius* of the Act could place McCullen 70 feet and beyond from the recipient of a sign display because she may be on one side of the zone and the recipient on the other.[11]   Whether a small sign in a crowded area can be seen from a distance of 70 feet is highly doubtful.

Regarding oral communications, the *Hill* Court found that maintaining an 8-foot distance requirement "certainly can make it more difficult for a speaker to be heard, particularly if the level of background noise is high and other speakers are competing for the pedestrian's attention."  *Id*.  "More significantly," said the Court, "this statute does not suffer from the failings that compelled us to reject the 'floating buffer zone' in *Schenck*" because "[u]nlike the 15-foot zone in *Schenck*, this 8-foot zone allows the speaker to communicate at a 'normal conversational distance.'"  *Id*. at 726-27 (quoting *Schenck*, 519 U.S. at 377).  The Colorado statute also allowed speakers to stand stationary anywhere in the zone where listeners could pass within eight feet.  *Id.* at 727.

As noted *supra*, the Act places McCullen as far as 70 feet from listeners, willing and unwilling alike, making it impossible for McCullen to speak from a

---

[11] Once the recipient enters the zone, McCullen may not enter it to approach her. *See* Addendum B and C.

normal conversational distance in most instances,[12] and perhaps not able to be heard at all.  Also unlike *Hill*, the Act prohibits McCullen from standing stationary inside the zone where others may pass close by.  *Hill* and *Schenck* make clear such severe burdens are unconstitutional.

The *Hill* Court was most concerned about the burden the 8-foot buffer placed on handbilling:  "The burden on the ability to distribute handbills is more serious because it seems possible that an 8-foot interval could hinder the ability of a leafletter to deliver handbills to some unwilling recipients."  530 U.S. at 727. The Court upheld the Colorado statute because it did not "prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her

---

[12] The District Court disagreed that the First Amendment protects the right of speakers to speak from a normal conversational distance.  *See* Addendum A at 52-55.  However, the Second Circuit and other district courts have held otherwise. *See*, *e.g.*, *New York ex rel. Spitzer v. Operation Rescue National*, 273 F.3d 184, 204 (2d Cir. 2001) ("The zone imposes a severe burden on First Amendment rights by effectively preventing protestors from picketing and communicating from a normal conversational distance); *Brown v. City of Pittsburgh*, 543 F. Supp. 2d 448, 479 (W.D. Pa. 2008) (holding that an "eight foot zone allows a speaker to communicate at a normal conversational distance); *Halfpap*, 2006 U.S. Dist. LEXIS 97428 at *70-71 (striking down 20-foot fixed buffer zone at RHCFs because the Supreme Court "found in *Schenck* and reaffirmed in *Hill* that a fifteen-foot zone did not allow the speaker to communicate at a 'normal conversational distance'"); *New York ex rel. Spitzer v. Cain*, 418 F. Supp. 2d 457, 487 (S.D.N.Y. 2006) (holding that a 60-square-foot "demonstration corridor" in front of an RHCF "preserves opportunity for picketing and communication from a normal conversational distance along the public sidewalk") (quotation marks and citation omitted).

material, which the pedestrians can easily accept." *Id*. As in every case, unwilling recipients were free to decline the tender. *Id*.

Here, the Act makes it impossible for McCullen to stand near the path of patients entering the RHCF (her intended audience) because she must stay at least 35 feet away from the entrance. Moreover, it is often impossible for McCullen to know whether a pedestrian is actually a patient intending to go into a RHCF until the patient nears the entrance. App. 53, 58-59, 67-68. By then it's far too late. Furthermore, an unwilling recipient of literature often will either steer clear of the leafletter until it's much too late to make an effective effort. This is precisely the situation that concerned the Supreme Court in *Hill*. *See* 530 U.S. at 727. If the 8-foot interval in *Hill* "could hinder the ability of a leafletter to deliver handbills to some unwilling recipients," *id*., the 35- to 70-foot fixed interval here obviously is much more burdensome. This is particularly true where the only opportunity to leaflet is by the side of an RHCF driveway. App. 61-62, 157-64.

Finally, a reviewing court "'must, of course, take account of the place to which the regulations apply in determining whether these restrictions burden more speech than necessary.'" *Hill*, 530 U.S. at 728 (quoting *Madsen*, 512 U.S. at 772). Like *Hill*, the statute here regulates traditional public forums at RHCFs. As noted *supra*, this case is unlike *Hill*, where "demonstrators with leaflets might easily stand on the sidewalk at entrances (without blocking the entrance) and, without

32

physically approaching those who are entering the clinic, peacefully hand them leaflets as they pass by." *Id.* at 729-30. McCullen is not permitted anywhere near entrances, exits, and driveways. It cannot be doubted that the Act places severe burdens on McCullen's First Amendment rights.

The right to peacefully picket and distribute literature in traditional public forums has been upheld time and again. *See*, *e.g.*, *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (leafletting); *Schneider v. New Jersey (Town of Irvington)*, 308 U.S. 147, 163 (1939), (leafletting); *Thornhill v. Alabama*, 310 U.S. 88, 104 (1940) (leafletting and picketing); *Carlson v. California*, 310 U.S. 106, 113 (1940) (peaceful demonstration); *Martin v. City of Struthers*, 319 U.S. 141, 145 (1943) (leafletting); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341 (1995) (anonymous leafletting).

McCullen commenced the present suit to challenge a statute that prevents her from expressing her views on abortion through the same peaceful and vital methods approved in *Lovell, Schneider, Thornhill, Carlson,* and *McIntyre.* "Laws punishing speech which protests the lawfulness or morality of the government's own policy are the essence of the tyrannical power the First Amendment guards against." *Hill*, 530 U.S. at 787 (Kennedy, J., dissenting). "Nowhere is the speech more important than at the time and place where the act is about to occur." *Id.* at 788. "For these protesters the [35-foot] zone in which young women enter a

building is not just the last place where the message can be communicated.  It likely is the only place.  It is the location where the Court should expend its utmost effort to vindicate free speech, not to burden or suppress it." *Id.* at 789.

The Act is not narrowly tailored because it targets much more than the evil it seeks to remedy.  It therefore is unconstitutional.

### D.    The Act is Substantially Overbroad.

The overbreadth doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (plurality) (quoting *Broadrick*, 413 U.S. at 615).

In weighing overbreadth, the first consideration is whether and to what extent the statute reaches protected conduct or speech.  *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). The second is determining the "plainly legitimate sweep" of the statute, i.e., the sweep that is justified by the government's interest.  *See Broadrick*, 413 U.S. at 615.  The third is determining the likely chilling effects of the statute.  *Id*. The last step involves weighing these various factors together, paying particular attention to the burden on speech when judging the illegitimate versus legitimate sweep of the statute.  *Id*.

### 1. Virtually all lawful conduct is banned from the zone.

Regarding the first consideration, the Act effectively excludes from the zone *all* types (political, religious, educational, conversational, entertainment, etc.) and *all* manner (oral communications, hand-billing, sign display, etc.) of speech. It reaches not only the abortion-related speech of McCullen, but also commercial speech (sale of Girl Scout cookies, newspapers, lemonade), charitable solicitations (Salvation Army bell-ringer, National Cancer Society), labor picketing or organizing (unionization of RHCF employees or demands for better wages/work environment), petition circulating (local, state, or national elections), entertainment (poetry, drama, singing, music, painting, etc.), and even panhandling, all of which is protected by the First Amendment. *See*, *e.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976) (commercial speech); *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (charitable solicitations); *Thornhill*, 310 U.S. at 104 (picketing); *McIntyre*, 514 U.S. at 347 (circulating petitions); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 602 (1998) (music, drama, poetry, painting), and *Loper v. N.Y. City Police Dep't*, 999 F.2d 699, 701-06 (2d Cir. 1993) (panhandling). These few examples demonstrate that the Act's reach toward protected speech is not only

substantial, but staggering.[13]

Moreover, the Act infringes not only on speech protected by the First Amendment, but also liberty interests protected by the Fourteenth Amendment. The "right to remove from one place to another according to inclination [i]s an attribute of personal liberty protected by the Constitution." *Morales*, 527 U.S. at 53-54 (quotation marks and citation omitted).

As already noted, the Act prohibits virtually all persons from standing in or utilizing the zone for any and all purposes other than "reaching a destination other than such facility." Addendum B. As noted by the Supreme Court, "[a] street is continually open, often uncongested, and constitutes not only a necessary conduit in the daily affairs of a locality's citizens, but also a place where people may enjoy the open air or the company of friends and neighbors in a relaxed environment." *Heffron*, 452 U.S. at 651. Yet, the Act prohibits a person from standing in the zone for such innocent purposes as smoking a cigarette, making a cell phone call, reading a newspaper, or conversing with an acquaintance. A person may not stand in the zone to wait for a bus or taxi, to drink a cup of coffee, or even people-watch. These are just a few of several innocent uses of the public ways banned by the Act.

---

[13] The District Court erred when it concluded that McCullen did not establish that "the impact of the statute on the conduct of other speakers will differ from its impact on their own sidewalk counseling." Addendum A at 59 (quoting *Hill*, 530 U.S. at 732). The foregoing demonstrates that there are several types expressive activities that differ substantially from McCullen's, yet are impacted by the Act.

36

## 2. The Act sweeps within its ambit a large amount of constitutionally-protected conduct.

As for the second consideration, McCullen assumes, but does not concede, that the Act was designed to protect the health and safety of women seeking reproductive health care services. *McGuire I*, 260 F.3d at 44. Even so, the significance of the governmental interest must be assessed in light of the nature and function of the particular forum involved. *Grayned v. City of Rockford*, 408 U.S. 104, 116-17 (1972); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 302-03 (1974).

The restrictions on speech here are vastly different from the "exceedingly modest restriction" imposed by the Colorado statute in *Hill*. 530 U.S. at 729. There, the High Court reasoned that restricting categories of speech without reference to the subject demonstrated content neutrality because all persons fell within the statute's legitimate sweep, i.e., close unwanted approaches. *Id.* at 732. Under Colorado's statute, every citizen was free to use the zone for every mode of speech so long as no close unwanted approach was made.

Here, the Commonwealth excluded *all* communicative activity from the zone as well as a host of other constitutionally-protected conduct. But, unlike *Hill*, most of these activities do not fall within the statute's *legitimate* sweep. For example, unobtrusive sign display, leafletting, oral communications, or prayer *that do not block, impede, or harass*, do not fall within the statute's legitimate sweep.

37

Neither does the mere wearing of buttons, t-shirts, or caps with abortion or partisan messages. Nor does the unobtrusive selling of newspapers or Girl Scout cookies, circulating petitions, soliciting charitable contributions, or labor organizing that do not block, impede, or harass, fall within the statute's legitimate sweep. Finally, no legitimate governmental interest justifies prohibiting persons from using the public sidewalk while waiting for a bus or taxi, drinking a cup of coffee, or smoking a cigarette.

*Board of Airport Commissioners v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987) is instructive. There, the government created a "virtual 'First Amendment Free Zone.'" *Id*. at 574. The unanimous Court noted that, as here, "the resolution does not merely regulate expressive activity . . . that might create problems such as congestion or the disruption of the activities," but rather "reaches the universe of expressive activity . . . by prohibiting *all* protected expression." *Id.* (emphasis in original). The zone was struck down as substantially overbroad "because no conceivable governmental interest would justify such an absolute prohibition of speech." *Id*. at 575, 577. Similarly, a restriction that "virtually ban[ned] speech" on a public pedestrian easement was characterized as a "First Amendment Free Zone" and struck down as substantially overbroad. *See First Unitarian Church of Salt Lake City v. Salt Lake City Corp*., 308 F.3d 1114, 1131-33 (10th Cir. 2002).

The "no enter zone" here likewise is an unconstitutional "First Amendment Free Zone."

Finally, the areas targeted by the Act are "quintessential" forums for speech. *See Frisby*, 487 U.S. at 480. Consequently, even where the interest of the State is legitimate, it still must not unduly infringe the rights of citizens to peacefully use the public ways. *See Jews for Jesus, Inc.*, 482 U.S. at 574. There simply is no way the Commonwealth can justify prohibiting the sale of cookies, newspapers, or lemonade; labor picketing; charitable solicitations; petition circulating; open-air music, drama, and poetry; and panhandling. Obviously these activities bear no relation to the Act's "legitimate sweep."[14] *See Broadrick*, 413 U.S. at 615. The Act is overbroad because it "sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments." *Grayned*, 408 U.S. at 115.

---

[14] The District Court erred in concluding the Act is not overbroad. The District Court based its conclusion on a passage from *Hill* taken out of context that characterized the "comprehensiveness" of the Colorado statute as a "virtue not a vice." Addendum A at 58 (quoting *Hill*, 530 U.S. at 731). However, the passage relied on by the District Court was discussing *where* the statute applied, i.e., all medical facilities, and not just RHCFs. *Id.* The Court noted that such comprehension was "evidence against discriminatory governmental motive." *Id.* The Court was not discussing the statute's sweep toward expressive activities, but rather "the specific concern that led to its enactment." *Hill*, 530 U.S. at 730-731.

### 3. The Act places a chilling effect on protected speech.

Regarding the third consideration, the chilling effect on protected speech is palpable. The Act excludes from the zone all non-travel activity, including expressive activity, and exacts a penalty of up to three months incarceration and/or a $500 fine for a first offense. *See* Addendum B, Section 120E1/2(d). Moreover, police are often present and casting a watchful eye over the zone – obviously a very real chilling effect. App. 49, 56, 62, 65, 137, [26-27] 144-45.

### 4. The competing interests favor free speech.

Finally, weighing the competing interests, it is plain that the burden visited on virtually all expressive activities outweighs any legitimate interest purporting to underlie the Act. Consequently, the Act impermissibly punishes a "substantial" amount of protected free speech "judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615.

### E. The Act is an Unlawful Prior Restraint.

#### 1. The plain text of the Act demonstrates an unlawful prior restraint.

A prior restraint exists whenever a law "'limits or conditions in advance the exercise of protected First Amendment activity.'" *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 20 n.15 (1st Cir. 2007) (quoting *Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115, 1120 (1st Cir. 1981)). "'Any system of prior restraints of expression . . . bear[s] a heavy

presumption against its constitutional validity.'" *Id.* at 20 n.15 (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 68, 70 (1963)). An unlawful prior restraint exists where the regulation forecloses an entire channel of communication. *See*, *e.g.*, *Hill*, 530 U.S. at 733-34 (statute was not an unlawful prior restraint because "absolutely no channel of communication is foreclosed").

On its face, the text of the Act prevents speakers from communicating from a normal conversational distance and bars leafletters from standing near the path of pedestrians, both of which severely limit access to the intended audience. It also unnecessarily blocks McCullen's access to *willing listeners* and needlessly makes arduous the ability of *willing recipients* to receive information. It is the ability to win the attention and reach the minds of people that is the *sine qua non* of free speech. *See*, *e.g.*, *Hill*, 530 U.S. at 728*; Heffron*, 452 U.S. at 655.

McCullen does not argue, as did the petitioners in *Schenck* and *Madsen*, that the prior restraint is unlawful merely because it is content or viewpoint based. At issue in those cases, unlike this one, were court-ordered injunctions that remedied prior unlawful conduct occurring in the context of large abortion demonstrations. *See Schenck*, 519 U.S. at 374 n.6; *Madsen*, 512 U.S. at 764 n.2. Neither is McCullen's contention like the petitioners' argument in *Hill*, which was that the "no approach without consent" provision amounted to a prior restraint. 530 U.S. at 733-34. The Supreme Court rejected that argument because the Colorado statute

allowed all sorts of expressive activities in the zone. Consequently, *Hill*, *Schenck*, *and Madsen* are distinguishable.

McCullen contends that the Act has the *effect* of banning virtually all persons from engaging in every sort of speech activity within a substantial portion of traditional public forums. The Supreme Court has intimated that an unlawful prior restraint may exist where, as here, a speech restriction forecloses an entire means of communication and is not a remedy for prior unlawful conduct.[15] *See Hill*, 530 U.S. at 734; *Schenck*, 519 U.S. at 374 n.6; and *Madsen*, 512 U.S. at 764 n.2.

"Regulations governing in advance the time, place or manner of expression permitted in a particular public forum are valid if they serve important state interests by the least restrictive means possible." *Fantasy Book Shop*, 652 F.2d at 1120 (citation omitted). A prior restraint is analyzed under the four-part test set forth in *United States v. O'Brien* and is permissible "'(1) if it is within the constitutional power of the Government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on First

---

[15] In *Bl(a)ck Tea Soc'y*, this Court stated, "[t]he Supreme Court has explicitly rejected attempts to analyze security-based time-place-manner restrictions as prior restraints." 378 F.3d at 12 (citing *Hill*, 530 U.S. at 733-34; *Schenck*, 519 U.S. at 374 n.6; and *Madsen*, 512 U.S. at 763 n.2). However, those cases did not entirely foreclose the possibility that a time, place, and manner regulation can constitute an unlawful prior restraint.

Amendment freedoms is no greater than is essential to the furtherance of that interest.'" *Fantasy Book Shop*, 652 F.2d at 1120 (quoting *O'Brien*, 391 U.S. 367, 377 (1968)).

McCullen acknowledges that time, place, and manner regulations are within the constitutional power of government. She further acknowledges that peace and public safety are legitimate government interests. And, while McCullen contends that the Act constitutes viewpoint discrimination because it exempts certain classes of persons with pro-choice viewpoints, she does not rely on that exclusively in her prior restraint analysis. Rather, it is the failure to meet the fourth prong of *O'Brien* that renders the Act an unlawful prior restraint because the incidental restrictions on speech cannot be considered *essential* to further the Commonwealth's interests.

As pointed out *supra* p. 31 n.12, the Commonwealth has several alternative means of protecting its interest in public safety without effectuating a total ban on expressive activity. "'Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'" *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988) (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)). The text of the Act fails the *O'Brien* test and should be enjoined as an impermissible prior restraint on speech.

### 2. The Act is a prior restraint as interpreted by the Attorney General.

The Attorney General's interpretation of the Act renders it a prior restraint because it expressly forbids all abortion and "partisan" speech before such speech occurs. *See* Addendum C. *See Garcia-Padilla*, 490 F.3d at 20 n.15 (a prior restraint exists whenever a law "limits or conditions in advance the exercise of protected First Amendment activity") (quotation marks and citation omitted). "To provide maximum assurance that the government will not throw its weight on the scales of free expression, thereby manipulating public debate through coercion rather than persuasion, courts presume content-based regulations to be unconstitutional." *McGuire I*, 260 F.3d at 43 (quotation marks and citations omitted); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Because the Commonwealth cannot demonstrate a compelling interest the prior restraint is impermissible.

### F. The Act Constitutes Viewpoint Discrimination and Violates the Right to Equal Protection.

#### 1. The text of the Act discriminates according to viewpoint.

"[V]iewpoint-based discrimination is a particularly offensive type of content-based discrimination." *McGuire I*, 260 F.3d at 43 (citation omitted). "Governmental restrictions on the content of particular speech pose a high risk that the sovereign is, in reality, seeking to stifle unwelcome ideas rather than to achieve

legitimate regulatory objectives." *Id.* at 42 (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994)). "To provide maximum assurance that the government will not throw its weight on the scales of free expression . . . courts presume content-based regulations to be unconstitutional." *Id.* at 43. "While courts theoretically will uphold such a regulation if it is absolutely necessary to serve a compelling state interest and is narrowly tailored to the achievement of that end, *see*, *e.g.*, *Boos*, 485 U.S. at 321-29; *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 231-32 (1987), such regulations rarely survive constitutional scrutiny." *McGuire I*, 260 F.3d at 43.

Viewpoint discrimination need not be overt or even intentional. It exists where "regulation limited to the details of a speaker's delivery results in removing a subject or viewpoint from effective discourse" while permitting other subjects or viewpoints. *Hill*, 530 U.S. at 736 (Souter, J., concurring) (citing *Ward*, 491 U.S. at 791). Put another way, a regulation that *impacts the speech* of some more than others is content neutral so long as *conduct* is regulated in an even-handed manner. *See id*. at 719 (finding content neutrality because "the statute's restrictions apply equally to all demonstrators, regardless of viewpoint") (quotation marks and citation omitted). But, where the regulation treats *conduct* unequally, and the unequal treatment of *conduct* favors or disfavors one speaker over another, the regulation is considered viewpoint or content based and reviewed under strict

45

scrutiny. *See id.* at 738-39 (Souter, J., concurring). As shown below, the Act unjustifiably treats the *conduct* of RHCF employees/agents differently from all other speakers, and *the different treatment of conduct* results in favor toward pro-choice speakers and disfavor toward all other speakers. It therefore constitutes a content-based restriction on speech and is subject to strict-scrutiny review.

### 2.     The Act violates the Equal Protection Clause.

In addition to constituting viewpoint or content-based discrimination, the Act also violates the Fourteenth Amendment guarantee to equal protection. As shown below, RHCF employees and agents are similarly situated to other persons with respect to the exercise of expressive activities and personal liberties, yet are classified differently by the Act. Where different classifications impact fundamental rights, such as the First Amendment, the law is subject to strict scrutiny and can survive review only if it serves a compelling state interest and is the least restrictive means of achieving that interest. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988); *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973); *Police Dep't v. Mosley*, 408 U.S. 92 (1972). Under strict scrutiny, the presumption of validity usually afforded legislative judgments does not apply and the state carries a "heavy burden of justification" for its unequal treatment. *Rodriguez*, 411 U.S. at 16.

46

By its plain terms, the Act grants RHCF employees/agents unfettered access to the zone while denying similar access to most others. *See* Addendum B. RHCF agents, i.e., escorts,[16] express pro-choice viewpoints. App. at 52, 58, 67. They surround, yell, make noise, chatter, and/or talk loudly to clinic patients for the purpose of disrupting or drowning out prolife speech. *Id*. They tell clinic patients not to listen to those "crazy" people. *Id*. at 58, 57. Escorts have pushed, shoved, and blocked persons with prolife viewpoints and, at times, flailed their arms to prevent prolife advocates from placing literature near the hands of clinic patients. *Id*. at 52, 58, 67. While in the zone, they drink coffee, smoke, and converse with each other. *Id*. at 59, 68. So, too, do companions of clinic patients, another class of persons exempted from the Act.[17] 53, 59, 68. By the Act's express terms, virtually all other persons are excluded from the zone for nearly all purposes.[18] *See* Addendum B, C.

The Prior Act was found to be content/viewpoint neutral on the ground that the "differential treatment" was justified "on an objective basis" because "the secondary effects that the [Prior] Act was designed to ameliorate include[d] securing public safety in and around RHCFs" and "because clinic employees often

---

[16] Escorts are agents of Planned Parenthood. App. at [28] 88.

[17] *See* Addendum B.

[18] As noted *supra*, the Attorney General's interpretation of the Act should be rejected because it renders the Act unconstitutional content based.

47

assist[ed] in protecting patients and ensuring their safe passage as they approach RHCFs." *McGuire I*, 260 F.3d at 45-46.

Unlike the present Act, however, the Prior Act permitted all persons to access any part of the zone so long as they did not make unconsented approaches from a distance of 6 feet or less. There was, then, a possibility that the zone could become crowded and therefore make navigation by clinic patients difficult. Furthermore, the Commonwealth construed the Prior Act as applying equally to all persons, including RHCF employees/agents. *McGuire II*, 386 F.3d at 64.

The same is not true of the Act. The Act *unnecessarily* exempts RHCF employees/agents. Because prolife advocates and virtually all other persons are excluded from the zone, there is no longer any need for clinic patients to be "escorted" through it. Put another way, there is absolutely no danger of an unwanted approach or overcrowding; the zone itself fully secures the safety of clinic patients without any need for escorts. Thus, the rationale employed to uphold the employee/agent exemption of the Prior Act does not apply here, making *McGuire I and II* distinguishable. The employee/agent exemption promotes a particular side of the abortion debate – the pro-choice view. This renders the exemption discriminatory and therefore unconstitutional.

### G. As Interpreted, the Act is Vague and Ambiguous.

The Attorney General's guidance letter introduced a new essential term that is vague and ambiguous – "partisan speech." Addendum C. Does the Commonwealth mean to ban from the zone all speech that is supportive, biased, or favorable toward a particular person, entity, or cause? For example, does the Act forbid speech demonstrating allegiance to the United States, its flag, or its President? Does the Act ban speech showing favoritism toward the Boston Red Sox or New England Patriots? How about support for animal rights or cancer research? Is any of this "partisan" speech banned by the Act?

It is precisely this type of guessing game that the Fourteenth Amendment forbids. A law is unconstitutionally vague when it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill*, 530 U.S. at 732 (citation omitted). It also is vague where it "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108-09. As construed, the Act suffers from both of these deficiencies.

## III.   THE LEGISLATIVE RECORD IS INSUFFICIENT.

### A.    Standard of Review.

The Court's review of the legislative record is plenary.  "[W]here the trial court is called upon to resolve a number of mixed fact/law matters which implicate core First Amendment concerns, the review is plenary so that the court may reduce the likelihood of a forbidden intrusion on the field of free expression" *Sullivan v. City of Augusta*, 511 F.3d 16, 25 (1st Cir. 2007) (quotation marks and citation omitted).  "Plenary review is called for simply because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and [this Court] must thus decide for [itself] whether a given course of conduct falls on the near or far side of the line of constitutional protection." *Id.*  (quotation marks and omitted).

In the instant case, whether the legislative record was adequate to justify the Act is a mixed question of law and fact.  In particular, testimony of alleged unlawful conduct at RHCFs must be examined to determine whether it was unlawful or constitutionally protected.

### B.    Legislative Findings Are Not Binding on the Court.

As shown *supra* at 8-13, the Supreme Court and other federal courts make clear that buffer zones regulating speech are constitutional only if supported by a substantial factual record.  Consequently, the Legislature's view that the Act was

50

necessary to ensure public safety is not controlling. Courts must "protect First Amendment interests against legislative intrusion, rather than defer to merely rational legislative judgments." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 519 (1981). That "courts must accord substantial deference to the predictive judgments" of legislative bodies "does not mean that they are insulated from meaningful judicial review altogether." *Turner Broad. Sys.*, 512 U.S. at 665-66. On the contrary, "the deference afforded to legislative findings does not foreclose [the Court's] independent judgment of the facts bearing on an issue of constitutional law." *Id*. at 666 (quotation marks and citation omitted). "This obligation to exercise independent judgment when First Amendment rights are implicated . . . is to assure that, in formulating its judgments, [the government] has drawn reasonable inferences based on *substantial evidence*." *Id.* (emphasis added; citation omitted). The Court must decide whether the factual record was sufficient to justify the Act.

### 1.    Record evidence of unlawful conduct is lacking.

What is highly significant about the legislative record is not what it contains, but what it lacks. The record contains hardly any evidence, let alone *substantial* evidence, of unlawful conduct. For example, the record contains:

- No evidence of any arrests or convictions for obstructing;

- No evidence of any arrests or convictions for detaining;

51

- No evidence of any arrests or convictions for hindering;

- No evidence of any arrests or convictions for impeding;

- No evidence of any arrests or convictions for blocking;

- No evidence of any arrests or convictions for stalking;

- No evidence of any arrests or convictions for harassment;

- No evidence of any arrests or convictions for trespass;

- No convictions for making an unwanted approach;

- No evidence of prolife violence since the mid-1990's; and

- No evidence of that any injunction was issued since the mid-1990's.

### 2.     Prolife conduct at RHCFs was lawful.

The legislative record contains many allegations of conduct that may be offensive, but is not unlawful, e.g.,

- demonstrators paced back and forth across RHCF driveways and entrances;

- demonstrators stood by the front door of the RHCF, positioning themselves and their signs so it was difficult for anyone entering or leaving the RHCF to do so without coming into very close proximity and even physical contact with protesters;

- demonstrators spoke to or yelled at patients and their companions from distances of much less than six feet, in a manner that often prompted angry reactions;

- demonstrators continued to offer leaflets even after the offer was declined;

- demonstrators continued to speak even after being asked to stop;

- demonstrators displayed "graphic and discomfiting pictures of aborted fetuses" and shouted at and taunted patients, calling them 'baby killers' and 'murderers.'"

- demonstrators stationed themselves at the rear garage entrance to the RHCF, yelling from close range at cars entering the garage;

- demonstrators wore Boston police shirts and hats, walked right up to and yelled at cars trying to enter the RHCF's garage, and videotaped and took still photographs of patients and staff from close range;

- demonstrators dressed in a manner suggesting they were police officers, stood near an entrance to the parking lot, and tricked patients into supplying them with their names, addresses, and telephone numbers.

App. at 170-182, [1-52] 198-249.  It may be that the foregoing activities are annoying to some people, but they either are not unlawful or more appropriately remedied by injunction directed at actual offenders.

## C.    Complained of Conduct is Constitutionally Protected.

Graphic depictions of aborted fetuses are not unlawful, but constitutionally protected.  *See*, *e.g.*, *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821-822 (6th Cir. 2007) (graphic signs of aborted fetuses protected by First Amendment).  Neither is it unlawful to stand near entrances of RHCFs aside the path of patients;[19] on the contrary, it is often essential in order to effectively

---

[19] *See*, *e.g.*, testimony of Gail Kaplan complaining that prolife advocates "attempt to hand out brochures to the patients" and that, "[w]e fill out police reports almost every week regarding the way [prolife advocates] encroach upon the door, but

communicate a message.  *See Hill*, 530 U.S. at 727-28.  Of course, leafletting and oral communications are protected.  *Id*. at 715.  Even wearing police garb is not unlawful.  App. at [35] 148.

Similarly, speech short of "fighting words" that may prompt angry reactions is not unlawful.  "The fact that society may find speech offensive is not a sufficient reason for suppressing it.  Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection."  *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (quotation marks citation omitted).  *See also Playboy Entm't Group, Inc*., 529 U.S. at 826 ("The history of the law of free expression is one of vindication in cases involving speech that many citizens may find shabby, offensive, or even ugly"); *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949) ("a function of free speech under our system of government is to invite dispute").

The affidavit of a Planned Parenthood security guard underscores the *real* complaint by abortion providers: patients "hear the protestors, view their signs, and become frustrated and upset" as a result of hearing things like, "'We can help you'" or "'Mommy please don't kill me.'"  App. at 124-25.  However, regardless

---

nothing has changed."  App. at 171.  It is reasonable to infer that police refused to take action because the activities were lawful.

of how unsettling non-violent or non-threatening speech may be,[20] the First Amendment does not permit government to squelch speech because of listeners' reactions.  "'[I]n public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.'"  *Schenck*, 519 U.S. at 383 (quoting *Boos*, 485 U.S. at 322).  Therefore, listener reaction cannot serve as a legitimate basis for the Act.

### D.    Eye-Witness Testimony Does Not Support a Large Fixed Buffer.

With *very* few exceptions affidavit and deposition testimony by eye-witness police officers demonstrate that prolife activity outside RHCFs is peaceful and orderly.  The testimony of Boston Police Capt. William Evans, for example, contains no facts demonstrating violence or material lawlessness.  App. at 136-39, [1, 24-27, 33-37, 52] 140-151.  On the contrary, he described prolife demonstration as peaceful.  App. at [36] 89.  Indeed, the only allegedly unlawful activity he explicitly identified was conduct he *thought* might constitute impersonating a police officer. *Id.* at 139.  But, an arrest on that basis was dismissed by a state court on the ground the conduct was constitutionally protected.  *Id.* at [34-35] 147-48.

---

[20] Unlike *Madsen*, where physicians testified that protests were causing increased health risks for patients, see 512 U.S. at 781-82 n.5, there was no physician testimony here.

Capt. Evans' testimony focused not on materially unlawful conduct (detaining, obstructing, harassment, etc.), but rather on difficulty enforcing the floating buffer law. *Id*. It does not follow, however, that difficulty enforcing a 6-foot floating buffer against unwanted approaches warrants the creation of a fixed one nearly six times in size that prohibits wanted and unwanted approaches alike. Moreover, Capt. Evans testified that, of the few arrests made for alleged violation of the floating buffer law, the Brighton court threw out the charges on the ground the alleged unlawful conduct was protected by the First Amendment. *Id.* at [34-35] 147-48. Significantly, Capt. Evans testified that police were "constant[ly] watching" demonstrators and that he himself was a frequent eye-witness. *Id.* at 137, [26-27] 144-45.

Lt. William McDermott of Brookline Police Department has been a liaison for RHCFs for more than 20 years. *Id.* at 186. He observes prolife advocates at Women's Health Services in Brookline at least four days per week, including Saturdays. *Id*. at 187. Despite the long amount of time he has been observing prolife advocates, he made no mention in the affidavit he signed at the Commonwealth's request that he saw them commit even a single unlawful act. *Id*. at 186-191.

Det. Arthur O'Connell, a 38-year veteran of the Boston Police Department, has for the past seven years been a liaison between police and Planned Parenthood.

56

*Id.* at 250. Det. O'Connell testified that he receives 2-3 reports every month and investigates every report. *Id.* at 250-51. Over the course of seven years, it appears he investigated between 168 and 252 complaints at Planned Parenthood. Yet, in the affidavit he signed at the Commonwealth's behest, he makes no mention of *ever* making an arrest on any of those complaints. *See id.* at 250-55. It is reasonable to infer, then, that no unlawful conduct occurred despite Planned Parenthood's vigorous protestations to the contrary. Det. O'Connell also frequently observed protests at Planned Parenthood, yet made no mention of blocking, harassing, impeding, or any other unlawful conduct. *See id.* Like those of Capt. Evans and Lt. McDermott, his affidavit offers meager support for the Act.

The police testimony is highly significant. Police are unbiased witnesses specially trained to distinguish between lawful and unlawful conduct. Abortion providers and their supporters are not. The claims by abortion providers and their supporters that certain conduct was impeding, blocking, and harassing was not shared by police. Great weight should be given to the testimony of trained and unbiased police; little weight to biased and untrained abortion providers (and their supporters) that lose business each time a prospective patient changes her mind.

Finally, McCullen's review of the record found nothing in the past 15 years demonstrating that any patient was ever denied reproductive health care. Other than the actions of John Salvi in 1994, there is no indication that prolife advocates

57

have engaged in any violence whatsoever.  If others resort to violence or threats as a result of protected speech, police "must permit the speech and control the crowd; there is no heckler's veto." *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1299 (7th Cir. 1993) (citation omitted).  Likewise, "undifferentiated fear or apprehension of a disturbance is not enough to overcome the right to freedom of expression." *Connick v. Myers*, 461 U.S. 138, 169 (1983) (Brennan, J., dissenting).  This principle has been reiterated time and again in many different contexts. *See Mosley*, 408 U.S. at 100-101 (labor picketing); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 508 (1969) (public schools); *Edwards v. South Carolina*, 372 U.S. 229, 236 (1963) (demonstrations).

### E.     Difficulty Enforcing a Floating Buffer Does Not Warrant an Expanded Fixed Buffer.

Police and abortion providers favored a fixed buffer because it is easier to enforce than a floating buffer.  App. at 96-117, [26] 223.  Of course it is.  It is also easier for police to do their job if the Constitution is disregarded altogether.  But, the First Amendment does not permit government to burden speech simply to make the job of police officers easier.  As the High Court recognized, the "needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power." *Almeida-Sanchez*, 413 U.S. at 273. S*ee also Melear v. Spears*, 862 F.2d 1177, 1186-1187 (5th Cir. 1989) ("While the difficulties of law enforcement are great, police investigations cannot

be allowed to subordinate the rights . . . under our Constitution"). Essentially, judges serve as gatekeepers to repel government from invading constitutional guarantees.

This principle has led the High Court to strike down several types of government action on the ground they violated the Constitution despite the fact that the rulings made it harder for police to do their jobs. *See*, *e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 564 (2004) (absent consent or exigency a warrantless search is presumptively unconstitutional); *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 673 (2004) (internet filtering requirement was likely unconstitutional despite government's difficulty policing Internet); and *Reno v. American Civil Liberties Union*, 521 U.S. 844, 875 (1997) (Communications Decency Act unconstitutional despite government's strong interest in protecting children from harmful material and easily accessible Internet pornography). The Commonwealth's alleged difficulties notwithstanding, it is axiomatic that constitutional guarantees defeat the State's desire to make police work easier.

### F.    Much of the Evidence was Stale.

Finally, much testimony offered in support of the Act consisted of vague, generalized, and conclusory allegations of violence, harassment, blocking, and impeding. It was essentially the very same evidence used to support the old buffer law. *See McGuire I*, 260 F.3d at 39. The actions of John Salvi, while tragic,

occurred in 1994 and have not been repeated.  App. at 69.  Nor have there been any

rescues or blockades at Massachusetts RHCFs since 1992.  *Id.*

A legislative record sufficient to support new legislation placing substantial

burdens on First Amendment rights must contain recent and identifiable acts of

harm.  *See Bl(a)ck Tea Soc'y*, 378 F.3d at 14.  Reliance upon rescues or blockades

that occurred in 1991, and the 1994 shooting by Salvi, were insufficient bases to

support a law enacted more than thirteen years later.  The factual record thus was

stale.

In sum, the factual grounds for the Act are not substantial, particularly in

light of eye-witness police testimony that fails to corroborate allegations by

abortion supporters.  The Act places severe burdens on speech that should not be

permitted to stand on such flimsy factual footing.

## CONCLUSION

For the foregoing reasons the Act should be declared facially invalid and

permanently enjoined.

Respectfully submitted,

Michael J. DePrimo, Bar # 74378
Attorney at Law
P.O. Drawer 2440
107 Parkgate Drive
Tupelo, Mississippi 38803
Tel: (662) 491-2000
Email: michaeldeprimo@gmail.com

Philip D. Moran, Bar # 23517
Philip D. Moran P.C.
265 Essex Street, Suite 202
Salem, Massachusetts 01970
Tel: (978) 745-6085
Fax: (978) 741-2572
Email: philipmoranesq@aol.com

Benjamin W. Bull, Bar # 1132885
Alliance Defense Fund
15100 North 90th Street
Scottsdale, Arizona 85260
Tel: (480) 444-0020
Fax: (480) 444-0028
Email: bbull@telladf.org

## CERTIFICATE OF COMPLIANCE

Pursuant to F.R.A.P. 32(a)7(C), the undersigned certifies this brief complies with the type-volume limitations of F.R.A.P. 32(a)7(B).    Exclusive of the exempted portions in F.R.A.P. 32(a)7(B), this brief contains _13,993_ words.

Michael J. DePrimo

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Brief of

Appellants was furnished by UPS Next Day Air Saver, postage prepaid, this 26th

day of January, 2009, to the Clerk of Court and by U.S. Mail, postage prepaid, this

26th day of January, 2009, to the counsel of record listed below.

Kenneth W. Salinger, Esq.
Administrative Law Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200 Ext. 2075
Fax: (617) 727-5785
ken.salinger@state.ma.us

Anna-Marie Tabor. Esq.
Assistant Attorney General
Civil Rights Division
One Ashburton Place
Boston, MA 02108
(617) 727-2200 ext. 2927
anna-marie.tabor@state.ma.us

Michele L. Schmidt, Paralegal

# ADDENDUM

# TABLE OF CONTENTS

A. Memorandum dated August 22, 2008

B. Chapter 266: Section 120E ½. Reproductive health care facilities
   (as revised November 13, 2007)

C. Letter from the Attorney General dated January 25, 2008 re Amendment
   to the Massachusetts Reproductive Health Care Facilities Act (a.k.a. the
   "Massachusetts Buffer Zone Law"



**A**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELEANOR McCULLEN, JEAN BLACKBURN ZARRELLA, GREGORY A. SMITH, CARMEL FARRELL, and ERIC CADIN,          * <br>                  * <br> Plaintiffs,          * <br>                  * <br> v.                * <br>                  * <br> MARTHA COAKLEY, in her capacity as Attorney General for the Commonwealth of Massachusetts,        * <br>                  * <br> Defendant.        * | Civil Action No. 08-10066-JLT |

MEMORANDUM

August 22, 2008

TAURO, J.

**Introduction**

      Plaintiffs challenge the facial constitutionality of a recently revised Massachusetts statute, Mass. Gen. Laws ch. 266, § 120E1/2 ("Act"), which establishes a 35-foot fixed buffer zone around driveways and entrances of reproductive health care facilities ("RHCFs").[1]  Following a Bench Trial held on May 28, 2008, this court finds that the Act survives First Amendment, Equal Protection and Due Process challenges.

---

[1] An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E1/2 (2007)) (Trial Ex. 1) [#36].  The Act revised parts of Mass. Gen. Laws ch. 266, § 120E1/2 (2000) (Trial Ex. 3) [#38].

1

**Background**

    **A.    The Parties**

    Plaintiffs Eleanor McCullen, Jean Blackburn Zarrella, Gregory A. Smith, Carmel Farrell and Eric Cadin are Massachusetts residents who regularly engage in pro-life counseling outside RHCFs.[2]  Defendant Attorney General Martha Coakley is the chief lawyer and law enforcement officer of the Commonwealth of Massachusetts.  As such, Attorney General Coakley bears responsibility for enforcing the Act.  She is sued in her official capacity only.[3]

    **B.    Procedural History**

    On January 16, 2008, Plaintiffs filed the Complaint, advancing eight counts under 42 U.S.C. § 1983: (1) Free Speech - Time, Place and Manner; (2) Free Speech - Substantial Overbreadth; (3) Free Speech - Prior Restraint; (4) "Free Speech - Free Association - Free Exercise Hybrid;" (5) Free Speech - Viewpoint Discrimination; (6) Due Process - Vagueness; (7) Due Process - Liberty Interest; and (8) Equal Protection.[4]

    Plaintiffs seek that this court: (1) declare that the Act is unconstitutional on its face; (2) declare that the Act is unconstitutional as applied at the Allston-Brighton Planned Parenthood and Women's Health Service; (3) preliminarily[5] and permanently enjoin Defendant from enforcing the Act; (4) award costs and attorneys fees; and (5) grant any other relief that this court

---

    [2] See Decl. of Eleanor McCullen (Trial Ex. 4) [#39]; Decl. of Jean Blackburn Zarrella (Trial Ex. 5) [#40]; Decl. of Carmel Farrell (Trial Ex. 6) [#41]; Decl. of Eric Cadin (Trial Ex. 7) [#42]; Decl. of Gregory A. Smith (Trial Ex. 8) [#43].

    [3] See Compl. at 3 [#1].

    [4] See id. at 13-22 [#1].

    [5] Pls.' Mot. for Prelim. Inj. [#2].

deems necessary and proper.[6]

Following Defendant's Answer, and briefing on Plaintiffs' preliminary injunction motion, this court held a Case Management Conference on April 23, 2008.  Without objection from the Parties, this court ordered that the matter proceed on the merits in two stages:[7] (1) a Bench Trial on Plaintiffs' facial challenge; and (2) a Bench Trial on Plaintiffs' as-applied challenge.[8]

In early May 2008, the Parties stipulated to the content of the Trial Record for the facial challenge,[9] and filed a Joint Trial Record with this court.[10]  On May 14, 2008, the Parties filed Proposed Findings of Fact and Conclusions of Law.[11]  Also on May 14, 2008, four individuals filed an Amicus Brief in support of Plaintiffs' facial and as-applied challenges.[12]

On May 28, 2008, this court held a Bench Trial on Plaintiffs' facial challenge.  The Parties presented extensive oral argument, and this court took the matter under advisement.[13]

---

[6] See Compl. at 22-23.

[7] This court denied Plaintiffs' Motion for Preliminary Injunction without prejudice to re-raising similar issues in a Bench Trial on the merits.  See Order [#34].

[8] See id.

[9] See Joint Stipulation as to the Content of the Trial R. for the Bench Trial of Pls.' Facial Challenge [#35].

[10] See Trial Exs. 1-29 [Docket Nos. 36-66].

[11] See Pls.' Proposed Findings of Fact and Conclusions of Law [#69] ("PFF"); Def.'s Proposed Findings of Fact and Conclusions of Law [#70] ("DFF").

[12] Mem. of Amicae Curiae [#71].

[13] On June 3, 2008, Plaintiffs filed a Motion for Leave to File Post-Argument Brief on the Trial of Facial Challenge [#72], which Defendant opposed.  See Opp'n to Pls.' Mot. for Leave to File a Post-Trial Brief [#73].  This court denied Plaintiffs' motion.  See Electronic Order dated June 5, 2008.  On June 16, 2008, this court received a preliminary copy of the Bench Trial Transcript ("Prelim. Bench Trial Transcript").

Factual Findings

  **A.** **Notes on Factual Findings**

    **1.** **Source**

  The following findings of fact derive from the Joint Trial Record submitted by the

Parties.  Additionally, this court takes notice of the findings of the First Circuit with respect to

the legislative justification for the original statute enacted in 2000 ("2000 Act").[14]

    **2.** **Focus on Facial Challenge**

  Plaintiffs urge this court to adopt various findings of fact relating to, among other things,

the following: Plaintiffs' activities at certain RHCFs; specific incidents at certain RHCFs; and

the operation of the buffer zone at certain RHCFs.[15]  Additionally, Defendant asks this court to

adopt certain findings of fact relating to the effects of the Act, to date, at certain RHCFs.[16]  While

this information may be important to Plaintiffs' as-applied challenge, it is largely irrelevant to the

facial challenge.  Moreover, because the as-applied challenge will be tried separately, this court

---

  [14] See McGuire v. Reilly, 260 F.3d 36, 39-41 (1st Cir. 2001) ("McGuire I"); McGuire v. Reilly, 386 F.3d 45, 48-49 (1st Cir. 2004) ("McGuire II").  See also, e.g., Daggett v. Comm'n on Governmental Ethics and Election Practices, 205 F.3d 445, 456 n.9 (1st Cir. 2000) ("The Rules of Evidence state that the court may take judicial notice of legislative facts whether requested or not.  See Fed. R. Evid. 201(c).  A 'legislative fact' is defined as 'one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' Fed. R. Evid. 201(b)."); Daggett v. Comm'n on Governmental Ethics and Election Practices, 172 F.3d 104, 112 (1st Cir. 1999) ("[S]o-called 'legislative facts,' which go to the justification for a statute, usually are not proved through trial evidence but rather by material set forth in the briefs, the ordinary limits on judicial notice having no application to legislative facts.") (citing Fed. R. Evid. 201 advisory committee's note; Knight v. Dugger, 863 F.2d 705, 742 (11th Cir. 1988)).

  [15] See PFF at 2-10.

  [16] See DFF at 16-18.

does not have a complete record from which to make such findings.

### B.   History of the 2000 Act

As noted by the First Circuit, "[b]y the late 1990s, Massachusetts had experienced repeated incidents of violence and aggressive behavior outside RHCFs."[17] These included a shooting that occurred on December 30, 1994, in which two people were killed and several others injured.[18] Massachusetts courts also issued numerous injunctions prohibiting certain individuals from engaging in violent, harassing or intimidating activity at RHCFs.[19]

Responding to these concerns, "the Massachusetts legislature, confronted with an apparently serious public safety problem, investigated the matter thoroughly."[20] "That investigation yielded solid evidence that abortion protesters are particularly aggressive and patients particularly vulnerable as they enter or leave RHCFs."[21]

Part of the investigation included a state senate hearing on the matter in April of 1999.[22] At the hearing, the "received testimony chronicled the harassment and intimidation that typically

---

[17] McGuire I, 260 F.3d at 38.

[18] See id. at App. B.

[19] See, e.g., Planned Parenthood League of Mass., Inc. v. Bell, 677 N.E.2d 204 (Mass. 1997); Commonwealth v. Filos, 649 N.E.2d 1085 (Mass. 1995); Planned Parenthood League of Mass., Inc. v. Blake, 631 N.E.2d 985 (Mass. 1994); Commonwealth v. Cotter, 612 N.E.2d 1145 (Mass. 1993); Commonwealth v. Brogan, 612 N.E.2d 656 (Mass. 1993); Planned Parenthood League of Mass., Inc. v. Operation Rescue, 550 N.E.2d 1361 (Mass. 1990); Commonwealth v. Manning, 673 N.E.2d 73 (Mass. App. Ct. 1996).

[20] McGuire I, 260 F.3d at 44.

[21] Id.

[22] Id. at 39.

occurred outside RHCFs."[23]  In addition, "numerous witnesses addressed the emotional and physical vulnerability of women seeking to avail themselves of abortion services, and gave accounts of the deleterious effects of overly aggressive demonstrations on patients and providers alike."[24]

The senate, "[b]ased in part on this testimony, . . . concluded that existing laws did not adequately protect public safety in areas surrounding RHCFs," and the Legislature began considering new laws to address the problem.[25]  Initially, in Senate Bill 148, the senate considered a 25-foot fixed buffer zone around RHCF entrances and driveways.  The First Circuit explained:

> To remedy this situation, the senate favored the creation of fixed buffer zones.  The sponsors of the bill left no doubt that they intended the proposed law to "increase public safety in and around [RHCFs]" while "maintaining the flow of traffic and preventing congestion" there.  S.B. 148 . . . § 1.  In the bargain, the sponsors expected the law to provide "reasonable time, place and manner restrictions to reconcile and protect both the First Amendment rights of persons to express their views near reproductive health care facilities and the rights of persons seeking access to those facilities to be free from hindrance, harassment, intimidation and harm."  It thereby would "create an environment in and around reproductive health care facilities which is conducive towards the provision of safe and effective medical services . . . to its patients."  Id.

> Skeptics worried that the proposed law might offend the Constitution.  To stave off these gloom-and-doom predictions, the senate, on November 3, 1999, asked the Massachusetts Supreme Judicial Court (SJC) for an advisory opinion on the bill's constitutionality.

---

[23] Id.  For copies of the written testimony received by the senate, see Exhibits A - F to the Affidavit of Richard A. Powell (Trial Ex. 29) [#66-2-7].  The testimony includes numerous specific observations and incidents.

[24] Id.

[25] Id.

On January 24, 2000, the SJC concluded that the Constitution presented no obstacle to enactment.  Opinion of the Justices to the Senate, 430 Mass. 1205, 1211-12, 723 N.E.2d 1 (2000).  The SJC advised that the bill, as framed, was unrelated to the content of protected expression.  Id. at 1209Moreover, the restrictions imposed had a rational basis in view of the heightened governmental interest that arises when "advocates of both sides of one of the nation's most divisive issues frequently meet within close proximity of each other in the areas immediately surrounding the State's clinics, in what can and often do become congested areas charged with anger."  Id. at 1210.[26]

Following the SJC's opinion, the state senate adopted the bill on February 29, 2000.[27]  On June 28, 2000, however, the Supreme Court decided Hill v. Colorado,[28]  There, the Court considered the constitutionality of a Colorado statute that regulated speech-related conduct around RHCFs.[29]  The statute created a "floating" buffer zone within a 100-foot "fixed" buffer zone.[30]  Plaintiffs challenged the "floating" zone, which "ma[de] it unlawful within the regulated areas for any person to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person . . . .'"[31]

The Court upheld the Colorado statute as a valid time, place and manner regulation, finding that the law was "narrowly tailored" and "serve[d] governmental interests that are

---

[26] Id. at 39-40 (spacing modified).

[27] Id. at 40.

[28] 530 U.S. 703 (2000).

[29] See id. at 707.

[30] See id.

[31] Id.

significant and legitimate and that the restrictions are content neutral."[32]  This court will address

<u>Hill</u> in more detail below.

### C.    The 2000 Act[33]

Subsequently, the Massachusetts Legislature decided to follow the Court-approved

Colorado model of a "floating" buffer zone within a "fixed" buffer zone.  The state house

redrafted Senate Bill 148 accordingly, and on July 28, 2000, adopted an Act Relative to

Reproductive Health Care Facilities, Chapter 217 of the Acts of 2000 ("2000 Act").[34]  The senate

approved on July 29, 2000, and Governor Celluci signed the bill on August 10, 2000.[35]

The 2000 Act created an 18-foot fixed buffer zone around RHCFs, within which a 6-foot

floating buffer zone existed around any person or occupied motor vehicle:

> (b) No person shall knowingly approach another person or occupied motor vehicle
> within six feet of such person or vehicle, unless such other person or occupant of the
> vehicle consents, for the purpose of passing a leaflet or handbill to, displaying a sign
> to, or engaging in oral protest, education or counseling with such other person in the
> public way or sidewalk area within a radius of 18 feet from any entrance door or
> driveway to a reproductive health care facility or within the area within a rectangle
> not greater than six feet in width created by extending the outside boundaries of any
> entrance door or driveway to a reproductive health care facility at a right angle and
> in straight lines to the point where such lines intersect the sideline of the street in

---

[32] <u>Id.</u> at 725-26.

[33] Judge Harrington, at the trial level, and the First Circuit on appeal, have adjudicated the
constitutionality of the 2000 Act, and much of the information in this section draws from their
discussions in the <u>McGuire</u> line of cases.

[34] <u>See</u> <u>McGuire I</u>, 260 F.3d at 40; Mass. Gen. Laws ch. 266, § 120E1/2 (2000) (Trial Ex.
3).

[35] <u>See</u> <u>McGuire I</u>, 260 F.3d at 40; Mass. Gen. Laws ch. 266, § 120E1/2 (2000) (Trial Ex.
3).

front of such entrance door or driveway.[36]

The 2000 Act, however, exempted certain groups from its coverage:

(1) persons entering or leaving such facility;

(2) employees or agents of such facility acting within the scope of their employment;

(3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

(4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.[37]

Additionally, the provisions of the 2000 Act were only in "effect during a facility's business hours and [only] if the area contained within the radius and rectangle described in said subsection (b) is clearly marked and posted."[38]

### D.    Attorney General's Guidance on the 2000 Act

On November 10, 2000, the Massachusetts Attorney General's office sent a letter to the Brookline and Boston police departments regarding the 2000 Act.[39]  The letter explained the Attorney General's interpretation of the exemption for "employees or agents of such facility acting within the scope of their employment,"[40] and "noted that if escorts were to approach within six feet of a woman within the fixed buffer zone in order to 'hurl[] epithets at demonstrators,' then their actions would not be within the scope of their employment and they

---

[36] Mass. Gen. Laws ch. 266, § 120E1/2(2)(b) (2000) (Trial Ex. 3).

[37] Id.

[38] Id. § 120E1/2(2)(c).

[39] See McGuire II, 386 F.3d at 52.

[40] Mass. Gen. Laws ch. 266, § 120E1/2(2)(b) (2000) (Trial Ex. 3).

would not be protected by the exemption."[41]

On May 23, 2001, members of the Attorney General's office met with staff from the Planned Parenthood League of Massachusetts, "to communicate the Attorney General's interpretation that the Act's exemption for clinic employees and agents acting within the scope of their employment would not protect such persons if they were to use the exemption to engage in counter-protests, counter-education, or counter-counseling against anti-abortion views, rather than simply assisting the patients into the clinic and protecting clinic access."[42]

On February 14, 2003, an assistant attorney general issued a letter to the police departments with RHCFs affected by the 2000 Act.[43]   The letter reiterated that "'all persons in the restricted area, including clinic employees and agents, are subject to the restrictions in Section 120E 1/2(b) of the Act, including the restriction on oral protest, education, or counseling[,]' and that clinic employees and agents may not use the exemption to 'express their views about abortion[.]'"[44]   As noted by the First Circuit, this letter "did not signify a new interpretation; it was merely a restatement of an old position.  In this most recent clarification of the interpretation, the Attorney General has clearly construed the exemption to exclude

---

[41] McGuire II, 386 F.3d at 52.

[42] Id.  Also during July of 2001, the Attorney General's office provided training consistent with its November 10, 2001 guidance letter to the Boston and Brookline police departments.  Id.

[43] McGuire v. Reilly, 271 F. Supp. 2d 335, 339 (D. Mass. 2003) (Harrington, J.), aff'd, McGuire II, 386 F.3d 45 (1st Cir. 2004).  Hereinafter, this court will refer to the letter as the "2003 Guidance Letter."

[44] Id. at 339-40.

pro-abortion or partisan speech from the term 'scope of their employment.'"[45]

### E.    McGuire I and McGuire II

Three pro-life "sidewalk counselors"[46] challenged the facial and as-applied

constitutionality of the 2000 Act in a federal lawsuit in this District.  Judge Harrington found that

the statute—on its face—violated the First Amendment, and preliminarily enjoined its

enforcement pending a hearing on the merits.[47]

In McGuire v. Reilly ("McGuire I"), the First Circuit reversed, holding that the statute

lawfully regulated the time, place and manner of speech without discriminating based on content

or viewpoint, and remanded the case to the district court for further proceedings.[48]

On remand, the plaintiffs pressed facial and as-applied challenges on the merits.   Based

on the First Circuit's decision in McGuire I, Judge Harrington granted Defendants summary

judgment on Plaintiffs' facial challenge,[49] but denied summary judgment on the as-applied

challenge pending additional discovery and the filing of a renewed motion for summary

judgment.[50]

After additional discovery, Judge Harrington granted Defendants summary judgment on

---

[45] McGuire II, 386 F.3d at 52 n.1.

[46] Id. at 48.

[47] See McGuire v. Reilly, 122 F. Supp. 2d 97 (D. Mass. 2000) (Harrington, J.), rev'd,
McGuire I, 260 F.3d 36 (1st Cir. 2001).

[48] See McGuire I, 260 F.3d 36.

[49] See McGuire v. Reilly, 230 F. Supp. 2d 189, 193 n.10 (D. Mass. 2002) (Harrington, J.).

[50] Id. at 194.

the as-applied challenge.[51]  On the issue of enforcement following <u>McGuire I</u>, Judge Harrington

found that "the Act has since been interpreted by the Attorney General so as to require

evenhanded enforcement of its prohibitions, even against clinic employees and agents, and the

Attorney General's interpretation has been adopted by the law enforcement authorities."[52]

In <u>McGuire v. Reilly</u> ("<u>McGuire II</u>"), the First Circuit affirmed summary judgment on

both the facial and as-applied challenges.[53]  <u>McGuire I</u> controlled the facial challenge, and the

plaintiffs "offered no reason why the conclusion reached in <u>McGuire I</u> . . . is flawed."[54]

Additionally, the court concurred with Judge Harrington's assessment of the Commonwealth's

enforcement position,  holding that "[t]he Attorney General's interpretation . . . is important for

our purposes . . . because it is clearly a proper, content-neutral way of interpreting the

exemption."[55]  With respect to the as-applied challenge, the court concluded that "there is no

evidence that the police have enforced this statute in anything other than an evenhanded way . . .

."[56]

---

[51] <u>See</u> <u>McGuire v. Reilly</u>, 271 F. Supp. 2d 335 (D. Mass. 2003) (Harrington, J.), <u>aff'd</u>,
<u>McGuire II</u>, 386 F.3d 45 (1st Cir. 2004).

[52] <u>Id.</u> at 341.

[53] <u>See</u> <u>McGuire II</u>, 386 F.3d 45.

[54] <u>Id.</u> at 59.

[55] <u>Id.</u> at 64.

[56] <u>Id.</u> at 65.

F.      The Legislature Determines that the Statute Needs to be Revised

1.      Proposed Senate Bill 1353

Following the passage and operation of the 2000 Act, members of the Legislature became

aware of continued and serious public safety problems in the areas adjacent to RHCF entrances

and driveways, including significant concerns regarding safe patient access to medical services.[57]

In 2007, responding to these concerns, several members of the Legislature introduced

Senate Bill 1353, "An Act Relative to Public Safety."  The proposed preamble read:

> Whereas preservation of public safety is a fundamental obligation of state
> government;
>
> Whereas pedestrians have a right to travel peacefully on Massachusetts streets and
> sidewalks; and
>
> Whereas clearly defined boundaries improve the ability of safety officials to
> protect the public;[58]

The bill modified the size and nature of the buffer zone:

> (b) No person shall knowingly enter or remain on a public way or sidewalk adjacent
> to a reproductive health care facility within a radius of thirty-five feet of any portion
> of an entrance, exit or driveway of a reproductive health care facility or within the
> area within a rectangle created by extending the outside boundaries of any entrance
> to, exit from or driveway of, a reproductive health care facility in straight lines to the
> point where such lines intersect the sideline of the street in front of such entrance,

---

[57] See, e.g., Hearing Transcript at 7-13 (legislators—including some of the bill's
sponsors—discussing public safety concerns at RHCFs, problems with the 2000 Act, and the
origins of Senate Bill 1353).

[58] An Act Relative to Public Safety, S.B. 1353, 185th Gen. Court (Mass. 2007) (enacted),
Ex. A to Aff. of Adam T. Martignetti ("Martignetti Aff.") (Trial Ex. 24) [#61-2].  Plaintiffs argue
that the preamble constitutes "three very different facts underlying [the bill's] purpose."  Pl.
Mem. in Supp. of Mot. for Prelim. Inj. at 52 [#16].  This court disagrees.  All three sections of
the preamble clearly relate to public safety.

exit or driveway.[59]

The Legislature's Joint Committee[60] on Public Safety and Homeland Security

("Committee") held a public Hearing on the bill on May 16, 2007, and received written and oral

testimony from law enforcement officials;[61] RHCF staff, volunteers and representatives; and

representatives of various advocacy organizations.[62]  At the Hearing, the Committee also viewed

video footage and photographs of protest activity at certain RHCFs.[63]  Additionally, the

Committee received written correspondence supporting and opposing the bill.[64]

### 2.    Public Safety and Access to Medical Services

The Committee received testimony that, despite the 2000 Act's floating and fixed buffer

zones, significant public safety concerns continued to exist at RHCFs in the Commonwealth,

including major concerns regarding safe patient access to medical services.  Attorney General

Martha Coakley ("Coakley") explained that the fixed buffer zone was necessary to address the

situation:

---

[59] Id.

[60] Members of the state house and senate serve on the Committee.

[61] Captain Williams Evans ("Evans") of the Boston Police Department testified.  Evans is the police commander for the South End, Back Bay, Lower Roxbury and Fenway sections of Boston.  See Transcription of Videotape of Hearing of the Joint Committee on Public Safety and Homeland Security at 25 ("Hearing Transcript"), Ex. C to Aff. of Vineeth Narayanan ("Narayanan Aff.") (Trial Ex. 26) [#63-4].  Attorney General Coakley, Mary Beth Heffernan, Undersecretary for Criminal Justice, and William Keating, Norfolk County District Attorney, also testified.

[62] See Martignetti Aff. at 1 (Trial Ex. 24) [#61].

[63] See, e.g., Hearing Transcript at 16 (Trial Ex. 26) [#63-4].

[64] See Compilation of Letters at 2-25 (Trial Ex. 17) [#52].

This is an important public safety issue. Over the years, reproductive healthcare facilities have been the scene of mass demonstrations, congestion, blockages, disturbances, and even murders. SB 1353 will help ensure greater safety along our public ways and sidewalks and prevent violence, harassment and intimidation of women who are attempting to exercise their fundamental right to access health care.

. . .

I support the bill's recognition that "clearly defined boundaries improve the ability of safety officials to protect the public."

. . .

Facility employees, volunteers, patients and prospective patients are routinely harassed as they try to enter and exit facilities for medical counseling and treatment. For example, at the Boston location, which has a recessed door, protesters are able to stand close to the entrance, with some protesters standing right at the entrance. Demonstrators regularly crowd facility entrances and surround women, facility employees and volunteers with graphic and discomfiting pictures of aborted fetuses, and shout at and taunt them calling them "baby killers" and "murderers."

. . .

[P]atients and employees are forced to step around or through the protestors as they make their way into the building. We have heard of some cases where women arrive at the facilities and then leave because they are too upset to pass through the gauntlet of protestors.

Protestors also stand and block cars as patients and employees attempt to enter the driveway or garage entrance to these facilities. Other times, protestors circle cars and put their faces against, or in close proximity to, the car windows to scream at and sometimes videotape people in their cars. In some cases, protestors throw anti-abortion literature and leaflets into people's cars as they enter or exit the facilities. Even more egregious are the protestors who dress as Boston Police Department officers and approach women and their companions at close distance, pretending that they are escorting them to the clinic's entrance, only to taunt them or force leaflets into their hands as they make their way to and from the healthcare facilities.

All of these actions can and do easily spark reaction and response and create an unsafe, dangerous risk along our public ways. The actions directly impede the normal flow of traffic along the Commonwealth's public ways and sidewalks and hinder women's ability to access reproductive healthcare.[65]

The Legislature also heard testimony from RHCF staff, volunteers and law enforcement

---

[65] Martha Coakley Written Testimony, Ex. D to Martignetti Aff. (Trial Ex. 24) [#61-5] (spacing modified).

15

personnel regarding specific incidents of patient harassment and intimidation in the areas

immediately outside RHCF entrances and driveways. Additionally, the Legislature learned about

protesters blocking access RHCFs by physically positioning themselves very close to RHCF

entrances and driveways.[66] Examples included the following:

• One clinic volunteer at a Boston RHCF reported:

> The protestors are moving closer and closer to the main door. They scream
> and block the way for the patients to get into the clinic. We fill out police
> reports almost every week regarding the way they encroach upon the door,
> but nothing has changed.[67]

> They get very close to the patients and escorts inside the buffer zone . . . .[68]

> [T]hey're getting so close that patients are terrified to even walk into the
> clinic. I've had people ask me, isn't there a back way . . . .[69]

> When it is raining, it is exceptionally bad. Many of the protestors are inside
> the buffer zone with very large umbrellas and have no regard for who they hit
> with them. I have often been swiped with the points on their umbrellas and
> have nearly fallen to avoid being hit.[70]

---

[66] Indeed, Captain Evans testified:

> A lot of people are under the misconception that [the law] prevents protestors
> from going into that buffer zone, which is incorrect. Protestors can stand up
> right in front of the door. A lot of them hold signs right there. As long as
> they stay stationary, you know, they can stand in front of that door. William
> Evans Oral Testimony, Hearing Transcript at 25 (Trial Ex. 26) [#63-4].

[67] Gail Kaplan Written Testimony, Ex. C to Martignetti Aff. (paragraph number omitted)
(Trial Ex. 24) [#61-4].

[68] Id. (paragraph number omitted).

[69] Gail Kaplan Oral Testimony, Hearing Transcript at 40 (Trial Ex. 26) [#63-4].

[70] Gail Kaplan Written Testimony, Ex. C to Martignetti Aff. (paragraph number omitted)
(Trial Ex. 24) [#61-4].

16

- The president of Planned Parenthood League of Massachusetts personally observed the following at the organization's Boston facility:

  - Protestors screaming at patients and employees inside the current 'buffer zone', usually right at the doorway . . . .

  - Protesters photographing and filming into patients and employees' cars and taking photos of license plate numbers to post on websites

  - Protesters standing in front of cars and the keypad to the garage to block access, so that they can throw pamphlets and other propaganda into cars entering the garage

  - And, most deceptively, I've seen protesters dress up wearing Boston Police T-shirts and hats, trying to collect patient contact information, videotaping, and in other ways trying to intimidate those who are simply exercising their legal right to seek confidential medical services[71]

- A Planned Parenthood volunteer reported that protesters stood in front of the building's entrance, "every Saturday morning, every week."[72]  She explained:

  There are several long-time protesters who appear in front of Planned Parenthood . . . .

  When women approach the building, protesters fan out and approach them. . . .
  The clear intent of the vast majority of protesters is to deter people from entering the building at all.  The current buffer zone . . . does not permit protesters to 'approach' anyone without consent in the zone, but it does not speak to standing still in front of the building's entrance and thereby forcing patients to approach them.
  . . .
  Physical blocking is practiced regularly by protesters.  They either stand in front of the door, in the middle of the sidewalk, or in front of car doors as cars pull up to the sidewalk.  Some people pull up in cars and roll down their window to ask about the clinic's secure parking garage.  If the protesters get to the car first, they have been repeatedly heard to tell people that the garage is closed, when it is not.  They also shove pamphlets through the open

---

[71] Diane Luby Written Testimony at 2, Ex. G to Martignetti Aff. (Trial Ex. 24) [#61-8].

[72] Liz McMahon Written Testimony at 1, Ex. F to Martignetti Aff. (Trial Ex. 24) [#61-7].

17

window, regardless of the occupant's requests.

In the rear of the building, near the clinic's garage entrance . . . . protesters often wait by the door and video tape the patients' cars' license plates.[73]

• At an Attleboro RHCF, a patient advocate reported:

[P]rotesters impede access to clinic doors, but also create safety issues for the general public trying to use sidewalks, streets or driveways.
. . .
[P]rotesters walk back and forth across the entrance of the driveway . . . . Though prohibited from standing in the entrance of the driveway, they frequently stop there until threatened with police action. There have been instances of picketers either slowing or speeding up to narrowly avoid being hit by cars driven by staff. Patients have reported feeling too intimidated by the pacing protesters to enter the property, and turning back.[74]

• At one RHCF, on a weekly basis, women try to drive to the facility but turn away "because they're afraid to enter the parking lot entranceway, [protesters] will block so as not to allow the car to come in, and then we have the other protestors dressed in paraphernalia who will come over to the window with a clipboard and ask them to please sign in before they come through the driveway."[75]

• Likewise, at one RHCF, "You can also see people circling in the same car around and around, and every time they pull up, you can see that they want to go out and they'll ask where is the garage and then they never stop."[76]

• A protester followed a woman into a Boston RHCF entranceway. At the same location, another protester approached and placed her head inside a car outside the clinic.[77]

_____

[73] Id. at 1-2.

[74] Melissa Conroy Written Testimony, Ex. B to Martignetti Aff. (Trial Ex. 24) [#61-3].

[75] Michael Baniukiewicz Oral Testimony, Hearing Transcript at 50-51 (Trial Ex. 26) [#63-4].

[76] Liz McMahon Oral Testimony, Hearing Transcript at 51 (Trial Ex. 26) [#63-4].

[77] See Martha Coakley Oral Testimony, Hearing Transcript at 18-19 (Trial Ex. 26) [#63-4].

- A protester wearing a "Boston Police" shirt, standing immediately next to a car trying to enter an RHCF garage.[78]

- Protestors "wearing police hats and police uniforms" as a way to get patients and others to consent to an approach.[79]

### 3.    Law Enforcement's Position

The Legislature also received testimony about the difficulties of enforcing the 2000 Act.[80]

The record demonstrates that these difficulties reduced the efficacy of the statute's intended

protections, and were part of the reason that significant public safety concerns continued to exist

at RHCFs.  Attorney General Coakley explained:

> The current law provides no clearly defined boundary because it is a "floating" buffer zone within a defined radius of eighteen feet, so the buffer zone effectively moves and shifts as people pass along the public way to facility entrances or driveways. Either ignoring the law, or inadequately measuring the six-foot distance around a moving person, protestors routinely invade the existing buffer zone in violation of the law.  This fact alone has made it very difficult if not impossible for police to be able to immediately or ever determine whether a violation has occurred.

> Another problem with the existing law is the inability to discern whether a patient, her companions, or facility employees have consented to a given protester's approach.  Some protesters have said that they believed that a patient "consented" because of the way she made eye contact or because a patient uttered a statement in

---

[78] William Evans Oral Testimony, Hearing Transcript at 36 (Trial Ex. 26) [#63-4].

[79] Id. at 35-37.

[80]  Plaintiffs argue that because a proposed amendment to Senate Bill 1353 did not make it into the final bill, "it appears the General Court rejected allegations that the [2000] Act was enforceable."  Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 51.   The proposed amendment was a line that stated, "The general court hereby finds that law enforcement officials have testified about practical problems related to the enforcement of [the 2000 Act]."  Id. (citing Mass. Senate Journal, Oct. 23, 2007).  This argument is unpersuasive.  The Legislature may not have adopted this amendment for a number of reasons, upon which this court will not speculate.  Regardless, however, of why this line was not included, the Legislature heard and considered testimony regarding enforcement difficulties with the 2000 Act.  The record also demonstrates that enforcement difficulties were related to the public safety problems.

response to a protestor's comment (even if that statement was not one of consent).
. . .
Given the lack of a clearly defined buffer zone boundary, it has been very difficult, if not impossible, for police officers to monitor the distance these protestors maintain between themselves and the persons approaching the facilities and determine if there has been a violation; in other words, to enforce the law.[81]

Echoing Coakley's remarks, Massachusetts law enforcement personnel reported significant difficulties in enforcing the 2000 Act, and urged legislators to modify the law. Captain Evans reported, "This law, the way it stands, the current buffer zone with the 18-foot buffer zone, makes it very difficult for us to enforce the law."[82]  Mainly, the police had trouble determining whether a protester had "approached" a person within the six feet floating buffer, without that person's consent.  Evans explained:

> What [the protesters] have to do is make an approach.  Now what an approach is is very hard to determine; whether they stick out their hand, that's an approach; where they take a step forward, that's an approach.  Basically, it turns us into basically something like - - I like to make the reference of a basketball referee down there, where we're watching feet, we're watching hands.[83]

This "constant watching" proved difficult and created a public safety problem.  At one of the RHCFs, for example, there have been "over 100 protestors every Saturday and a lot of them go right up in the faces of patients entering the premises."[84]  Additionally, such surveillance was a significant "tying up of resources" that the police "had to deal with [for] seven years."[85]

---

[81] Martha Coakley Written Testimony at 4-6, Ex. D to Martignetti Aff. (emphasis in original) (spacing modified) (Trial Ex. 24) [#61-5].

[82] William Evans Oral Testimony, Hearing Transcript at 25 (Trial Ex. 26) [#63-4].

[83] Id. at 25-56.

[84] Id. at 26-27.

[85] Id. at 26.

Contrary to Plaintiffs' assertions at oral argument,[86] the police and district attorneys *tried* to prosecute violations of the 2000 Act.  Evans indicated his frustration with trying to prosecute violations at one of the RHCF locations:

> We've trying [sic] everything, honestly.  We've tried violation of the buffer zone, and we've brought a few cases up to Brighton Court and the court has basically not supported us . . . .

> Chairman, we know all the players down there.  We know the regular protesters.  We back up the stay-away orders and nothing seems to work down there.[87]

Evans noted that at one of the RHCFs, police had made "no more than five or so arrests."[88]  The low number of arrests, however, was due to the difficulty of enforcing the law, not a lack of problematic conduct.   Evans explained:

> Again, [it is] a very difficult law to enforce, what an approach is, what isn't.  I mean, like I said, people can stand inside the buffer zone, and given the current set up of Planned Parenthood there, their door is in 10 feet of - - - actually, their buffer zone is really only 8 feet outside because of the setup.

> So it's such close quarters as it is there that everybody is in everybody's face, no matter what.  So the buffer zone basically is no good, it really isn't, because just the proximity.  It's almost like a goalie's crease out there . . . .

> So given that fact, it makes it very difficult for us to say someone is violating it because they're allowed to stand outside the door, with the sign in their hand.[89]

In response to these problems, Captain Evans urged the Legislature to implement the 35-foot fixed buffer zone:

---

[86] See, e.g., Prelim. Bench Trial Transcript at 73.

[87] William Evans Oral Testimony, Hearing Transcript at 34-35 (Trial Ex. 26) [#63-4].

[88] Id. at 33.

[89] Id. at 33-34.

> Week in and week out, we are constantly receiving calls down there [at one of the facilities], both from protestors and from Planned Parenthood on violations. I think clearly having a fixed buffer zone, where everyone knows the rules and nobody can go in that and protest, will make our job so much easier. I think you've seen the video; you see what we have to deal with. You know, it's a very difficult rule to enforce.
>
> You know, there's the misconception that it's a fixed area where no protestors can go. That would be great. That would make our job so much easier.
> . . .
> So I encourage the Committee and the legislators to support this bill. Not only will it safeguard the patients going in there, but it will also make the public safety official's job a lot easier. So I welcome the 35-foot buffer zone.[90]

With respect to the problem of protesters wearing police hats and uniforms, Evans noted:

> [W]e've tried everything, and I think the only thing honestly that will keep these people out and the patients safe is to establish a fixed zone. That way there's no watching feet, watching hands and allowing protesters right up in their face.[91]

### 4.    First Amendment Concerns Articulated by Advocacy Groups

The Public Safety Committee also received testimony and correspondence from several organizations that voiced First Amendment concerns about the bill. For example, the American Civil Liberties Union of Massachusetts opposed the bill, mainly on overbreadth grounds.[92] Wendy Kaminer of the Defending Dissent Foundation expressed her "dismay about the effect of this bill on free speech."[93] Marie Sturgis of Massachusetts Citizens for Life, Inc. testified, "To increase the size of the existing area without substantial reason would be an action that

---

[90] Id. at 26-27.

[91] Id. at 35.

[92] See Statement of the ACLU of Massachusetts (Trial Ex. 17) [#52].

[93] Wendy Kaminer Written Testimony at 1 (Trial Ex. 17) [#52].

demonstrates unquestionable bias and clashes with First Amendment rights."[94]  C.J. Doyle of the

Catholic Action League of Massachusetts stated, "The proposed expansion of existing buffer

zone legislation represents yet another effort to impose a content based restriction on freedom of

speech, and to impair other constitutionally protected First Amendment activity such as freedom

of religion and freedom of assembly."[95]

> ## 5.      Balancing First Amendment Concerns

The Legislature specifically acknowledged these First Amendment concerns, and took

them into account.   Indeed, at the May 16, 2007 Hearing, several legislators discussed the

importance of balancing public safety considerations with the First Amendment rights of the

protesters.  Representative Marty Walz explained:

> What we're seeking here is to amend the existing buffer zone law around healthcare
> clinics to establish a fixed buffer zone of only 35 feet, so much smaller than the 150
> feet that we're accustomed to around polling places, and so for that 35 feet, we think
> that is an appropriate balance and one that strikes the right balance between First
> Amendment rights of protesters and the rights of women and other patients and
> family members and staff members to enter unimpeded into the healthcare clinics,
> so to recognize that there are competing rights and interests here, just as there are at
> polling places, and we think a 35-foot fixed buffer zone strikes the right balance to
> protect women entering and exiting the clinics.[96]

Similarly, Representative Michael Festa stated that the 2000 Act balanced the "First

Amendment issues" with the concern "that without unfettered and reasonable access to these

health services, that many women were being intimidated from having those services provided in

---

[94] Marie Sturgis Written Testimony (Trial Ex. 17) [#52].

[95] Letter from C.J. Doyle, Catholic Action League to Committee, May 16, 2007 (Trial Ex. 17) [#52].

[96] Marty Walz Oral Testimony, Hearing Transcript at 7 (Trial Ex. 26) [#63-4].

an appropriate manner."[97]  Addressing the 2007 Act, Representative Festa commented:

> I think this bill, quite frankly, strikes the balance in a way in 2007 that we can
> acknowledge, does give due respect for those who feel that they have need to express
> their objections to this whole situation, and at the same time, acknowledge that 35
> feet is quite reasonable . . . .
>
> [T]his bill, I think, fundamentally does what needs to be done today, which is to give
> that protection and also afford the right to those who are concerned to express their
> views.[98]

The Legislature also specifically solicited and heard testimony on balancing these

concerns.  Senator Jarrett Barrios, the Committee's Chairman, stated:

> [S]ince I've got three of the finest lawyers in Massachusetts in front of me, and one
> of the leading arguments that is made in opposition to this is infringement on First
> Amendment rights which the federal government, and obviously there's a state
> equivalent to that.
> . . .
> And I'm interested in your thoughts, if you have any, specifically as to why that's not
> the case.[99]

Attorney General Coakley responded that the law was a constitutional time, place and

manner restriction that appropriately balanced patient rights, protester rights and public safety

considerations.[100]  Additionally, after recognizing the importance of First Amendment rights,[101]

Coakley emphasized the balancing process: "There's always a balance involved" in First

---

[97] Michael Festa Oral Testimony, Hearing Transcript at 11-12 (Trial Ex. 26) [#63-4].

[98] Id. at 12-13.

[99] Jarrett Barrios Oral Testimony, Hearing Transcript at 29-30 (Trial Ex. 26) [#63-4].

[100] Martha Coakley Oral Testimony, Hearing Transcript at 30-32 (Trial Ex. 26) [#63-4].
See also Martha Coakley Written Testimony at 6-7, Ex. D to Martignetti Aff. (discussing how
the proposed bill protected First Amendment rights) (Trial Ex. 24) [#61-5].

[101] Id. at 30 ( "I think all four of us take that right of the First Amendment extremely
seriously . . . .").

Amendment situations, "and I think it's an appropriate question and I think the Legislature has to weigh this."[102]  Similarly, Keating noted, "I also view this in a Constitutional sense as a contest of competing freedoms . . . ."[103]  Heffernan agreed with Coakley and Keating, and briefly echoed their comments.[104]

### G.      The 2007 Act

After receiving and considering this testimony, the Legislature enacted Senate Bill 1353 on November 8, 2007,[105] titled "An Act Relative to Reproductive Health Care Facilities ("Act or 2007 Act")," Chapter 155 of the Acts of 2007.[106]  The Act contained an emergency preamble:

> *Whereas*, The deferred operation of this act would tend to defeat its purpose, which is to increase forthwith public safety at reproductive health care facilities, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public safety.[107]

The Act itself read:

> Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority of the same as follows:

---

[102] Id. at 30.

[103] William Keating Oral Testimony, Hearing Transcript at 32 (Trial Ex. 26) [#63-4].

[104] See Mary Beth Heffernan Oral Testimony, Hearing Transcript at 32-33 (Trial Ex. 26) [#63-4].

[105] See Martignetti Aff. at 3 (Trial Exhibit 24) [#61] ("Senate No. 1353 in its final form was passed by the Senate and the House on November 8, 2007.").

[106] An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E1/2 (2007)) (emphasis in original) (Trial Ex. 1) [#36].

[107] Id. (emphasis in original).

SECTION 1.  Section 120E1/2 of chapter 266 of the General Laws, as appearing in the 2006 Official Edition, is hereby amended by inserting after the word "within", in line 2, the following words:-  or upon the grounds of.

SECTION 2.  Subsection (b) of said section 120E1/2 of said chapter 266, as so appearing, is hereby amended by striking out the first sentence and inserting in place thereof the following sentence:-  No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway.[108]

The Act did not affect the 2000 Act's exemptions:

(1) persons entering or leaving such facility;

(2) employees or agents of such facility acting within the scope of their employment;

(3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

(4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.[109]

The Act also maintained the business hours and clearly marked restriction of the 2000 Act:

"The provisions of subsection (b) shall only take effect during a facility's business hours and if the area contained within the radius and rectangle described in said subsection (b) is clearly marked and posted."[110]

---

[108] Id.

[109] Mass. Gen. Laws ch. 266, § 120E1/2(2)(b) (2000), amended by Mass. Gen. Laws ch. 266 § 120 E1/2(b) (2007) (spacing modified) (Trial Ex. 3) [#38].

[110] Id. § 120E1/2(2)(c) (2000), amended by Mass. Gen. Laws ch. 266 § 120 E1/2(c) (2007) (Trial Ex. 3).

Governor Patrick signed the bill on November 13, 2007.[111]

## H.    Attorney General's Guidance on the 2007 Act

On January 25, 2008, the Attorney General's Office sent a letter to law enforcement personnel and RHCFs subject to the Act's coverage.[112]  The letter summarized the Act, and emphasized that the Act's provisions were in effect only during an RHCF's business hours and only if the boundaries were "clearly marked and posted."[113]  The letter also provided "guidance to assist you in applying the four exemptions" in the Act, which consisted of the following four paragraphs:

> The first exemption—for persons entering or leaving the clinic—only allows people to cross through the buffer zone on their way to or from the clinic. It does not permit companions of clinic patients, or other people not within the scope of the second or third exemptions, to stand or remain in the buffer zone, whether to smoke, talk with others, or for any other purpose.
>
> The second exemption—for employees or agents of the clinic acting within the scope of their employment—allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics, but does not allow them to express their views about abortion or to engage in any other partisan speech within the buffer zone.
>
> Similarly, the third exemption—for municipal employees or agents acting within the scope of their employment—does not allow municipal agents to express their views about abortion or to engage in any other partisan speech within the buffer zone.

_____

[111]  See An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E1/2 (2007)) (Trial Ex. 1); Martignetti Aff. at 3 (Trial Ex. 24) [#61].

[112]  See Narayanan Aff. at 1 (Trial Ex. 26) [#63]; Letters from Maura T. Healey, Chief, Civil Rights Division, to the Boston and Brookline Police Departments, Ex. A to Narayanan Aff. (Trial Ex. 26) [#63-2]; Letters from Maura T. Healey, Chief, Civil Rights Division, to Planned Parenthood League of Massachusetts and Women's Health Services, Ex. B to Narayanan Aff. (Trial Ex. 26) [#63-3].  Aside from slight differences in the introductory paragraph, the letters are identical.  Accordingly, this court will refer to the letter as the "2008 Guidance Letter."

[113]  2008 Guidance Letter at 1-2 (Trial Ex. 26).

Finally, the fourth exemption—for persons using the sidewalk or street adjacent to the clinic to reach a destination other than the clinic—applies to individuals who are crossing through the buffer zone, without stopping, to go somewhere other than a location within the zone and other than the clinic, and who are not using the buffer zone for some other purpose while passing through. For example, an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech).[114]

The Attorney General's approach with respect to the second exemption directly tracks its approach to this exemption in the 2000 Act,[115] an approach approved by the First Circuit in McGuire II.[116]

---

[114] Id. at 2-3 (Trial Ex. 26).

[115] In the 2003 Guidance Letter, the Attorney General emphasized that "'*all persons* in the restricted area, including clinic employees and agents, are subject to the restrictions in Section 120E 1/2(b) of the Act, including the restriction on oral protest, education, or counseling[,]' and that clinic employees and agents may not use the exemption to 'express their views about abortion[.]'" McGuire v. Reilly, 271 F. Supp. 2d 335, 339-40 (D. Mass. 2003) (Harrington, J.), aff'd, McGuire II, 386 F.3d 45 (1st Cir. 2004) (quoting 2003 Guidance Letter) (emphasis added).

[116] McGuire II, 386 F.3d at 64 ("[W]e find the Attorney General's interpretation to be one very likely interpretation of the exemption's language . . .[,]" and it "is important for our purposes . . . because it is clearly a proper, content-neutral way of interpreting the exemption."). See also supra Factual Findings § E.

28

**Discussion**: **Legal Standard for Facial Challenge**

Three different standards may apply to Plaintiffs' facial challenge.[117]

In <u>United States v. Salerno</u>, the Supreme Court held that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."[118]

Second, although "some Members of the Court have criticized the <u>Salerno</u> formulation, all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.'"[119]

Lastly, in the First Amendment context, there is another "type of facial challenge . . . under which a law may be overturned as impermissibly overbroad because a 'substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'"[120]

For the reasons below, the Act survives under all three standards.

---

[117] <u>See</u>, <u>e.g.</u>, <u>United States v. Carta</u>, 503 F. Supp. 2d 405 (D. Mass. 2007) (Tauro, J.) ("The precise test to apply to a facial challenge is not clear.").

[118] 481 U.S. 739, 745 (1987). <u>See</u> <u>also</u> <u>Crawford v. Marion County Election Bd.</u>, 128 S. Ct. 1610, 1621 (2008) ("Given the fact that petitioners have advanced a broad attack on the constitutionality of [the statute], seeking relief that would invalidate the statute in all its applications, they bear a heavy burden of persuasion."); <u>McGuire I</u>, 260 F.3d at 46-47 ("a party who mounts a facial challenge to a statute must carry a significantly heavier burden than one who seeks merely to sidetrack a particular application of the law.").

[119] <u>Wash. State Grange v. Wash. State Republican Party</u>, 128 S. Ct. 1184, 1190 (2008) (quoting <u>Washington v. Glucksberg</u>, 521 U.S. 702, 739-40, and n.7 (1997) (Stevens, J., concurring in judgments)).

[120] <u>Id.</u> at 1191 n.6 (<u>citing</u> <u>New York v. Ferber</u>, 458 U.S. 747, 769-771 (1982) and <u>quoting</u> <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 615 (1973)).

## Discussion: First Amendment Challenge

### A.    First Amendment Doctrine

The Free Speech Clause of the First Amendment states that "Congress shall make no law

. . . abridging the freedom of speech . . . ."[121]  This prohibition applies to the states by virtue of

the Fourteenth Amendment.[122]  As clarified by the First Circuit, "Notwithstanding its exalted

position in the pantheon of fundamental freedoms, free speech always must be balanced against

the state's responsibility to preserve and protect other important rights.  This balance may be

weighted differently, however, depending upon the nature of the restriction that the government

seeks to foster."[123]

"The Supreme Court has articulated a framework for determining whether a particular

regulation impermissibly infringes upon free speech rights.  That framework dictates the level of

judicial scrutiny that is due—and that choice, in turn, informs the nature of the restrictions on

free speech that may be permissible in a public forum."[124]

The appropriate level of scrutiny depends on whether a statute is content-based or

content-neutral.[125]  As a general rule, the government cannot impose content-based restrictions on

---

[121] U.S. Const. Amend. I.

[122] See Knights of Columbus v. Town of Lexington, 272 F.3d 25, 30-31 (1st Cir. 2001) (citing Cantwell v. Connecticut, 310 U.S. 296, 303 (1940)).

[123] McGuire I, 260 F.3d at 42.  See also Knights of Columbus, 272 F.3d at 31 ("Despite the uncompromising language in which this proscription is couched, it is not absolute.").

[124] Knights of Columbus, 272 F.3d at 31 (citing McGuire I, 260 F.3d at 42).

[125] Naser Jewelers, Inc. v. City of Concord, 513 F.3d 27, 32 (1st Cir. 2008) ("A threshold question in cases involving challenges to government restrictions on speech is whether the restriction at issue is content-neutral or, to the contrary, is content-based.).

speech.[126] Any such restriction is presumptively invalid, and must be evaluated under strict

scrutiny.[127] A content-based law, therefore, will be upheld only if it is "absolutely necessary to

serve a compelling state interest and is narrowly tailored to the achievement of that end."[128]

Instead of regulating the content of speech, content-neutral restrictions regulate the time,

place and manner in which expression may occur. Content-nuetral restrictions "are less

threatening to freedom of speech because they tend to burden speech only incidentally, that is, for

reasons unrelated to the speech's content or the speaker's viewpoint."[129] As a result, these

restrictions are evaluated under the "intermediate" level of scrutiny, and will be upheld if

(1) "they are justified without reference to the content of the regulated speech;" (2) "are narrowly

tailored to serve a significant governmental interest;" and (3) "leave open ample alternative

channels for communication of the information."[130]

### B.    Content-Based versus Content-Neutral

Plaintiffs argue that the Act constitutes an impermissible content-based restriction on

speech. This argument takes two forms. First, Plaintiffs, albeit briefly, urge this court to find

---

[126] McGuire I, 260 F.3d at 42 (citing Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641-42 (1994)).

[127] Id. at 43 (citing R. A. V. v. City of St. Paul, 505 U.S. 377, 382 (1992); Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 736 (1st Cir. 1995)).

[128] Id. (citing, as examples, Boos v. Barry, 485 U.S. 312, 321-29 (1988); Ark. Writers' Project, Inc. v. Ragland, 481 U.S. 221, 231-32 (1987)).

[129] Id.

[130] Id. (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

that the statute itself is a content-based restriction.[131]  Second, in their Complaint, Plaintiffs bring

a viewpoint discrimination count,[132] and "courts correctly regard viewpoint discrimination as a

particularly pernicious form of content discrimination . . . ."[133]

Alternatively, Plaintiffs argue that the Act is an impermissible time, place and manner

regulation.[134]

Defendant argues that the act is content-neutral and validly regulates the time, place and

manner of expressive activity.  This court agrees.

### 1.    No Subject Matter Restriction

"The principal inquiry in determining content neutrality, in speech cases generally and in

time, place, or manner cases in particular, is whether the government has adopted a regulation of

speech because of disagreement with the message it conveys."[135]  Accordingly, "a law designed

to serve purposes unrelated to the content of protected speech is deemed content-neutral even if,

incidentally, it has an adverse effect on certain messages while leaving others untouched."[136]

Here, as with the 2000 Act, "[b]y addressing political speech on public streets and

---

[131] See, e.g., Pls.' Proposed Findings of Fact and Conclusions of Law at 27 ("PFF") [#69].

[132] Compl. at 18-19.

[133] McGuire I, 260 F.3d at 48.

[134] See Compl. at 15;  PFF at 27-32.

[135] Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754 (1989).  See also Hill v. Colorado, 530 U.S. 703, 719 (2000) (citing Ward); Naser Jewelers, Inc., 513 F.3d at 32; McGuire I, 260 F.3d at 43.

[136] McGuire I, 260 F.3d at 43 (citing Hill, 530 U.S. at 736; City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-48 (1986)).

sidewalks, the Act plainly operates at the core of the First Amendment."[137]  But "First

Amendment interests nonetheless must be harmonized with the state's need to exercise its

traditional police powers."[138]  As the First Circuit did in McGuire I, for the following reasons,

this court "resolve[s] this balance" in favor of the Commonwealth.[139]

    As noted above, in Hill v. Colorado, the Supreme Court considered a Colorado statute

that also regulated conduct around reproductive health care facilities.[140]  The Court held that the

statute was content-neutral for "three independent reasons."[141]

> First, it is not a "regulation of speech."  Rather, it is a regulation of the places where
> some speech may occur.
>
> Second, it was not adopted "because of disagreement with the message it conveys."
> This conclusion is supported not just by the Colorado courts' interpretation of
> legislative history, but more importantly by the State Supreme Court's unequivocal
> holding that the statute's "restrictions apply equally to all demonstrators, regardless
> of viewpoint, and the statutory language makes no reference to the content of the
> speech."
>
> Third, the State's interests in protecting access and privacy, and providing the police
> with clear guidelines, are unrelated to the content of the demonstrators' speech.  As
> we have repeatedly explained, government regulation of expressive activity is
> "content neutral" if it is justified without reference to the content of regulated speech
> . . . .[142]
>
> Here, the 2007 Act is content-neutral for the same three reasons.  First, the statute does

---

[137] Id. at 43 (citing Hague v. CIO, 307 U.S. 496, 515 (1939)).

[138] Id. at 44 (citing Hill, 530 U.S. at 714-15).

[139] Id.

[140] 530 U.S. at 707.

[141] Id. at 719.

[142] Id. at 719-720 (footnote omitted and spacing modified).

not directly regulate speech. Indeed, it does not mention speech or expression at all, much less

prohibit certain types of messages, statements, literature or signage.[143]  Instead, and permissibly,

"it merely regulates the places *where* communications may occur."[144]  Moreover, the statute

continues to apply during an RHCF's business hours only, and only if the buffer zone is clearly

delineated.[145]

  Second, the record clearly demonstrates that the Legislature did not adopt the 2007 Act

"because of disagreement with the message it conveys."[146]  The Legislature amended the 2000

Act to address continued and serious public safety problems in the areas adjacent to RHCF

entrances and driveways, including significant concerns regarding safe patient access to medical

services.  Relatedly, serious enforcement difficulties with the 2000 Act limited its intended

protections and were part of the reason that major public safety concerns continued to exist at

RHCFs.

  These reasons are entirely "unrelated to disagreement with the underlying message of

particular speech."[147]  Moreover, as with the 2000 Act, the 2007 Act's "restrictions apply equally

to *all demonstrators*, *regardless of viewpoint*, and the statutory language makes no reference to

---

[143] See id. at 731 ("As we have already noted, [the statute] simply does not 'ban' any
messages, and likewise it does not 'ban' any signs, literature, or oral statements.").

[144] Id. (emphasis added).

[145] See Mass. Gen. Laws ch. 266 § 120E1/2(2)(c) (2000), amended by Mass. Gen. Laws
ch. 266 § 120 E1/2(c) (2007) (Trial Ex. 3); 2008 Guidance Letter at 1-2 (Trial Ex. 26).

[146] Ward, 491 U.S. at 791.

[147] McGuire I, 260 F.3d at 44.

the content of the speech."[148]  Indeed, this "comprehensiveness . . . is a virtue . . . because it is

evidence against there being a discriminatory governmental motive."[149]

Third, as in Hill, the statute "advances interests unconnected to expressive content."[150]

"As [the Court has] repeatedly explained, government regulation of expressive activity is

'content neutral' if it is justified without reference to the content of regulated speech."[151]

Here, as was the case with the 2000 Act, "[t]he Massachusetts legislature, confronted

with an apparently serious public safety problem, investigated the matter thoroughly."[152]  As

described above, the investigation demonstrated that there was still a significant public safety and

patient access problem in the areas immediately adjacent to RHCF entrances and driveways.

Moreover, major enforcement difficulties with the 2000 Act allowed the problems to persist.

Accordingly, as in McGuire I, the Act is justified by "conventional objectives of the state's police

power—promoting public health, preserving personal security, and affording safe access to

medical services," without *any* reference to content.[153]

Focusing on this third reason, the First Circuit explained:

> The critical question in determining content neutrality is not whether certain speakers
> are disproportionately burdened, but, rather, whether the reason for the differential
> treatment is—or is not—content-based.  . . .  As long as a regulation serves a

---

[148] Hill, 530 U.S. at 719 (emphasis added).

[149] Id. at 731.

[150] McGuire I, 260 F.3d at 44 (citing Hill, 530 U.S. at 719).

[151] Hill, 530 U.S. at 720.

[152] McGuire I, 260 F.3d at 44.

[153] Id.

legitimate purpose unrelated to expressive content, it is deemed content-neutral even if it has an incidental effect on some speakers and not others. . . . In that event, all that remains is for the government to show that accomplishment of the legitimate purpose that prompted the law also rationally explains its differential impact.[154]

Here, as in <u>McGuire I</u>, the Act's goals "justify its specific application to RHCFs."[155]

Additionally, "[a]lthough the Act clearly affects anti-abortion protesters more than other groups, there is no principled basis for assuming that this differential treatment results from a fundamental disagreement with the content of their expression."[156]  As in <u>McGuire I</u>,

[T]he finding required on these facts is that the legislature was making every effort to restrict as little speech as possible while combating the deleterious secondary effects of anti-abortion protests.  Just as targeting medical centers did not render Colorado's counterpart statute content based, . . . so too the Act's targeting of RHCFs fails to undermine its status as a content neutral regulation.[157]

Plaintiffs, however, as the plaintiffs did in <u>McGuire I</u>, imply that the Legislature's reasons for amending the Act were pretextual.[158]  Additionally, Plaintiffs argue:

[I]t is only abortion providers and supporters that talk about all these problems that are around the clinics.  And they don't do it with respect to facts. They make conclusory allegations.
. . .
These people would be expected to embellish their testimony because they side with the pro choice viewpoint as opposed to those who oppose abortion.

But when we look at the objective unbiased evidence in the record, there is nothing that supports the zone.  The police didn't testify that there was any problem outside

---

[154] <u>Id.</u> (citations omitted).

[155] <u>Id.</u>

[156] <u>Id.</u>

[157] <u>Id.</u>

[158] <u>See</u>, <u>e.g.</u>, Prelim. Bench Trial Transcript at 70-71 ("Mr. DePrimo: Well, that's what they claim their purpose is.").

the abortion clinics.  They didn't say that there was any impeding, any blocking, any harassment, any trespass.[159]

Plaintiffs' arguments fail for two reasons.  First, with respect to the Legislature's reasons for amending the statute, Plaintiffs' "insinuations are unsupported by any record evidence."[160] Moreover, "where differential treatment is justified, on an objective basis, by the government's content-neutral effort to combat secondary effects, it is insufficient that a regulation may have been adopted in direct response to the negative impact of a particular form of speech."[161]

Second, despite Plaintiffs' claims regarding the evidence before the Legislature, the record is replete with factual references to specific incidents and patterns of problematic behavior around RHCFs.  Additionally, nothing in the record suggests that the individuals who testified—under oath—before the Legislature, embellished or were in any way untruthful.

Lastly, although Plaintiffs claim abortion providers and supporters were the only individuals who identified problems, Captain Evans of the Boston Police Department testified with respect to public safety problems outside of the RHCFs and the difficulties with enforcing the 2000 Act.  Attorney General Coakley testified regarding the same.

---

[159] Id. at 72-73 (spacing modified).

[160] McGuire I, 260 F.3d at 45.

[161] Id.

## 2. Count V. Viewpoint Discrimination[162]

Plaintiffs also argue that the statute constitutes unlawful viewpoint discrimination, because "[t]he fixed buffer statute unjustifiably treats the conduct of the facility employees/agents differently from all other speakers, and the different treatment of conduct results in favor toward pro-choice speakers and disfavor toward all other speakers."[163]  Plaintiffs base this claim on the employee/agent exemption in the Act, which exempts from the Act's coverage "employees or agents of such facility acting within the scope of their employment."[164]

This count also fails.  First, it is important to note that the Act did not modify any of the exemptions previously established by the 2000 Act, including the employee/agent exemption. Furthermore, the First Circuit specifically addressed and upheld this exemption in McGuire I and McGuire II, holding that it was content-neutral and did not constitute viewpoint discrimination.[165] Nothing in this case warrants a departure from that analysis and holding.

In McGuire I, the plaintiffs' argument suggested that "the sole practical purpose of the employee exemption is to promote a particular side of the abortion debate."[166]  In response, the court held, among other things,

The Massachusetts legislature may or may not have intended the employee

_____

[162] This Memorandum addresses Plaintiffs' counts by topic, not by their order in the Complaint.

[163] PFF at 40.

[164] Mass. Gen. Laws ch. 266, § 120E1/2(2)(b) (2000), amended by Mass. Gen. Laws ch. 266 § 120 E1/2(b) (2007) (Trial Ex. 3).

[165] See McGuire I, 260 F.3d at 46-48; McGuire II, 386 F.3d at 58.

[166] McGuire I, 260 F.3d at 46.

38

exemption to serve the purpose envisioned by the plaintiffs. There are other likely explanations. For example, the legislature may have exempted clinic workers—just as it exempted police officers—in order to make crystal clear what already was implicit in the Act: that those who work to secure peaceful access to RHCFs need not fear prosecution.[167]

. . .

Because we can envision at least one legitimate reason for including the employee exemption in the Act, it would be premature to declare the Act unconstitutional for all purposes and in all applications.[168]

The First Circuit concluded, "The employee exemption . . . is neutral on its face, drawing no distinction between different ideologies. And to the extent (if at all) that the exemption contributes to the Act's disproportionate impact on anti-abortion protesters, it can be justified by reference to the state's neutral legislative goals."[169]

Similarly, in McGuire II, the court held:

As we explained in McGuire I, so long as a reviewing court can "envision at least one legitimate reason for including the employee exemption in the Act," the law is not facially unconstitutional. McGuire I, 260 F.3d at 47. In McGuire I this court found there were likely explanations for the exemption other than the desire to favor pro-abortion speech over anti-abortion speech: "For example, the legislature may have exempted clinic workers—just as it exempted police officers—in order to make crystal clear . . . that those who work to secure peaceful access to RHCFs need not fear prosecution." Id. at 47. For this reason given in McGuire I, the viewpoint facial attack fails, now as then.[170]

Plaintiffs try to distinguish McGuire I and McGuire II on the ground that "[t]he rationale employed to uphold the employee/agent exemption of the floating buffer statute does not apply to

---

[167] Id. at 47.

[168] Id.

[169] Id. at 48.

[170] McGuire II, 386 F.3d at 58.

the fixed buffer zone statute . . . ."[171]  Plaintiffs argue:

> Unlike the fixed buffer statute, the floating buffer statute permitted all persons to access any part of the zone so long as they did not make unconsented to approaches from a distance of 6 feet or less, creating a possibility that the zone could become crowded and therefore make navigation by clinic patients difficult. . . . The same is not true of the fixed buffer statute.  Because pro-life advocates and virtually all other persons are excluded from the zone, patients have unhindered and safe passage through the zone to the clinics.[172]

This argument fails for several reasons.  First, contrary to Plaintiffs' contention, the rationale advanced in McGuire I continues to apply.  In McGuire I, the court held that the employee exemption served the goals of the 2000 Act "because clinic employees often assist in protecting patients and ensuring their safe passage as they approach RHCFs."[173]  As the record reflects, the same is true today.  Accordingly, "[s]ince it is within the scope of their employment for clinic personnel to escort patients in this fashion, and since a primary purpose of the law is to facilitate safe access, the employee exemption serves the basic objectives of the Act."[174]

Additionally, "[t]o cinch matters, the legislature could have concluded that clinic employees are less likely to engage in directing of unwanted speech toward captive listeners—a datum that the Hill court recognized as justifying the statute there."[175]  As with the 2000 Act, the legislature likely concluded the same thing here when deciding to maintain the exemption.

---

[171] PFF at 41.  Plaintiffs make this argument as part of their equal protection count, but because it directly implicates the employee/agent exemption, this court addresses it here.  The equal protection count fails for independent reasons discussed below.

[172] Id.

[173] McGuire I, 260 F.3d at 46.

[174] Id.

[175] Id.

40

Second, even assuming that the rationale applies with less weight here than with the 2000 Act—contrary to the position of this court—as long as there is "one legitimate reason for including the employee exemption in the Act," the law is not facially unconstitutional.[176]  In addressing the identical employee/agent exemption, the <u>McGuire I</u> court found "other likely explanations for the exemption," and gave the example cited twice above.   The same example applies here: "the legislature may have exempted clinic workers—just as it exempted police officers—in order to make crystal clear . . . that those who work to secure peaceful access to RHCFs need not fear prosecution."[177]  Accordingly, there is "at least one legitimate reason for including the employee exemption in the Act, [and] it would be premature to declare the Act unconstitutional for all purposes and in all applications."[178]

Plaintiffs also argue, "Whether or not by design, the fixed buffer statute allows escorts with pro-choice viewpoints to express their views in the zone while prohibiting most other persons from expressing their views in the zone."[179]

This argument also fails, at least on this facial challenge.[180]  On its face, the statute does

---

[176] <u>Id.</u> at 47; <u>McGuire II</u>, 386 F.3d at 58 (<u>citing</u> <u>McGuire I</u>, 260 F.3d at 47).  As noted above, the First Circuit emphasized this point in both <u>McGuire</u> cases.

[177] <u>McGuire I</u>, 260 F.3d at 47; <u>McGuire II</u>, 386 F.3d at 58 (<u>citing</u> <u>McGuire I</u>, 260 F.3d at 47).  <u>See</u> <u>also</u> <u>McGuire I</u>, 260 F.3d at 46 (Holding that "testimony taken before the state senate indicates beyond cavil that the employee exemption will promote the Act's goals because clinic employees often assist in protecting patients and ensuring their safe passage as they approach RHCFs.").

[178] <u>McGuire I</u>, 260 F.3d at 47.

[179] PFF at 41.

[180] If "experience shows that clinic staffers in fact are utilizing the exemption as a means either of proselytizing or of engaging in preferential pro-choice advocacy . . . [,]"  Plaintiffs may

not permit advocacy of any kind in the zone. Moreover, the Attorney General's enforcement

position expressly and unequivocally prohibits any advocacy by employees and agents of the

RHCF's in the buffer zone:[181]

> The second exemption—for employees or agents of the clinic acting within the scope
> of their employment—allows clinic personnel to assist in protecting patients and
> ensuring their safe access to clinics, but does not allow them to express their views
> about abortion or to engage in any other partisan speech within the buffer zone.[182]

This approach is consistent with the Attorney General's past interpretation of the

exemption,[183] an approach the District Court and the First Circuit cited with approval in McGuire

II.[184] As with the 2000 Act, the Attorney General's current position "require[s] evenhanded

enforcement of its prohibitions, even against clinic employees and agents . . . ."[185] It is "one very

likely interpretation of the exemption's language," and "is clearly a proper, content-neutral way

of interpreting the exemption."[186]

---

present this argument during the as-applied challenge. McGuire I, 260 F.3d at 47.

[181] Although this is a facial challenge, this court may properly consider the Attorney General's enforcement position. See Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 494 n.5 (1982) ("In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered.") (citing Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)). See also Ward v. Rock against Racism, 491 U.S. 781, 795-96, 109 S.Ct. 2746, 2756 (1989) (quoting Hoffman Estates, 455 U.S. at 494 n.5).

[182] 2008 Guidance Letter at 2 (Trial Ex. 26).

[183] See supra Factual Findings § D.

[184] See McGuire II, 386 F.3d at 65-66; McGuire v. Reilly, 271 F. Supp. 2d 335, 341 (D. Mass. 2003). See also supra Factual Findings § E.

[185] McGuire v. Reilly, 271 F. Supp. 2d at 341.

[186] McGuire II, 386 F.3d at 64.

42

For these reasons, the employee exemption does not discriminate based on viewpoint, and

Count V of Plaintiffs' Complaint fails.

### 3.    Conclusion Regarding Content Neutrality

On its face, the 2007 Act is a content-neutral time, place and manner restriction, and the

employee exemption does not constitute viewpoint discrimination.  Accordingly, this court

evaluates the Act using intermediate scrutiny.

### C.    Count I.  Time, Place and Manner Restriction

Time, place and manner regulations will be upheld if (1) "they are justified without

reference to the content of the regulated speech;" (2) "are narrowly tailored to serve a significant

governmental interest;" and (3) "leave open ample alternative channels for communication of the

information."[187]  Here, the Act meets all three prongs of the test.

### 1.    Justified Without Reference to Content of Regulated Speech

As explained above, the statute is justified without any reference to the content of

regulated speech.  The Act's purpose is "to increase forthwith public safety at reproductive

healthcare facilities,"[188] by protecting public safety in the areas adjacent to RHCF entrances and

driveways, and ensuring safe patient access to medical services.[189]  "The interests that underlie

---

[187] McGuire I, 260 F.3d at 43 (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).

[188] An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E1/2 (2007)). (Trial Ex. 1) [#36].

[189] The Commonwealth's public safety goal is furthered by the statute's attempt to eliminate the enforcement difficulties with the 2000 Act's floating zone.  As noted, these difficulties limited the 2000 Act's intended protections and were part of the reason that major public safety concerns persisted at RHCFs.

these purposes are firmly rooted in the state's traditional police powers, and these are precisely the sort of interests that justify some incidental burdening of First Amendment rights."[190]

### 2. Narrowly Tailored

The Supreme Court has repeatedly held that "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so."[191] Instead, a law is narrowly tailored if it "'promotes a substantial government interest that would be achieved less effectively absent the regulation,'"[192] and "does so without burdening substantially more speech than is necessary to further this goal."[193]

As long as this test is satisfied, a "regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative."[194]  "Put another way, the validity of time, place, or manner

---

[190] McGuire I, 260 F.3d 48 (citing Hill, 530 U.S. at 715 (noting the "enduring importance of the right to be free from persistent importunity, following and dogging after an offer to communicate has been declined") (citation and internal quotation marks omitted); Schenck v. Pro-Choice Network, 519 U.S. 357, 376 (1997) (extolling the significance of "ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services"); Madsen v. Women's Health Center, Inc, 512 U.S. 753, 772-73 (1994) ("The First Amendment does not demand that patients at a medical facility undertake Herculean efforts to escape the cacophony of political protests.").

[191] Ward, 491 U.S. at 798.

[192] Id. at 799 (quoting U.S. v. Albertini, 472 U.S. 675, 689 (1985)).

[193] McGuire I, 260 F.3d 48 (citing Ward, 491 U.S. at 799).  See also Naser Jewelers, Inc. v. City of Concord, 513 F.3d 27, 30 (1st Cir. 2008) (citing Ward, 491 U.S. at 799).

[194] Ward, 491 U.S. at 800; Naser, 513 F.3d at 35 (citing Ward, 491 U.S. at 800).

44

regulations is not subject to 'a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.'"[195]

Lastly, this court "must, of course, take account of the place to which the regulations apply in determining whether these restrictions burden more speech than necessary."[196] "States and municipalities plainly have a substantial interest in controlling the activity around certain public and private places," and the Supreme Court has recognized "the unique concerns that surround health care facilities . . . ."[197]

Here, the Commonwealth has a substantial and legitimate content-neutral interest in protecting public safety at RHCF entrances and driveways, because "[i]t is a traditional exercise of the States' police powers to protect the health and safety of their citizens."[198] The Commonwealth also has a legitimate, content-neutral interest in providing "unimpeded access to health care facilities and the avoidance of potential trauma to patients associated with confrontational protests."[199] Indeed, Plaintiffs appear to acknowledge the importance of this

---

[195] Bl(a)ck Tea Society v. City of Boston, 378 F.3d 8, 12 (1st Cir. 2004) (citing Ward, 491 U.S. at 800) (internal citations and quotation marks omitted).

[196] Hill, 530 U.S. at 728 (quoting Madsen, 512 U.S. at 772).

[197] Id.

[198] Hill, 530 U.S. at 715 (internal citations and quotation marks omitted).

[199] Id. (citing Madsen, 512 U.S. 753; NLRB v. Baptist Hospital, Inc., 442 U.S. 773 (1979)). See also id. at 728 ("Persons who are attempting to enter health care facilities—for any purpose—are often in particularly vulnerable physical and emotional conditions. The State of Colorado has responded to its substantial and legitimate interest in protecting these persons from unwanted encounters, confrontations, and even assaults by enacting an exceedingly modest restriction on the speakers' ability to approach.").

interest: "[I]t appears the fixed buffer statute was designed to protect the health and safety of women seeking reproductive health care services. This is a legitimate interest."[200] Additionally, at the Bench Trial, Plaintiffs noted: "In this particular case the legitimate sweep is what? It is clearing out the bottleneck . . . immediately adjacent to the doors and to the driveways. Certainly blocking, impeding, trespass is actually a significant interest. That's a legitimate interest of the government."[201]

Having found qualifying governmental interests, this court now determines that the law is narrowly tailored to serve those interests. Despite the passage of the 2000 Act, the Commonwealth faced significant public safety problems in the areas adjacent to RHCF entrances and driveways, including serious concerns regarding safe patient access to medical services. As a result, following an investigation, the Legislature reasonably concluded that the 2000 Act's floating buffer zone was insufficient,[202] and determined that a 35-foot fixed buffer zone was immediately necessary to protect public safety and ensure patient access to clinics. Accordingly, based on the record before the Legislature and the record before this court, promoting these public safety interests would be achieved less effectively without the fixed-buffer zone law.

Additionally, the law does not burden substantially more speech than necessary to further these public safety goals. Again, "the government is not required to choose the least restrictive

---

[200] PFF at 34 (citing McGuire I, 260 F.3d at 44).

[201] Prelim. Bench Trial Transcript at 76.

[202] See, e.g., McGuire I, 260 F.3d at 49 (holding that "[t]he Massachusetts legislature reasonably concluded that *existing law inadequately addressed* the public safety, personal security, traffic, and health care concerns created by persistent demonstrations outside RHCFs.") (emphasis added).

approach in content-neutral regulation."[203]  Here, the Legislature appears to have carefully

considered and balanced the Act's effects on speech with the Commonwealth's legitimate

governmental interests.  The result was a 35-foot fixed buffer zone that targeted the problematic

areas (areas immediately adjacent to RHCF entrances and driveways), during the problematic

times (an RHCF's business hours).

 Furthermore, the Supreme Court and other federal courts have upheld several fixed zones

as "narrowly tailored" under the First Amendment.  For example, in Madsen, the Court upheld

part of an injunction that created a 36-foot fixed buffer zone around an RHCF's entrances and

driveway.[204]  Also, in Schenck, the Court upheld an injunction that created a 15-foot fixed buffer

zone around RHCF entrances, doorways and driveways.[205]

On the record before this court, like in Schenck, this court finds that the fixed buffer zone

is "necessary to ensure that people and vehicles trying to enter or exit the clinic property or clinic

parking lots can do so,"[206] which directly furthers the public safety and access goals of the

Commonwealth.  As in Madsen and Schenck, "the record shows that protesters purposefully or

effectively blocked or hindered people from entering and exiting the clinic doorways, from

driving up to and away from clinic entrances, and from driving in and out of clinic parking

---

[203] Naser, 513 F.3d at 36.

[204] See Madsen, 512 U.S. 753.  The Court invalidated other aspects of the injunction, including the 36-foot buffer zone as applied to certain private property surrounding the clinic. See id. at 776.

[205] See Schenck v. Pro-Choice Network of Western N.Y., 519 U.S. 357 (1997).

[206] Id. at 380.

lots."[207]  As such, the Legislature "was entitled to conclude that the only way to ensure access

was to move back the demonstrations away from the driveways and parking lot entrances," and

"the only way to ensure access was to move *all* protesters away from the doorways."[208]

Lastly, the exact size of the buffer zone is not a choice for this court to make.[209]  Maybe

the Legislature's concerns warranted a slightly larger buffer zone, or maybe the Legislature could

have accomplished its objectives with a slightly smaller zone.  It is the view of this court,

however, considering all of the evidence before the Legislature and this court, the Legislature's

choice of 35 feet was a reasonable one under the circumstances, and one that was narrowly

tailored to promoted the Commonwealth's substantial and legitimate interests.

### i.        Note: Plaintiffs' Challenges to Legislature's Evidence

Plaintiffs argue that the Legislature based the 2007 Act on outdated evidence that

preceded the passage of the 2000 Act.[210]  This argument carries no weight.

First, virtually all of the evidence presented to the Legislature in 2007 addressed the

---

[207] Id.

[208] Id. at 380-381 (emphasis in original).  Similarly, as this court noted at the Bench Trial, "the government has the right to neutralize a certain amount of property."  Prelim. Bench Trial Transcript at 79.

[209] Again, "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted."  Ward, 791 U.S. at 800 (internal citations and quotation marks omitted).  Additionally, "Courts owe legislative judgments substantial respect and, as a general matter, should be reluctant "to reduce statutory language to a merely illustrative function.'"  McGuire I, 260 F.3d at 47 (quoting Mass. Ass'n of HMOs v. Ruthardt, 194 F.3d 176, 181 (1st Cir. 1999)).

[210] See, e.g., Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 48 (characterizing the evidentiary record as "stale").

public safety situation in the years *following* the enactment of the 2000 Act, including information from the then-recent past. This cannot be considered stale by any means.

Second, based on the record before this court, the post-2000 Act evidence formed the primary basis for the Legislature's adoption of the 2007 Act.

Third, the Legislature may certainly "make use of past experience," as long as "the degree to which inferences drawn from past experience are plausible."[211] Here, to the extent the Legislature considered the Commonwealth's history of public safety problems at RHCFs, it was reasonable to do so, particularly because the "past experience" derived from a relatively recent time frame. Indeed, this would be expected prior to the passage of most public safety laws. Additionally, it was plausible and reasonable for the Legislature to infer from past experiences at RHCFs that these problems would continue unless the 2000 Act was passed.

Plaintiffs also argue that nothing in the record supports creation of the fixed zone. According to Plaintiffs: "There is no evidence that anything happened between 2000 and 2007 that warranted the increase in the size of the buffer zone or even the fixed buffer zone but for the fact that the police were having difficulty in enforcing it. That's it."[212]

Similarly, Plaintiffs claim:

> The police didn't testify that there was any problem outside the abortion clinics. They didn't say there was impeding, any blocking, any harassment, any trespass.

---

[211] Bl(a)ck Tea Society v. City of Boston, 378 F.3d 8, 14 (1st Cir. 2004). Indeed, Plaintiffs acknowledged this at the Bench Trial. See Prelim. Bench Trial Transcript at 38 ("In Bl(a)ck Tea Society the First Circuit said that the government can consider past experiences but, I mean, there has to be a fairly reasonable nexus, a plausible nexus between what happened in the past and what's happened in the future.").

[212] Prelim. Bench Trial Transcript at 39.

The police are there all the time. That's the testimony in the record. They're there all the time and they didn't see any of the problems that these abortion providers and supporters saw.

Nothing in the record with respect [to] arrests and convictions.
. . .
Well, if these things are happening, Judge, why aren't the people who were actually violating the law being prosecuted? And if they're being prosecuted, why are there no convictions? There are no arrests and no convictions in the record with respect to unlawful conduct.
. . .
My point is is the lack of arrests and the law of convictions are showing that the illegal unlawful behavior isn't occurring in the first place.[213]

These arguments echo Plaintiffs' claims in the "content-based" versus "content-neutral" debate, and the response is the same. Contrary to Plaintiffs' contentions, the record contains numerous and specific factual references to continued public safety problems around RHCFs in the years following the passage of the 2000 Act, including impeded access, blocking and harassment. All of this evidence went well beyond difficulties in enforcing the 2000 Act.

Furthermore, although Plaintiffs claim that only RHCF employees and supporters identified problems, Captain Evans of the Boston Police Department testified about public safety problems outside of the RHCFs. Attorney General Coakley also testified. Moreover, nothing in the record supports Plaintiffs' implication that RHCF employees and supporters embellished or fabricated their testimony.

Additionally, as explained above, police and district attorneys *tried* to prosecute violations of the 2000 Act, but encountered significant difficulty; and the low number of arrests for violations was due to the difficulty of enforcing the law, not a lack of problematic conduct.

Lastly, although the 2007 Act mainly—if not entirely—responds to an existing public

---

[213] Id. at 73-74 (spacing modified).

safety and law enforcement problem, the Legislature may certainly take a preventative approach to lawmaking.  Indeed, in this case, "[a] bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself."[214]

### ii.      Note: Plaintiffs' Conduct

Plaintiffs note that their conduct at RHCFs is peaceful, and that they do not block, impede or harass patients or pedestrians.[215]  If this case involved an injunction directed at Plaintiffs, the lawfulness and character of their behavior would be important.  At this time, however, this court is evaluating a facial challenge to a statute of general application.  Accordingly, Plaintiffs' specific conduct is largely, if not entirely, irrelevant to the present analysis.[216]

### 3.      Ample Alternative Channels

### i.      Alternative Channels

The law also satisfies the final requirement, because it leaves open ample alternative avenues of communication.[217]  First, there are important prerequisites for the Act to apply at a particular RHCF: the buffer zone must be clearly marked and posted, and is only enforceable

---

[214] Hill, 530 U.S. at 729.

[215] See, e.g., Decl. of Eleanor McCullen at 2, 4 (Trial Ex. 4); Decl. of Jean Blackburn Zarrella at 2-3 (Trial Ex. 5); Decl. of Carmel Ferrell at 2-3 (Trial Ex. 6); Decl. of Eric Cadin at 2-3 (Trial Ex. 7); PFF at 3-4.

[216] Moreover, this court does not have a complete record on such conduct.

[217] Plaintiffs may try to establish otherwise during their as-applied challenge, but this court cannot make such a finding on this facial challenge.

during the normal business hours of the clinic.[218]  Additionally, when in effect, the Act only

applies within 35-foot radii of RHCF entrances and driveways, not around the entire property

line.[219]

Furthermore, as long as Plaintiffs—or anyone for that matter—remain outside the zone,

they may freely talk to individuals entering and exiting the RHCFs, as well as people inside the

zone.  The Act also does nothing to prevent patients from leaving the zone to speak with

protesters or counselors.  Moreover, individuals may continue to display signs and photographs,

hand out literature, talk, pray, chant, sing or engage in any other form of lawful communication

or protest outside of the buffer zone.   Importantly, most, if not all of this expressive activity, can

be seen and heard by people entering and exiting the buffer zone, and also by people inside the

buffer zone.[220]

### ii.     Plaintiffs' Approach Argument

Plaintiffs argue that "[t]he First Amendment protects the right of speakers to

communicate with their intended audience from a normal conversational distance, and distances

of 15 feet or more do not, as a matter of law, allow for normal conversation."[221]

---

[218] Mass. Gen. Laws ch. 266, § 120E1/2(2)(c) (2000), amended by Mass. Gen. Laws ch. 266 § 120 E1/2(c) (2007) (Trial Ex. 3).

[219] An Act Relative to Public Safety at Reproductive Health Care Facilities, Chapter 155 of the Acts of 2007 (codified as amended at Mass. Gen. Laws ch. 266, § 120E1/2 (2007)) (emphasis in original) (Trial Ex. 1) [#36].).

[220] See, e.g., Madsen, 512 U.S. at 770 ("Protesters standing across the narrow street from the clinic can still be seen and heard from the clinic parking lots.").  Plaintiffs may try to establish otherwise during their as-applied challenge, but there is no basis for such a finding at the facial challenge stage.

[221] PFF at 29.

The Supreme Court, however, has repeatedly upheld fixed buffer zones that have the effect of limiting normal conversation within the zone. For example, in Madsen and Schenck, respectively, the Court upheld 36-foot and 15-foot fixed buffer zones around RHCF entrances and driveways.[222]

Plaintiffs, however, urge that Schenck supports their position. There, the Court addressed both a floating and a fixed buffer zone. The floating zone required all protesters to stay at least 15 feet away from any individual or vehicle seeking access to or leaving an RHCF, regardless of the person or vehicle's location.[223] The fixed buffer zone prohibited "demonstrating within fifteen feet from either side or edge of, or in front of, doorways or doorway entrances, parking lot entrances, driveways and driveway entrances of such facilities."[224]

The Court observed that the floating buffer zone "prevented defendants . . . from communicating a message from a normal conversational distance or handing leaflets to people entering or leaving the clinics who are walking on the public sidewalks," and that this was a "broad prohibition, both because of the type of speech that is restricted and the nature of the location."[225] But, "[o]n the other hand, we have before us a record that shows physically abusive conduct, harassment of the police that hampered law enforcement, and the tendency of even peaceful conversations to devolve into aggressive and sometimes violent conduct. In some

---

[222] Madsen, 512 U.S. at 768-71; Schenck, 519 U.S. at 374-76. Likewise, albeit in a different context, the Court upheld a 100-foot fixed "campaign free" zone around polling places. See Burson v. Freeman, 504 U.S. 191, 210-11 (1992).

[223] See Schenck, 519 U.S. at 366.

[224] Id. (internal quotation marks omitted).

[225] Id. at 377.

53

situations, a record of abusive conduct makes a prohibition on classic speech in limited parts of a public sidewalk permissible."[226]

The Court, however, declined to decide "whether the governmental interests involved would ever justify some sort of zone of separation between individuals entering the clinics and protesters, measured by the distance between the two."[227]  Instead, the Court held that "because this broad prohibition on speech 'floats,' it cannot be sustained on this record."[228]  The Court explained:

> [I]t would be quite difficult for a protester who wishes to engage in peaceful expressive activities to know how to remain in compliance with the injunction.  This lack of certainty leads to a substantial risk that much more speech will be burdened than the injunction by its terms prohibits.  That is, attempts to stand 15 feet from someone entering or leaving a clinic and to communicate a message—certainly protected on the face of the injunction—will be hazardous if one wishes to remain in compliance with the injunction.[229]

Significantly, however, the Court *upheld* the 15-foot fixed buffer zone around RHCF entrances and driveways,[230] even though the effect on conversation was similar.

Here, the buffer zone is fixed, not floating.  Accordingly, the Court's concern regarding the uncertainty that attaches to a floating zone disappears.  A fixed zone provides a bright-line

---

[226] Id.

[227] Id.

[228] Id.

[229] Id. at 378 (internal citations omitted).

[230] Id. at 380-81 ("We uphold the fixed buffer zones around the doorways, driveways, and driveway entrances.  These buffer zones are necessary to ensure that people and vehicles trying to enter or exit the clinic property or clinic parking lots can do so . . . .").

rule for violations: if you are a non-exempt person in the zone, you are violating the Act.[231]

Moreover, as discussed in the narrowly tailored analysis, this court finds that the substantial

governmental interests involved here justify the creation of the 35-foot fixed buffer zone.

Additionally, although the Supreme Court cases control the holding here, this court

briefly notes the First Circuit's decision in Bl(a)ck Tea Society v. City of Boston.[232] There, the

First Circuit considered and upheld the establishment of a "designated demonstration zone" for

the 2004 Democratic National Convention.[233]

The designated zone "allowed no opportunity for physical interaction (such as the

distribution of leaflets) and severely curtailed any chance for one-on-one conversation."[234] The

court held, however, among other things, that "although the opportunity to interact directly with

the body of delegates by, say, moving among them and distributing literature, would doubtless

have facilitated the demonstrators' ability to reach their intended audience, there is no

constitutional requirement that demonstrators be granted that sort of particularized access."[235]

The same applies here. Although slightly closer physical interaction may partially

enhance one's ability to sidewalk counsel RHCF patients, there is no constitutional right to that

level of particularized access.

---

[231] This also provides the police with clear guidelines for enforcing the law.

[232] 378 F.3d 8 (1st Cir. 2004).

[233] Id. at 10.

[234] Id. at 13.

[235] Id. at 14.

### 4.    Conclusion Regarding Time, Place and Manner Restriction

For the foregoing reasons, this court finds that the 2007 Act (1) is justified without reference to the content of the regulated speech; (2) is narrowly tailored to serve significant governmental interests; and (3) leaves open ample alternative channels for communication. Accordingly, the Act is a lawful time, place and manner restriction, and Defendant prevails on Count I of Plaintiffs' Complaint.

### D.    Note on Public Forum Doctrine

Although Plaintiffs do not press a separate public forum challenge, Plaintiffs correctly note that sidewalks and streets are "'quintessential' public forums."[236]  Plaintiffs also dedicate a section of their brief to the subject of free speech on public streets and sidewalks.[237] Accordingly, this court will conduct a separate public forum analysis.

Governments can regulate public forums if the restrictions meet the appropriate level of scrutiny.  As noted, while content-based regulations must survive strict scrutiny,[238] content-neutral time, place and manner restrictions must pass intermediate scrutiny.[239]

Here, the Act clearly can affect sidewalks and streets in the vicinity of RHCFs, and is thereby subject to the public forum doctrine.  For the reasons above, however, the Act is content-

---

[236] See PFF at 18 (citing Frisby v. Schultz, 487 U.S. 474, 481 (1988); United States v. Grace, 461 U.S. 171, 179 (1983)).

[237] See "The Nature of Public Streets and Sidewalks," id. at 18-19; "Free Speech on Public Streets and Sidewalks," id. at 20-22.

[238] Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983).

[239] Id. ("The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.").

neutral, time, place and manner regulation.   Accordingly, intermediate scrutiny applies, and this court has already held that the Act passes this level of scrutiny.   The Act, therefore, also survives a separate public forum challenge.

**E.    Count II.  Overbreadth Challenge**

Plaintiffs also assert that the Act is overbroad because it burdens more speech than is necessary to achieve a substantial and legitimate government interest.   There are two main parts to this argument.  First, Plaintiffs argue that the "statute bans from the zone all types of speech . . . and all manner of speech . . . not only the abortion-related speech . . . .[,]"[240] and the government's interest is not served by such a broad ban.[241]  Second, Plaintiffs argue that the statute unconstitutionally burdens personal liberty interests, because it "prohibits virtually all persons from standing in or utilizing the zone for any and all purposes other than 'reaching a destination other than such facility.'"[242]

The Supreme Court rejected similar arguments in Hill v. Colorado, and the Court's analysis applies with equal weight here.   There, the Court held, "The fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance.  What is important is that all persons entering or leaving health care facilities share the interests served by the statute."[243]  Here, all persons entering and exiting the health care facilities share the legitimate health and safety interests served by the Act.

---

[240] PFF at 33.

[241] See id. at 35-36.

[242] See id. at 34 (quoting Mass. Gen. Laws ch. 266, § 120E1/2(b) (2007)).

[243] Hill, 530 U.S. 703, 730-31 (2000).

Furthermore, as noted in the content-neutral discussion, the Act's "comprehensiveness . . . is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive."[244]   Indeed, "there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally."[245]

Additionally, as already noted, the Act "simply does not 'ban' any messages, and likewise it does not 'ban' any signs, literature, or oral statements.  It merely regulates the places where communications may occur."[246]

Addressing Plaintiffs' overbreadth argument more generally, "a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[247]   The Court, however, "vigorously enforce[s]" the substantiality requirement, "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep."[248]   Additionally, "[t]he overbreadth doctrine is 'strong

---

[244] Id. at 731.

[245] Id.

[246] Id.

[247] Wash. State Grange v. Wash. State Republican Party, 128 S. Ct. 1184, 1191 n.6 (2008) (citing New York v. Ferber, 458 U.S. 747, 769-71 (1982) (internal citations and quotation marks omitted)).  See also Hill, 530 U.S. at 732 ("'particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.'") (quoting Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)).

[248] United States v. Williams, 128 S. Ct. 1830, 1838 (2008) (citing Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 485 (1989); Broadrick, 413 U.S. at 615).

medicine' that is used 'sparingly and only as a last resort.'"[249]

On the record before this court on Plaintiffs' facial challenge, Plaintiffs have not

established that "the impact of the statute on the conduct of other speakers will differ from its

impact on their own sidewalk counseling."[250]  "Like [Plaintiffs'] own activities, the conduct of

other protesters and counselors at all health care facilities are encompassed within the statute's

'legitimate sweep.'"[251]  Accordingly, Count II must fail.

### F.    Count III.  Prior Restraint

Plaintiffs also assert that the Act constitutes an impermissible prior restraint on speech in

violation of the First and Fourteenth Amendments.  The Act, however, is not a prior restraint,

because the Commonwealth "has not sought to prevent speech, but, rather, to regulate the place

and manner of its expression."[252]  Indeed, "The Supreme Court has explicitly rejected attempts to

analyze security-based time-place-manner restrictions as prior restraints," including in Hill,

Schenck and Madsen, "and those cases are controlling here."[253]  As cautioned by the First Circuit,

"If content-neutral prohibitions on speech at certain places were deemed prior restraints, the

intermediate standard of review prescribed in the time-place-manner jurisprudence would be

---

[249] New York State Club Ass'n v. City of New York, 487 U.S. 1, 14 (1988) (quoting Broadrick, 413 U.S. at 613).  See also Williams, 128 S. Ct. at 1838; Wash. State Grange, 128 S. Ct. at 1191 n.6.

[250] Hill, 530 U.S. at 732.

[251] Id.

[252] Bl(a)ck Tea Society, 378 F.3d 8, 12 (1st Cir. 2004).

[253] Id. (citing Hill, 530 U.S. at 733-34; Schenck, 519 U.S. at 374 n.6; Madsen, 512 U.S. at 763 n.2).

eviscerated."[254]

Accordingly, Count III of Plaintiffs' Complaint fails.

## G.     Count IV.  "Free Speech - Free Association - Free Exercise Hybrid"

Plaintiffs also argue that "the Act implicates rights to free speech, free assembly, free association and free exercise of religion,"[255] and that "[i]nfringement of the right to free exercise of religion exercised in combination of other fundamental constitutional rights subjects the Act to strict scrutiny review."[256]  This court will first address each of these rights individually.

### 1.     Free Exercise Claim

"The Free Exercise Clause also is made applicable to the states (and, therefore, to municipalities) through the Fourteenth Amendment."[257]  The clause states that "Congress shall make no law . . . prohibiting the free exercise [of religion] . . . ."[258]  If, however, "'a law . . . is neutral and of general applicability,'" it "'need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.'"[259]

Here, this court has already determined that the Act is a generally-applicable, content-neutral statute that passes intermediate scrutiny.  The Act does not regulate speech, expression,

---

[254] Id.

[255] Pl. Mem. of Law in Supp. of Mot. for Prelim. Inj. at 39.

[256] Compl. at 18.

[257] Knights of Columbus v. Town of Lexington, 272 F.3d 25, 35 (1st Cir. 2001) (citing Cantwell v. Connecticut, 310 U.S. 296, 303 (1940)).

[258] U.S. Const. Amend. I.

[259] Knights of Columbus, 272 F.3d at 35 (quoting Church of Lukumi Babalu Aye v. City of Hialeah, 508 U.S. 520, 531 (1993)).

prayer, singing, worship or display of religious articles. It merely regulates where such expression may take place, i.e., outside of a clearly marked buffer zone during the normal business hours of an RHCF. The Act also applies to all non-exempt persons equally. As a result, this court is "bound to conclude that the regulation does not discriminate against a particular religion or religious practice."[260] Accordingly, as a matter of law, Plaintiffs "cannot rewardingly invoke the Free Exercise Clause in their attack on the regulation."[261]

### 2. Freedom of Speech

This court has already determined that the Act is a lawful, content-neutral time, place and manner restriction; is not overbroad; and does not constitute a prior restraint. Accordingly, Plaintiffs' free speech claim fails.

### 3. Freedom of Assembly and Association

The Supreme Court has held, "Regulations imposing severe burdens on plaintiffs' [associational] rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."[262]

Here, the Act does not impose a "severe" burden on a protester's right to assemble or associate. As noted above, the Act permits ample alternative channels of communication, because, among other things, individuals are free to demonstrate and associate outside the buffer

---

[260] Id.

[261] Id.

[262] Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997) (internal citations and quotation marks omitted).

61

zone. Moreover, for the reasons above, the Commonwealth's interests are of sufficient importance to justify the 35-foot fixed buffer zone. Accordingly, the Act does not violate the First Amendment's right to associate or assemble peaceably.

### 4. No Hybrid Cause of Action

All of Plaintiffs' First Amendment individual claims fail, leaving Plaintiffs' "hybrid" cause of action. Again, Plaintiffs argue that "heightened review applies when free exercise rights are infringed in combination with other fundamental constitutional rights."[263]

Although the First Circuit has yet to decide the "hybrid rights" issue definitively,[264] this court declines to apply strict scrutiny to the instant case.[265] After reviewing all of Plaintiffs constitutional claims on an individual basis and finding no violation, this court will not engage in multiplication theory. Notwithstanding the Supreme Court's dicta in Smith,[266] there is no basis

---

[263] Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 39. Plaintiffs base this count on Employment Div., Dept. of Human Resources of Oregon v. Smith, where the Court observed, "The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press . . . ." 494 U.S. 872, 882 (1990), rehearing denied, 496 U.S. 913 (1990) (subsequent history omitted).

[264] See Parker v. Hurley, 514 F.3d 87, 98 (1st Cir. 2008) (declining to "enter[] the fray over the meaning and application of Smith's 'hybrid situations' language"). The court did, however, note that "[n]o published circuit court opinion, including Brown [v. Hot, Sexy & Safer Productions, 68 F.3d 525 (1st Cir. 1995)], has ever applied strict scrutiny to a case in which plaintiffs argued they had presented a hybrid claim." Id. at 98. Additionally, "[o]ther circuits have held explicitly that Smith does not create a new category of hybrid claims." Id.

[265] The court has already held that the Act passes intermediate scrutiny.

[266] The Court's observation was incidental and unnecessary to the outcome of the case. Indeed, the Court specifically acknowledged, "The present case does not present such a hybrid situation." Smith, 494 U.S. at 882. Accordingly, the comment is dicta and non-binding. See, e.g., Leebaert v. Harrington, 332 F.3d 134, 143 (2d Cir. 2003) ("We have held, by contrast, in the

in the Constitution for heightening the level of review simply based on the number of rights

asserted or implicated in a case.[267]   Either a plaintiff has a constitutional claim or she does not.[268]

---

context of claims involving free exercise and free speech, that Smith's 'language relating to hybrid claims is dicta and not binding on this court.'") (quoting Knight v. Conn. Dep't of Pub. Health, 275 F.3d 156, 167 (2d Cir. 2001)).  This court also does not believe that the statement rises to the level of a "carefully considered statement" recognized by the First Circuit as controlling precedent.  See United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993).

    [267] See, e.g., Leebaert, 332 F.3d at 144 ("We too can think of no good reason for the standard of review to vary simply with the number of constitutional rights that the plaintiff asserts have been violated.  Therefore, at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard to evaluate hybrid claims.") (internal citations and quotation marks omitted); Kissinger v. Bd. of Trustees of Ohio State Univ., 5 F.3d 177, 180 (6th Cir. 1993) ("We do not see how a state regulation would violate the Free Exercise Clause if it implicates other constitutional rights but would not violate the free Exercise Clause if it did not implicate other constitutional rights.").  See also Hialeah, 508 U.S. at 567 (Souter, J., concurring) ("[T]he distinction Smith draws strikes me as ultimately untenable.  If a hybrid claim is simply one in which another constitutional right is implicated, then the hybrid exception would probably be so vast as to swallow the Smith rule, and, indeed, the hybrid exception would cover the situation exemplified by Smith, since free speech and associational rights are certainly implicated in the peyote ritual.  But if a hybrid claim is one in which a litigant would actually obtain an exemption from a formally neutral, generally applicable law under another constitutional provision, then there would have been no reason for the Court in what Smith calls the hybrid cases to have mentioned the Free Exercise Clause at all.").

    [268] This court notes, however, that even assuming the existence of a "hybrid rights" doctrine, Plaintiffs' "hybrid" claim would still fail.  Under the doctrine, a plaintiff must still establish an independently viable constitutional violation, or at least a "colorable" associated claim.  See, e.g., Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 765 (7th Cir. 2003) ("Based on the analyses of Appellants' speech, assembly, and equal protection claims that follow, however, we find them individually lacking the merit necessary to withstand summary judgment . . . .  Appellants have identified no constitutionally protected interest upon which the [statute] infringes, as they must in order to establish a hybrid rights claim requiring heightened scrutiny."); EEOC v. Catholic University of America, 83 F.3d 455, 467 (D.C. Cir. 1996) (acknowledging a "hybrid situation," but finding no independently viable constitutional claim).  See also Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1148 (9th Cir. 2000) (characterizing EEOC as "requiring that a free exercise claim based on the hybrid rights exception must include an independently viable claim of infringement of a companion right").  For the "colorable" claim requirement, see, for example, Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 656 (10th Cir. 2006) (explaining that "hybrid rights exception"

63

Accordingly, Count IV of the Complaint also fails.

**Discussion: Count VIII.  Equal Protection Challenge**

Plaintiffs also assert that the employees/agents exemption of the Act violates the Equal Protection Clause.  As such, Plaintiffs argue that the Act "impinges fundamental rights and liberty interests and therefore is subject to strict scrutiny review."[269]  This court's other holdings regarding the Act, however, and the case law, foreclose such an argument.

"From time to time, the Supreme Court has invoked equal protection rather than free speech, as the basis for invalidating a content-based speech restriction."[270]  "But where the state shows a satisfactory rationale for a content-neutral time, place, and manner regulation, that regulation necessarily passes the rational basis test employed under the Equal Protection Clause."[271]

Here, as discussed above, the exemption is content-neutral and there are satisfactory rationales for the exemption.  Accordingly, "the Act passes muster under the Equal Protection Clause for the same reasons that it passes muster under the First Amendment."[272]

Furthermore, as explained above, intermediate scrutiny applies, not strict scrutiny.[273]

---

requires a "colorable independent constitutional claim").  Here, for the reasons above, Plaintiffs have not established either.  Accordingly, any "hybrid" claim would fail.

[269] Compl. at 22.

[270] McGuire I, 260 F.3d at 49.

[271] Id. at 49-50.

[272] Id. at 50.

[273] See, e.g., Sullivan v. City of Augusta, 511 F.3d 16, 32-33 (1st Cir. 2007) ("Unlike regulations that are not content-neutral, which are reviewed under a harsher strict-scrutiny

Because this court has already held that the Act survives intermediate scrutiny, Count VIII of

Plaintiffs' Complaint also fails.

**Discussion: Due Process Challenges**

    **A.    Count VI.  Vagueness**

        **1.    Plaintiffs' Position**

  Plaintiffs argue that the Act is unconstitutionally vague because of one of the Act's

exemptions.[274]  Exemption four excludes from the Act's coverage "persons using the public

sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a

destination other than such facility."[275]

    Plaintiffs find two words of the exemption problematic.  First, Plaintiffs argue that

"solely" is unclear, "because there are often multiple reasons for persons to travel from one place

to another."[276]  Second, Plaintiffs argue that "destination" is unclear, "because a person need not

have a destination as a reason to use a public sidewalk."[277]

    Plaintiffs also argue that "it is unclear whether the statute permits plaintiffs to walk

through the zone carrying a sign, or wearing a t-shirt or hat with an abortion-related or partisan

---

standard, . . . content-neutral regulations are reviewed under so-called intermediate scrutiny.").

    [274] See Compl. at 19-20; PFF at 42-43.

    [275] Mass. Gen. Laws ch. 266, § 120E1/2(2)(b) (2000), amended by Mass. Gen. Laws ch.
266 § 120 E1/2(b) (2007) (spacing modified) (Trial Ex. 3).

    [276] PFF at 42.

    [277] Id. at 43.

message."[278]  According to Plaintiffs, "Based on the Attorney General's guidance letter, it appears they cannot," because, "[a]s construed by the Attorney General, the term 'partisan speech' is undefined, forcing a person to guess about the conduct proscribed."[279]

## 2.    Attorney General's Guidance

As noted above, the Attorney General's 2008 Guidance Letter addresses all of the exemptions, including the fourth:

> Finally, the fourth exemption—for persons using the sidewalk or street adjacent to the clinic to reach a destination other than the clinic—applies to individuals who are crossing through the buffer zone, without stopping, to go somewhere other than a location within the zone and other than the clinic, and who are not using the buffer zone for some other purpose while passing through. For example, an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech).[280]

## 3.    Legal Standard for Vagueness

The Due Process Clause of the Fifth Amendment "'mandates that, before any person is held responsible for violation of the criminal laws of this country, the conduct for which he is held accountable be prohibited with sufficient specificity to forewarn of the proscription of said conduct.'"[281]  Accordingly, "'[a]s generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can

---

[278] Id.

[279] Id.

[280] 2008 Guidance Letter at 3 (Trial Ex. 26).

[281] United States v. Lachman, 387 F.3d 42, 56 (1st Cir. 2004) (quoting United States v. Anzalone, 766 F.2d 676, 678 (1st Cir. 1985)).

understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'"[282]

"The mere fact that a statute or regulation requires interpretation does not render it unconstitutionally vague."[283]  Indeed, "'Many statutes will have some inherent vagueness . . . . Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'"[284]

Lastly, as acknowledged by Plaintiffs,[285] "[i]n evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered."[286]

### 4.    Vagueness Standard Applied

Reading the statute "as a whole,"[287] this court finds the exemption to be clear on its face.

---

[282] Id. at 56 (quoting Kolender v. Lawson, 461 U.S. 352, 357 (1983) and citing Grayned v. City of Rockford, 408 U.S. 104, 108 (1972); Bouie v. City of Columbia, 378 U.S. 347, 350-51 (1964)).  See also United States v. Williams, 128 S. Ct. 1830, 1845 (2008) ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.").

[283] Id.

[284] Id. (quoting Rose v. Locke, 423 U.S. 48, 49-50 (1975)).

[285] See PFF at 18.

[286] Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 495 n.5 (1982) (citing Grayned, 408 U.S. at 110).  See also McGuire II, 386 F.3d at 58 (internal citations and quotation marks omitted).

[287] See Schenck v. Pro-Choice Network, 519 U.S. 357, 383 (1997) (citing Grayned, 408 U.S. at 110).

"Solely," meaning "to the exclusion of all else,"[288] should not confuse a person of ordinary intelligence.[289]   The exemption applies if an individual walks through the zone with the sole purpose of walking home or to work or to the store.  Additionally, if a counselor or protester decides to walk through the zone with the *sole* purpose of getting to the other side, the exemption applies.  What the statute prohibits is walking through the zone with the purpose of engaging in an activity *other than* reaching the other side.  This would clearly not be passing through the zone "to the exclusion of all else."

Moreover, the word "destination," meaning "the place to which one is journeying,"[290] is also clear.  Plaintiffs disagree, and argue, as an example, that a person jogging or strolling does not necessarily have a destination.  This argument is unpersuasive.  A jogger's destination is to the end of his run, which may be at the end of the block or in the next neighborhood.  Indeed, for purposes of the exemption, any destination is fine, so long as it is not in the middle of a clearly marked buffer zone during an RHCF's business hours.  Even the aimless stroller has a likely destination in mind before she turns around.  In any event, the word is sufficiently clear for ordinary people to understand.

Furthermore, even assuming that the exemption requires some degree of explanation, the Attorney General's interpretation eliminates any possible confusion.[291]  Not only is the Attorney

---

[288] Merriam-Webster's Collegiate Dictionary 1114 (Definition 2) (10th ed. 2000).

[289] Williams, 128 S. Ct. at 1845.

[290] Id. at 314 (Definition 3).

[291] Again, although this court considers the statute clear on its face, "[t]he mere fact that a statute . . . requires interpretation does not render it unconstitutionally vague."  Lachman, 387 F.3d at 56.

General's construction reasonable, it comports with a common sense and plain read of the language.

Also, despite Plaintiffs' contention, the Attorney General's guidance is clear. The 2008 Guidance Letter states, "an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech)."[292]

Although Plaintiffs claim to be confused by this, displaying signs or shirts with abortion-related or partisan messages clearly qualifies as "expressing their views about abortion," which counts as "do[ing] anything else within the buffer zone."[293] As such, the Attorney General's interpretation specifically prohibits this type of conduct.[294] After all, if individuals could simply walk back and forth all day in the buffer zone engaging in various activities, the main goals of the statute—ensuring public safety and guaranteeing unimpeded and safe access for patients—would be severely frustrated.

Contrary to Plaintiffs' assertion, the phrase "partisan speech" is also not vague such that

---

[292] 2008 Guidance Letter at 2 (Trial Ex. 26).

[293] Id.

[294] Indeed, and despite their alleged confusion, Plaintiffs appear to acknowledge as such: "On its face, it is unclear whether the statute permits plaintiffs to walk though the zone carrying a sign, or wearing a t-shirt or hat with an abortion-related or partisan message. *Based on the Attorney General's guidance letter, it appears they cannot.*" PFF at 43 (emphasis added).

an ordinary person is "forc[ed] . . . to guess about the conduct proscribed."[295] An ordinary person understands "partisan" as support for political party or cause. The formal definition is also consistent with the contemporary use of the word: when used as an adjective, "partisan" means embodying "a firm adheren[ce] to a party, faction, cause or person."[296] Especially when used in the context of "abortion . . . or other partisan speech,"[297] an ordinary person would understand that the provision refers to political or cause-related speech. Accordingly, this provides people of ordinary intelligence a reasonable opportunity to understand which type of conduct is prohibited.

Moreover, the Attorney General's interpretation is authoritative. The Attorney General is the Commonwealth's chief law enforcement officer, and she sent the guidance letter to all law enforcement agencies with an RHCF in their jurisdiction.[298] This court has no reason to believe that the guidance will be anything but strictly heeded. Additionally, if past experience in the McGuire line of cases serves as a guide, law enforcement will interpret the statute in a manner consistent with the Attorney General's position.

Finally, despite Plaintiffs' argument to the contrary,[299] nothing in the exemption itself or the Attorney General's interpretation appears to encourage arbitrary and discriminatory

---

[295] Id.

[296] Merriam-Webster's Collegiate Dictionary 845 (Definition 1).

[297] 2008 Guidance Letter at 2 (Trial Ex. 26).

[298] See Narayanan Aff. at 1 (Trial Ex. 26).

[299] See Compl. at 20; PFF at 42.

70

enforcement.[300]  The exemption and the Attorney General's interpretation of the exemption are

clear for the reasons above.  Additionally, to the extent the "solely" determination requires a

judgment call, "'[a]s always, enforcement requires the exercise of some degree of police

judgment.'"[301]  As in Hill, at least facially, "the degree of judgment involved here is

acceptable."[302]

     For these reasons, the Act is not unconstitutionally vague, and Count VI of Plaintiffs'

Complaint fails.

### B.    Count VII.  Liberty Interest

     Count VII of the Complaint alleges violation of Plaintiffs' liberty interests protected by

the Due Process Clause.   Plaintiffs base this claim on the "freedom to loiter for innocent

purposes," and "their rights to intrastate travel in violation of the Fourteenth Amendment."[303]

Although Plaintiffs did not press this cause of action at the Bench Trial, this court will address it

briefly.

     Plaintiffs support this cause of action[304] by reference to City of Chicago v. Morales.[305]

---

[300] Indeed, the fixed buffer zone itself provides clearer guidance to law enforcement than its predecessor.   Instead of a floating buffer zone with a subjective "approach" requirement, the fixed buffer zone—which is clearly marked on the pavement—provides police with a bright-line basis to assess violations.  A non-exempt person is either inside the zone or outside the zone.

[301] Hill, 530 U.S. 703, 733 (2000) (quoting Grayned, 408 U.S. at 114).

[302] Id.

[303] Compl. at 21.

[304] See Pl. Mem. in Supp. of Mot. for Prelim. Inj. at 33.

[305] 527 U.S. 41 (1999).

There, the Supreme Court addressed Chicago's "Gang Congregation Ordinance," which prohibited "criminal street gang members" from "loitering" in public places.[306] In addressing the overbreadth doctrine, Justice Stevens noted, writing for the plurality, "[T]he freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment."[307]

The Court, however, explicitly declined "to decide whether the impact of the Chicago ordinance on constitutionally protected liberty alone would suffice to support a facial challenge under the overbreadth doctrine."[308] Instead, the Court found the law unconstitutionally vague.[309] The "freedom to loiter" reference, therefore, was dicta and not precedential.[310]

Even acknowledging, however, a "right to loiter," this court agrees with the Seventh Circuit that "it is not at all clear, and indeed, quite improbable, that Justice Stevens undertook in this statement any type of fundamental rights analysis."[311] Accordingly, even assuming Plaintiffs are "seeking a right to enter" the areas immediately adjacent to RHCF entrances and driveways "simply to wander and loiter innocently," this court "cannot characterize that right as

---

[306] Id. at 45-46.

[307] Id. at 53.

[308] Id. at 55.

[309] Id. at 55-64.

[310] This court also does not believe that the statement rises to the level of a "carefully considered statement" recognized by the First Circuit as controlling precedent. See United States v. Santana, 6 F.3d 1, 9 (1st Cir. 1993).

[311] Doe v. City of Lafayette, 377 F.3d 757, 772 (7th Cir. 2004).

'fundamental.'"[312]

As a result, this court applies rational basis review to this count.[313]  This court has already

held, however, that the Act passes intermediate scrutiny.  This ends the analysis, and Plaintiffs'

liberty interests count also fails.

**Conclusion**

For the foregoing reasons, the Act survives under all three facial challenge standards.

Because the Act passes constitutional muster under the First Amendment, the Equal Protection

Clause and the Due Process Clause, Plaintiffs have fallen far short of establishing that "no set of

circumstances exists under which the Act would be valid."[314]  Furthermore, the Act has a "plainly

legitimate sweep."[315]  Lastly, Plaintiffs have failed to establish that the Act is impermissibly

overbroad.[316]

Because Defendant prevails on all counts of Plaintiffs' facial challenge, Plaintiffs' request

for preliminary and permanent injunctive relief is DENIED.[317]

---

[312] Id. at 772-773.

[313] See id. at 773 ("Because we have concluded that the City's ban does not encroach on a fundamental liberty interest, we are bound to apply the rational basis standard of review to the City's ban.").

[314] 481 U.S. 739, 745 (1987).

[315] Wash. State Grange v. Wash. State Republican Party, 128 S. Ct. 1184, 1190 (2008) (quoting Washington v. Glucksberg, 521 U.S. 702, 739-40, and n.7 (1997) (Stevens, J., concurring in judgments)).

[316] See id. at 1191 n.6 (citing New York v. Ferber, 458 U.S. 747, 769-71 (1982) and quoting Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)).

[317] See, e.g., McDonald's Corp. v. Rappaport, 532 F. Supp. 2d 264, 275 n.67 (D. Mass. 2007) (Tauro, J.) ("Because [Plaintiff] has not prevailed on the merits, and all four elements of

This matter now proceeds to Plaintiffs' as-applied challenge. A Status Conference shall be held to establish a discovery schedule and trial date.

IT IS SO ORDERED.

\_\_\_\_/s/ Joseph L. Tauro\_\_\_\_\_
United States District Judge

---

the injunction standard must be met for an injunction to issue, this court need not address the remaining elements of the standard.").

**B**

**Chapter 266: Section 120E ½. Reproductive health care facilities
(as revised November 13, 2007)**

Section 120E ½. (a) For the purposes of this section, "reproductive health care facility" means a place, other than within or upon the grounds of a hospital, where abortions are offered or performed.

(b) No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway.  This subsection shall not apply to the following:--

    (1) persons entering or leaving such facility;

    (2) employees or agents of such facility acting within the scope of their employment;

    (3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and

    (4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

(c) The provisions of subsection (b) shall only take effect during a facility's business hours and if the area contained within the radius and rectangle described in said subsection (b) is clearly marked and posted.

(d) Whoever knowingly violates this section shall be punished, for the first offense, by a fine of not more than $500 or not more than three months in a jail or house of correction, or by both such fine and imprisonment, and for each subsequent offense, by a fine of not less than $500 and not more than $5,000 or not more than two and one-half years in a jail or house of correction, or both such fine and imprisonment. A person who knowingly violates this section may be arrested without a warrant by a sheriff, deputy sheriff or police officer if that sheriff, deputy sheriff, or police officer observes that person violating this section.

(e) Any person who knowingly obstructs, detains, hinders, impedes or blocks another person's entry to or exit from a reproductive health care facility shall be punished, for the first offense, by a fine of not more than $500 or not more than three months in a jail or house of correction, or by both such fine and imprisonment, and for each subsequent offense, by a fine of not less than $500 nor more than $5,000 or not more than two and one-half years in a jail or house of correction, or by both such fine and imprisonment. A person who knowingly violates this provision may be arrested without a warrant by a sheriff, deputy sheriff or police officer.

(f) A reproductive health care facility or a person whose rights to provide or obtain reproductive health care services have been violated or interfered with by a violation of this section or any person whose rights to express their views, assemble or pray near a reproductive health care

facility have been violated or interfered with may commence a civil action for equitable relief. The civil action shall be commenced either in the superior court for the county in which the conduct complained of occurred, or in the superior court for the county in which any person or entity complained of resides or has a principal place of business.

C



# THE COMMONWEALTH OF MASSACHUSETTS
# OFFICE OF THE ATTORNEY GENERAL

### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108

MARTHA COAKLEY
ATTORNEY GENERAL

(617) 727-2200
www.ago.state.ma.us

January 25, 2008

Chief Daniel C. O'Leary
Brookline Police Department
350 Washington Street
Brookline, MA 02445

Re:     Amendment to the Massachusetts Reproductive Health Care Facilities Act (a.k.a. the "Massachusetts Buffer Zone Law")

Dear Chief O'Leary:

I am writing to you because there is at least one reproductive health care facility within your jurisdiction to which the state "buffer zone" law applies, or may apply in the future. The law is formally called the Massachusetts Reproductive Health Care Facilities Act, Mass. Gen. Laws ch. 266, § 120E ½ (the "Act"). The law in its original form took effect on November 10, 2000.[3] The Governor recently signed an emergency amendment to the Act that took effect on November 13, 2007. A copy of the Act as amended is enclosed with this letter. I am writing to provide guidance regarding the primary provisions of the amended Act.

In general, the amended Act creates fixed "no enter" zones (or "buffer zones") in defined areas near the entrances to reproductive health care facilities if such areas are "clearly marked and posted." The "buffer zones" consist of (1) the area within a 35-foot radius around clinic driveways and clinic building entrances and exits, to the extent such areas fall within a public way, and (2) a rectangular corridor (to the extent it falls on a public way) that extends in parallel lines from the outside boundaries of clinic building entrances or exits, and clinic driveways, to the edge of the street.

Specifically, the amended Act makes it unlawful for any person to "knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility." *Id.*, § 120E ½ (b). In addition, the amended Act makes it unlawful for any person to "knowingly

---

[3] In its original form, the Act created a "floating bubble zone" that prohibited persons from approaching within six feet of another person for the purpose of protest, education, or counseling without their consent. This provision applied only within an 18-foot radius of clinic building entrances and exits and clinic driveways and within the 6-foot rectangular corridor from clinic building entrances and exits and clinic driveways to the street. The United States Court of Appeals for the First Circuit upheld the original version of the Act against constitutional challenges in *McGuire v. Reilly*, 386 F.3d 45 (1st Cir. 2004) ("*McGuire II*"), and *McGuire v. Reilly*, 260 F.3d 36 (1st Cir. 2001) ("*McGuire I*").

*Id.,* § 120E ½ (b). In addition, the amended Act makes it unlawful for any person to "knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility . . . within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway." *Id.*[4] These provisions are in effect only during the clinic's business hours and if the areas described above are "clearly marked and posted." *Id.,* § 120E ½ (c). The marking and posting of the areas could be accomplished by marking the areas with painted lines on a street and sidewalk, and by posting a sign advising the public of the applicability of the law.

The amended Act exempts four categories of persons from the above provisions: 1) persons entering or leaving the clinic; 2) employees or agents of the clinic acting within the scope of their employment; 3) law enforcement, ambulance, firefighting, construction, utilities, public works, and other municipal agents acting within the scope of their employment; and 4) persons using the public sidewalk or street right-of-way adjacent to the clinic solely to reach a destination other than the clinic. *Id.,* § 120E ½ (b). Identical exemptions in the original Act were upheld by the First Circuit in *McGuire II,* 386 F.3d at 57-59, and *McGuire I,* 260 F.3d at 46-47. With respect to exemption (2), the Court found that it reasonably allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics. *Id.*

The Attorney General provides the following guidance to assist you in applying the four exemptions in the prior paragraph, in locations where the buffer zone is clearly marked and posted, and during a clinic's business hours.

The first exemption — for persons entering or leaving the clinic — only allows people to cross through the buffer zone on their way to or from the clinic. It does not permit companions of clinic patients, or other people not within the scope of the second or third exemptions, to stand or remain in the buffer zone, whether to smoke, talk with others, or for any other purpose.

The second exemption — for employees or agents of the clinic acting within the scope of their employment —allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics, but does not allow them to express their views about abortion or to engage in any other partisan speech within the buffer zone.

Similarly, the third exemption — for municipal employees or agents acting within the scope of their employment — does not allow municipal agents to express their views about abortion or to engage in any other partisan speech within the buffer zone.

---

[4] The Act applies only to the public way (*i.e.,* public streets and sidewalks). *Id.* There may be sites at which a clinic entrance is set back more than 35 feet from the public street or sidewalk. In that case, the Act would not apply to the area outside of the clinic entrance, as the 35-foot radial area around the entrance falls on private property, not on the public way. At such sites, other laws, such as trespass law, could still apply to the area outside of those clinic entrances. However, the Act would still apply to clinic driveway entrances and exits abutting a public way.

Finally, the fourth exemption — for persons using the sidewalk or street adjacent to the clinic to reach a destination other than the clinic — applies to individuals who are crossing through the buffer zone, without stopping, to go somewhere other than a location within the zone and other than the clinic, and who are not using the buffer zone for some other purpose while passing through. For example, an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech).

If you have any questions, or need additional information, please feel free to contact me at (617) 727-2200, ext. 2068.

Very truly yours,

Maura T. Healey
Assistant Attorney General
Chief, Civil Rights Division
Public Protection and Advocacy Bureau

cc: Dennis C. Mahoney, First Assistant District Attorney, Norfolk County
Cathy Cappelli, Assistant District Attorney, Norfolk County
Jennifer Dopazo, Counsel, Town of Brookline
Lieutenant William McDermott, Brookline Police Department