No.: 08-2310

## UNITED STATES COURT OF APPEALS
## FOR THE FIRST CIRCUIT

ELEANOR MCCULLEN, JEAN BLACKBURN ZARRELLA, CARMEL FARRELL, ERIC CADEN, AND GREGORY A. SMITH,

Plaintiffs - Appellants,

v.

MARTHA COAKLEY, IN HER CAPACITY AS ATTORNEY GENERAL FOR THE COMMONWEALTH OF MASSACHUSETTS,

Defendant - Appellee.

On Appeal from the United States District Court
for the District of Massachusetts

### BRIEF OF *AMICUS CURIAE*
### AMERICAN CIVIL LIBERTIES UNION OF MASSACHUSETTS

Robert E. McDonnell (First Cir. No. 56450)
Laura K. Langley (First Cir. No. 1134809)
Josephine Deang (First Cir. No. 124152)
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA 02110-1726
Telephone: 617.951.8000
Facsimile: 617.951.8736

*Attorneys for Amicus Curiae*
*American Civil Liberties Union of Massachusetts*

A/72852825.2

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1, the American Civil Liberties Union of Massachusetts ("ACLUM") submits this Corporate Disclosure Statement. ACLUM is a not-for-profit organization. It has no parent corporation and no corporation owns 10 percent or more of its stock.

A/72852825.2

# **TABLE OF CONTENTS**

Page

I. STATEMENT OF INTEREST OF AMICUS CURIAE ............................... 1

II. ARGUMENT ................................................................................................ 2

    A.    In the Reproductive Health Care Facility Context, the Supreme Court's Decisions in *Ward* and *Hill* Provide the Principled Framework for Evaluating Time, Place, and Manner Restrictions on Speech. In Addition to Being Narrowly Tailored, Such Restrictions Must Leave Open Adequate Channels of Communication ............................................................ 2

    B.    In Reviewing the Massachusetts RHCF Statute, the First Circuit Should Consider Whether Normal Conversational Discourse, Handbilling or Other Channels of Communication Remain Open ................................................................................................ 6

    C.    Giving Vitality to the Notion that Particularized Access can be Generally Restricted will Lead to Overreliance on Exclusionary Zones and Demonstration Areas ................................................... 11

III. CONCLUSION .......................................................................................... 13

# TABLE OF AUTHORITIES

## CASES

Berger v. City of Seattle, 512 F.3d 582 (9th Cir. 2008)
    rehearing en banc granted, 533 F.3d 1030 (2008) .................................. 12, 13

Bl(a)ck Tea Society v. City of Boston, 378 F.3d 8 (1st Cir. 2004) .................. 7, 8, 9

Citizens Against Rent Control v. Berkeley, 454 U.S. 290 (1981) ........................... 9

Coalition to March on the RNC & Stop the War v. City of St. Paul, 557 F.
    Supp. 2d 1014 (D. Minn. 2008) ................................................................. 13

FEC v. Massachusetts Citizens For Life, Inc., 479 U.S. 238 (1986) ....................... 9

Heffron v. International Society for Krishna Consciousness, Inc.,
    452 U.S. 640 (1981) ..................................................................................... 9

Hill v. Colorado, 530 U.S. 703 (2000) ........................................................... 2, 5, 6,
                                                                                                                7, 9, 10

Kuba v. 1-A Agricultural Association, 387 F.3d 850 (9th Cir. 2004) ............... 11, 12

Madsen v. Women's Health Center, Inc., 512 U.S. 753 (1994) ............................... 7

McCullen v. Coakley, 573 F. Supp. 2d 382 (D. Mass. 2008) ........................ 6, 7, 10

Meyer v. Grant, 486 U.S. 414 (1988) ...................................................................... 9

Phelps-Roper v. Nixon, 509 F.3d 480 (8th Cir. 2007) ........................................... 11

Phelps-Roper v. Strickland, 539 F.3d 356 (6th Cir. 2008) .................................... 11

Planned Parenthood League of Massachusetts, Inc. v. Blake, 417 Mass. 467
    (1994) ........................................................................................................... 1

Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406
    Mass. 701 (1990) ......................................................................................... 1

Schenck v. Pro-Choice Network of W. N.Y., 519 U.S. 357 (1997) .................... 5, 7

Ward v. Rock Against Racism, 491 U.S. 781 (1989) .............................. 2, 3, 4, 6, 10

U.S. v. Albertini, 472 U.S. 675 (1985) ................................................................. 3

## STATUTES

Mass. Gen. Laws ch. 266 §120E1/2 ..................................................................... 2

I.  **STATEMENT OF INTEREST OF AMICUS CURIAE**

The American Civil Liberties Union of Massachusetts ("ACLUM") is a nonprofit membership organization dedicated to the principles of liberty and equality embodied in the U.S. Constitution. Since its founding in 1919, ACLUM has vigorously defended the right to free speech on the public streets.

At the same time, ACLUM has long been committed to preserving a woman's right to reproductive choice. ACLUM has participated, either directly or as *amicus*, in most of the major reproductive health care cases in Massachusetts over the course of the past thirty-five years. It has also consistently argued in this context and in others that constitutional rights can quickly become meaningless if they cannot be exercised without running a gauntlet of violence, intimidation and harassment. Accordingly, ACLUM, as *amicus curiae* in *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467 (1994) and *Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue*, 406 Mass. 701 (1990), supported the position that clinic protestors who had engaged in prior unlawful conduct could be subject to a narrowly crafted injunction imposing reasonable time, place, and manner restrictions on their demonstration activity.

Based on this experience, ACLUM deeply believes that the volatile issue of reproductive health care facility protest must not be resolved by sacrificing either

1

the right to reproductive choice or the right to engage in peaceful political protest. Rather, the burden in each case is to arrive at a solution that accommodates both rights, and that does so in a principled way that is consistent with our constitutional tradition. All parties have consented to ACLUM's filing of an amicus brief in this case, and the Court's February 18, 2009 Order granted leave for ACLUM to file beyond the time allowed by Fed. R. App. P. 29(e).

## II. ARGUMENT

### A. In the Reproductive Health Care Facility Context, the Supreme Court's Decisions in *Ward* and *Hill* Provide the Principled Framework for Evaluating Time, Place and Manner Restrictions on Speech. In Addition to Being Narrowly Tailored, Such Restrictions Must Leave Open Adequate Channels of Communication.

Assuming that it sustains the trial court's finding of content-neutrality, the First Circuit must look to the factors articulated in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), to determine if the revised Massachusetts Reproductive Health Care Facility ("RHCF") statute, Mass. Gen. Laws ch. 266, § 120E1/2, is a valid time, place and manner regulation of speech. The Supreme Court relied upon the *Ward* framework when ruling on the validity of the RHCF statute at issue in *Hill v. Colorado,* 530 U.S. 703 (2000). In now considering the revised Massachusetts statute, the First Circuit must determine whether the law is "'narrowly tailored' to serve [significant government] interests and . . . leave[s] open ample alternative channels for communication." *See id.* at 726. In evaluating

2

whether the channels of communication are sufficiently ample, the court must consider how the statute affects a regulated speaker's ability to communicate with his or her intended audience.

In *Ward,* the Supreme Court rejected the "least restrictive means test," but it did not by any means abrogate a significant place for judicial scrutiny of speech regulations. The Court expressly stated that "a regulation . . . must be narrowly tailored . . . but . . . it need not be the least restrictive or least intrusive means of doing so." 491 U.S. at 798. The court evaluating the regulation need not sift through every alternative means of regulating speech, nor does the validity of the regulation "turn on a judge's agreement . . . concerning the most appropriate method" of limitation. *Id.* at 799, *quoting U.S. v. Albertini*, 472 U.S. 675, 689 (1985). Additionally, the *Ward* factors countenance some deference to the legislative choice of regulation, but the measure of deference by the reviewing court is far from unbridled. The judiciary must serve an important gatekeeper function to ensure that the regulation of speech has not gone too far. The *Ward* "standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." 491 U.S. at 799. A statute is narrowly tailored only "[s]o long as the means chosen

3

are *not substantially broader than necessary* to achieve the government's interest." *Id.* at 800 (emphasis added).

In the context of determining whether a content-neutral buffer zone around an RHCF is "not substantially broader than necessary," the reviewing court should consider the gloss that the Supreme Court itself put on the passages from the *Ward* test just cited. In footnote seven of that opinion, the Court focused on the example of handbilling and cautioned against complete prohibitions on such core expressive activities. The Court made the following general statement of principle about a traditional means of communication situated at the heart of the First Amendment:

> A ban on handbilling, of course, would suppress a great quantity of speech that does not cause the evils that it seeks to eliminate, whether they be fraud, crime, litter, traffic congestion, or noise. For that reason, *a complete ban on handbilling would be substantially broader than necessary to achieve the interests justifying it*.

491 U.S. at 799 n.7 (emphasis added) (citation omitted).

*Ward's* declaration concerning handbilling reflects the Court's longstanding concern that the regulation of protected speech not unnecessarily constrict or, in the worst of outcomes, even eliminate traditional avenues of communication. Leaving open adequate channels of discourse is the end goal of narrowly tailoring speech regulation. Ensuring the continued existence of a speaker's ability to communicate is a fundamental element of the *Ward* test, and it has been an

4

important focus of the Court's analysis of speech regulation near RHCFs.

*Hill v. Colorado* examined an 8-foot buffer-zone statute. *See* 530 U.S. at 707. Like the case now before this court, *Hill* involved a facial challenge to a statute with actual effects on both the parties in the case and prospective future demonstrators across the state. The Court focused carefully on whether or not the Colorado statute left open adequate channels of communication for the anti-choice protestors whose speech would be regulated. In order to make that determination, the Court considered whether or not the statute left the protestors with some effective ability to communicate their ideas to their intended audience. Specifically, in determining whether or not the Colorado statute satisfied the *Ward* test, the Court analyzed whether speech could be conducted in normal conversational tones and whether leafleting could occur. *Id.* at 725-28. The Court also carefully considered the place where speech would be limited; noted the statute's scienter requirement; and took account of the statute's general applicability. *Id.* at 728-31.

Without deciding whether the Colorado statute's "8-foot interval is the best possible accommodation," the Court endorsed the law in part because "[u]nlike the 15-foot [floating] zone in *Schenck,* this 8-foot zone allows the speaker to communicate at a 'normal conversational distance.'" *Id.* at 726-27, *quoting*

*Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 377 (1997). With respect to handbilling, the Court expressed concern about the burden the 8-foot zone placed upon this aspect of expression, but opined that the "8-foot interval . . . does not . . . prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can easily accept . . . [or] . . . decline." *Id.* at 727 (footnote omitted). With respect to place, although the limitations imposed by the statute modified expression in a quintessential public forum – the streets and sidewalks – the physical and emotional conditions of those seeking health care justified some restraints. In sum, the Court held that the restraints imposed were narrowly tailored to serve legitimate government interests and left open sufficient channels of communication: "the 8-foot restriction on an unwanted physical approach leaves ample room to communicate a message through speech. Signs, pictures, and voice itself can cross an 8-foot gap with ease." Demonstrators could also peacefully hand out leaflets. *Id.* at 729-30.

> **B.     In Reviewing the Massachusetts RHCF Statute, the First Circuit Should Consider Whether Normal Conversational Discourse, Handbilling or Other Channels of Communication Remain Open.**

In the trial court, McCullen and the other plaintiffs asserted that normal conversational discourse is protected speech, and that distances greater than 15 feet "do not, as a matter of law, allow for normal conversation." *McCullen v. Coakley*,

573 F. Supp. 2d 382, 414 (D. Mass. 2008) (quotation omitted). The trial court responded that the Supreme Court "has repeatedly upheld fixed buffer zones that have the effect of limiting normal conversation within the zone," citing *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) (36 feet) and *Schenck,* 519 U.S. 357 (15-foot fixed zone). *McCullen,* 573 F. Supp. 2d at 414. The trial court, however, overlooked the fact that neither *Madsen* nor *Schenck* involved a statute with prospective, state-wide application. Both cases involved injunctions that were targeted at specific individuals who had been contemptuous of earlier injunctions imposing milder burdens on speech. The trial court correctly noted that it was the record of "physically abusive conduct" in *Schenck* that made "a prohibition on classic speech in limited parts of a public sidewalk permissible." *Id., citing Schenck,* 519 U.S. at 377. But in evaluating whether or not ample channels of communication remain open under the revised Massachusetts statute, the trial court focused only on *Madsen, Schenck* and the First Circuit's *Bl(a)ck Tea Society v. City of Boston,* 378 F.3d 8 (1st Cir. 2004). *See McCullen,* 573 F. Supp. 2d at 414-15. In addressing the point about "normal conversational distance," the trial court overlooked the concerns raised by the Supreme Court in *Hill,* where the Court specifically characterized *Schenck's* lack of a normal conversational distance as a "failing." 530 U.S. at 726-27.

The trial court's reliance upon *Bl(a)ck Tea* to justify the burdens on normal

conversational discourse and the ability to distribute leaflets in the RHCF context is misplaced. The plaintiffs in *Bl(a)ck Tea* were would-be demonstrators who challenged security-based restrictions on First Amendment activities outside the 2004 Democratic National Convention at Boston's Fleet Center. The convention was a "high-profile" event that thousands would attend and that millions would observe. *See Bl(a)ck Tea Soc.*, 378 F.3d at 14. Its size and dimension presented substantial security challenges to municipal police and the United States Secret Service. *See id.* at 10-11. The *Bl(a)ck Tea* court found there to be "heightened sensitivity to security concerns following the terrorist attacks of September 11, 2001." *Id.* at 10. Moreover, intense coverage by television and other media arguably provided numerous alternative means for the communication of ideas and arguments to convention delegates. *Id.* at 14. Nevertheless, even with national security concerns in the mix, the First Circuit characterized the case as "close and difficult." *Id.* Additionally, the court declared that the timing of the suit "sharply limited the remedial options available to the district court." *Id.* at 15. Driven by those temporal limitations, the Court of Appeals validated a demonstration zone that "allowed no opportunity for physical interaction (such as the distribution of leaflets) and severely curtailed any chance for one-on-one conversation." *Id.* at 13. In a troubling statement that did not cite any Supreme Court authority for the proposition, the Court of Appeals went so far as to assert that "there is no

8

constitutional requirement that demonstrators be granted that sort of particularized access." *Id.* at 14.

Whether or not the prohibition of such direct contact might have been justified under the specific, time-pressured, national-security circumstances of *Bl(a)ck Tea*, it is certainly not the case that particularized access, as the court describes it, can be generally restricted consistent with the First Amendment. Although *Heffron v. International Society for Krishna Consciousness, Inc.*, 452 U.S. 640 (1981), is sometimes cited for the lack of any right to particularized access, the *Heffron* Court stated that "there are significant differences between a street and the fairgrounds," and "[a]s such, any comparisons to public streets are necessarily inexact." *Id.* at 651. In *Meyer v. Grant,* 486 U.S. 414 (1988), decided after *Heffron*, the Supreme Court stated:

> That appellees remain free to employ other means to disseminate their ideas does not take their speech through petition circulators outside the bounds of First Amendment protection. <u>Colorado's prohibition of paid petition circulators restricts access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication</u>. That it leaves open 'more burdensome' avenues of communication, does not relieve its burden on First Amendment expression. *FEC v. Massachusetts Citizens For Life, Inc.,* 479 U.S. 238 . . . (1986). *Cf. Citizens Against Rent Control v. Berkeley,* 454 U.S. 290, 296, 299 . . . (1981). <u>The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing</u>.

*Id.* at 424 (emphases added).

9

That same principle, in fact, is brought home by *Hill v. Colorado*, 530 U.S. 703. If particularized access can be generally restricted in a wide range of contexts, the *Hill* Court would not have focused on how the Colorado statute had or had not left open opportunities for normal discourse and leaflet distribution. In the case now before this Court, the trial court cited *Hill* many times in its lengthy opinion, but tellingly did not cite it or consider it in the section of the opinion analyzing the availability of ample channels of communication. *See McCullen*, 573 F. Supp. 2d at 413-15. As stated earlier, the Court in *Hill* focused specifically on conversational discourse, the ability to leaflet, and other channels of communication. *See* 530 U.S. at 725-731. Here, the trial court indicated that in a facial challenge it could not make any findings about whether or not the revised Massachusetts statute leaves open ample alternative avenues of communication. *See McCullen*, 573 F. Supp. 2d at 413 nn.217 & 220. The Supreme Court, however, undertook that close evaluation of the availability of ample channels of communication in a case that was expressly described as a facial challenge to the Colorado statute. *See Hill*, 530 U.S. at 708, 710. Full application of the time-place-manner framework established in *Ward* and applied in *Hill* requires that this case include a detailed consideration of channels of communication and a determination that that no more speech than necessary has been burdened.

### C. Giving Vitality to the Notion that Particularized Access can be Generally Restricted will Lead to Overreliance on Exclusionary Zones and Demonstration Areas.

Because courts have held some exclusionary zones near RHCFs constitutionally permissible, there is a strong temptation for state and local legislative bodies to apply such remedies to other situations in which speech gives rise to discomfort, inconvenience, and objections by involuntary listeners. For example, controversial demonstrations at soldiers' funerals have recently inspired a host of legislation imposing time and place restrictions on protests at funerals. A raft of litigation has followed. *See, e.g.*, *Phelps-Roper v. Strickland,* 539 F.3d 356 (6th Cir. 2008); *Phelps-Roper v. Nixon,* 509 F.3d 480 (8th Cir. 2007).

More problematically, some legislative bodies have been emboldened to establish large exclusionary zones or small, restricted demonstration zones at locations that constitute the core of the traditional public forum. For example, in *Kuba v. 1-A Agricultural Association,* 387 F.3d 850 (9th Cir. 2004), a state-created agricultural association enforced limitations on speech, leafleting and other forms of expression at its annual circus and rodeo staged at a large public arena in San Francisco. The association's so-called "First Amendment Expression Policy" effectively barred animal rights activists from delivering their views on the use and treatment of animals in such exhibitions. *Id.* at 854, 863. Although the Court of Appeals reversed, the district court originally held that the Policy was a valid time,

11

place and manner regulation. *See id.* at 852.

More recently, the City of Seattle imposed limitations on street performers at the Seattle Center – an 84-acre, municipally owned entertainment zone in the heart of the city containing theaters, arenas, museums, exhibition halls, conference rooms, outdoor stadiums and restaurants that attracts 10 million visitors per year. *Berger v. City of Seattle*, 512 F.3d 582, 587 (9th Cir. 2008), *rehearing en banc granted,* 533 F.3d 1030 (2008). Among the limitations imposed was a regulation establishing a 30-foot exclusionary zone around all building entrances and even around people waiting in line for events. *Id.* at 588. Over a vigorous dissent, the Court of Appeals upheld the 30-foot exclusionary zone, relying expressly on cases that have approved exclusionary zones around reproductive health care facilities. *Id.* at 605. Notably, the dissent challenged this mixing of remedial apples and oranges:

> The interests involved in [the RHCF cases], however could not be more different than those we consider here. . . . The idea that park-goers are in any way similarly situated to the patients and doctors of an abortion clinic under siege by hostile protesters, is absurd. The Supreme Court has made the distinctiveness of the interests at issue in such cases very clear. *See Hill v. Colorado* . . . (upholding 8-foot regulatory buffer around clinic entrances due to the 'unique concerns that surround health care facilities,' where those using the facilities 'are often in particularly vulnerable physical and emotional conditions'). It trivializes the interests carefully balanced in those cases to extend them in this way.

*Id.* at 617-18 (Berzon, J., dissenting in part and concurring in part) (footnote omitted).[1]

## III. CONCLUSION

In this case, the Court must to determine whether or not the revised Massachusetts RHCF statute is a principled time-place-manner restriction that does not sacrifice either the right to reproductive choice or the right to engage in peaceful political protest. It is the Court's task to determine if the revised statute accommodates both rights, and if it does so in a principled way that is consistent with our constitutional tradition of not burdening more speech than is necessary to achieve the government's legitimate interests.

Respectfully Submitted,

American Civil Liberties Union of Massachusetts,

By its attorneys,

Robert E. McDonnell (First Cir. No. 56450)
Josephine Deang (First Cir. No. 124152)
Laura K. Langley (First Cir. admission pending)
**BINGHAM MCCUTCHEN LLP**
One Federal Street
Boston, MA 02110-1726
Telephone: 617.951.8000
Facsimile: 617.951.8736

---

[1] *See also Coalition to March on the RNC & Stop the War v. City of St. Paul*, 557 F. Supp. 2d 1014, 1022 (D. Minn. 2008) ("Time-place-manner restrictions that may be constitutionally permissible at one site and event may be held constitutionally infirm at another site and event.")

# CERTIFICATE OF SERVICE

I, Josephine Deang, hereby certify that on February 23, 2009, I served the attached Brief of Amicus Curiae American Civil Liberties Union of Massachusetts, together with a copy on disk, by mailing copies thereof, postage prepaid, to:

Michael J. DePrimo
P.O. Drawer 2440
107 Parkgate Drive
Tupelo, MS 38803

Philip D. Moran
Phillip D. Moran P.C.
265 Essex Street, Suite 202
Salem, MA 01970

Benjamin W. Bull
Alliance Defense Fund
15100 North 90th Street
Scottsdale, AZ 85260

Timothy D. Chandler
Alliance Defense Fund
101 Parkshore Drive
Folsom, CA 95630

Kevin H. Theriot
Alliance Defense Fund
15192 Rosewood
Leawood, KS 66224

Kenneth W. Salinger
Assistant Attorney General
Administrative Law Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108

Anna-Marie Tabor
Assistant Attorney General
Civil Rights Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108

Patricia Correa
Office of Town Counsel
333 Washington Street
Brookline, MA 02445

Dwight Gerard Duncan
Southern New England School of Law
333 Faunce Corner Road
North Dartmouth, MA 02747

_____
Josephine Deang