APPEAL NO. 08-2310

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

ELEANOR MCCULLEN, JEAN BLACKBURN ZARELLA,
CARMEL FARRELL, ERIC CADEN, AND GREGORY A. SMITH,
*Plaintiffs-Appellants*,

v.

MARTHA COAKLEY, Attorney General
for the Commonwealth of Massachusetts,
*Defendant-Appellee*.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CIVIL CASE NO. 08-10066-JLT
(HONORABLE JOSEPH L. TAURO)

————————————

**APPELLANTS' REPLY BRIEF**

————————————

Michael J. DePrimo, Bar #74378
Attorney at Law
P.O. Drawer 2440
107 Parkgate Drive
Tupelo, Mississippi 38803
Telephone: (662) 491-2000
Email: michaeldeprimo@gmail.com

Philip D. Moran, Bar #23517
Philip D. Moran P.C.
265 Essex Street, Suite 202
Salem, Massachusetts 01970
Telephone: (978) 745-6085
Facsimile: (978) 741-2572
Email: philipmoranesq@aol.com

Benjamin W. Bull, Bar #1132885
Alliance Defense Fund
15100 North 90th Street
Scottsdale, Arizona 85260
Telephone: (480) 444-0020
Facsimile: (480) 444-0028

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................... 1

I.    THE ACT IS UNCONSTITUTIONALLY CONTENT BASED ................... 3

    A.    The Act Targets Abortion Speech ............................................. 3

    B.    The Act Cannot be Justified Without Reference to the Content of the Regulated Speech ................................................................... 5

II.   THE ACT UNNECESSARILY BURDENS PROTECTED SPEECH .......... 9

    A.    The Act Is Not Narrowly Tailored .......................................... 11

    B.    The Act Unnecessarily Burdens the Free Speech Rights of Third Parties ............................................................................... 16

III.  THE COMMONWEALTH RELIES ON CASES THAT ARE INAPPOSITE OR READILY DISTINGUISHABLE ................................. 19

    A.    *Madsen, Schenck*, and *Burson* are Inapposite ...................... 19

    B.    *Bl(a)ck Tea*, *Hill*, and *McGuire* are Distinguishable .......... 22

        1.    *Bl(a)ck Tea* is an anomaly ........................................ 22

        2.    The Act is unlike the statutes in *Hill* and *McGuire* .......... 24

IV.   MCCULLEN'S REBUTTAL TO THE COMMONWEALTH'S STATEMENT OF FACTS ........................................................... 25

CONCLUSION ................................................................................ 28

i

# TABLE OF AUTHORITIES

## Cases

*Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*,
  482 U.S. 569 (1987)...........................................................................11, 12

*Bd. of Trustees v. Fox*,
  492 U.S. 469 (1989)..........................................................................9

*Bl(a)ck Tea Soc. v. City of Boston*,
  378 F.3d 8 (1st Cir. 2004).................................................................22, 23

*Boos v. Berry*,
  485 U.S. 312 (1988).........................................................................19

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973).........................................................................19

*Burson v. Freeman*,
  504 U.S. 191 (1992)........................................................................4, 21

*Carey v. Brown*,
  447 U.S. 455 (1980).........................................................................21

*Casey v. City of Newport*,
  308 F.3d 106 (1st Cir. 2002)..............................................................9, 12, 14

*Century Commc'ns Corp. v. FCC*,
  835 F.2d 292 (D.C. Cir. 1987)............................................................10, 11

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993).........................................................................9

*Clark v. Cmty. for Creative Non-Violence*,
  468 U.S. 288 (1984).........................................................................6

*Cox v. Louisiana*,
  379 U.S. 536 (1965).........................................................................16

*Frisby v. Schultz,*
    487 U.S. 474 (1988)................................................................................11, 12

*G. & C. Merriam Co. v. Webster Dictionary Co., Inc.,*
    639 F.2d 29 (1st Cir. 1980).................................................................20

*Hill v. Colorado,*
    530 U.S. 703 (2000)....................................................................*passim*

*Knights of Columbus v. Town of Lexington,*
    272 F.3d 25 (1st Cir. 2001)................................................................11

*Landmark Commc'ns, Inc. v. Virginia,*
    435 U.S. 829 (1978)...........................................................................10

*Madsen v. Women's Health Center, Inc.,*
    512 U.S. 753 (1994)...............................................................2, 13, 20

*McGuire v. Reilly,*
    386 F.3d 45 (1st Cir. 2004)................................................................27

*McGuire v. Reilly,*
    260 F.3d 36 (1st Cir. 2001).............................................2, 5, 7, 15, 24, 25

*Members of City Council v. Taxpayers for Vincent,*
    466 U.S. 789 (1989)......................................................................10, 16

*Metromedia, Inc. v. City of San Diego,*
    453 U.S. 490 (1981)...........................................................................20

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
    460 U.S. 37 (1983).......................................................................11, 19

*Police Dept. v. Mosley,*
    408 U.S. 92 (1972)...........................................................................4, 5

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992).............................................................................3

*Sable Commc'ns of Calif., Inc. v. FCC*,
    492 U.S. 115 (1989)......................................................................10

*Schenck v. Pro-Choice Network of Western New York, Inc.*,
    519 U.S. 357 (1997)...............................................2, 13, 20, 23

*Terminiello v. City of Chicago*,
    337 U.S. 1 (1949)........................................................................16

*Tinker v. Des Moines Ind. Sch. Dist.*,
    393 U.S. 503 (1969)...................................................................16

*United States v. Eichman*,
    496 U.S. 310 (1990).....................................................................6

*United States v. Grace*,
    461 U.S. 171 (1983)...................................................................19

*United States v. Playboy Entm't Group, Inc.*,
    529 U.S. 803 (2000).....................................................................3

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)........................................................5, 6, 8, 12

## **Statutes**

Mass. Gen. Laws ch. 266: Section 120E1/2(b).........................................1

## **Other Authorities**

Fed. R. Civ. P. 65 ..............................................................................13, 20

**INTRODUCTION**

In a nutshell, this case concerns the Commonwealth's attempt to criminalize speech by selected speakers, on selected topics, in public forums when and where abortions are performed.   The Commonwealth's attempt to defend the constitutionality of Mass. Gen. Laws ch. 266: Section 120E1/2(b), as amended, (hereafter, "the Act") suffers from three primary flaws.

First, the Commonwealth persists in its argument that the Act is content neutral; to the contrary, enforcement of the Act requires determinations as to whether certain speakers are or are not expressing views about abortion.  In fact, the District Court found that the Act regulates the content of messages on even the t-shirts of passers-by walking through the zone.  This type of message regulation makes the Act a classic content-based restriction and, therefore, presumptively invalid.

Second, the Commonwealth argues that the Act is a permissible content-neutral restriction on the time, place, or manner of speech because it is "justified without reference to the content of the regulated speech" and because it is "narrowly tailored."  However, the Commonwealth offers the Court versions of the content-neutral inquiry that suggest the inquiry is really nothing more than a rational basis test in which this Court must abandon its role as gatekeeper and rubber-stamp legislative policy choices.  To the contrary, the law is clear that even

purportedly neutral laws are subject to intermediate scrutiny; that these tests place the burden on the government (not the challengers) to prove that its justifications are neutral and its restrictions narrow; and that this Court is obligated to critically assess whether the Act passes muster and targets only the evils it is supposedly designed to prevent. When properly stated and applied, all of these tests require invalidation of the Act.

Third, the Commonwealth repeatedly attempts to convince the Court that the Act is unremarkable; that is, it is no different in substance than other regulations of speech upheld by this Court and the Supreme Court. But as shown below, that strategy also fails. The Act's criminalization of speech within a 70-foot circle on public streets and sidewalks near abortion clinics is dramatically different and more restrictive than any other abortion buffer zone statute approved by this Court or any other. The Act is not limited only to the close, unwanted approaches upheld in *Hill v. Colorado*, 530 U.S. 703 (2000) and *McGuire v. Reilly*, 260 F.3d 36 (1st Cir. 2001). Nor is it an injunction limited only to prior lawbreakers with an "extraordinary" record of repeat offenses, as in *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753 (1994) and *Schenck v. Pro-Choice Network of Western New York, Inc.*, 519 U.S. 357 (1997). Rather, after eight years without a single proven violation of the prior buffer zone law or any other law aimed at protecting access or preventing violence, the Commonwealth chose to adopt a comprehensive law

2

that prohibits all speech, regardless of how welcomed it is by the recipient, how still the speaker stands, or how peaceful the offer of help may be. The Constitution does not permit such broad restrictions on speech. For these reasons, as set forth more fully below, the Act is invalid.

## I.   THE ACT IS UNCONSTITUTIONALLY CONTENT BASED.

### A.   The Act Targets Abortion Speech.

"When the Government seeks to restrict speech based on its content, the usual presumption of constitutionality afforded [legislative] enactments is reversed [because] '[c]ontent-based regulations are presumptively invalid.'" *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 817 (2000) (quoting *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382 (1992)). Here, by the Commonwealth's own admission, the state has done exactly that because it's the content of the speech that determines whether activities are criminal or not, i.e., whether a person falls within the scope of the one or more of the four exemptions.

For example, the Commonwealth readily admits that persons passing through the zone are protected by the Act's fourth exemption *only* if they do not, while passing, "express[] their views about abortion" or otherwise engage in "partisan" speech. Brief of Martha Coakley, Attorney General for the Commonwealth of Massachusetts (hereafter, "Commonwealth Brief") at 12

3

(citation omitted).[1]  On its face, this restriction forces passersby to cease their conversations if they are talking about abortion or "partisan" matters but not if discussing other subjects.  In fact, the District Court expressly found that passersby may not even wear "shirts with abortion-related or partisan messages" because they would be "expressing their views about abortion" in violation of the Act.  *See* McCullen's Brief in Chief, Addendum A, at 69 (quoting Attorney General Guidance Letter at 2).

The second, third, and fourth exemptions to the Act each affirmatively *require* law enforcement officials to judge the content of speech in order to determine whether the Act has been violated or not.  *See id*.  This is the quintessential mark of a content-based statute.  *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 208 (1992) ("[D]istinguishing among types of speech requires that the statute be subjected to strict scrutiny"); *Police Dept. v. Mosley*, 408 U.S. 92, 96 (1972) ("[G]overnment may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.").  The Constitution does not authorize such abortion-silence zones, and certainly does not permit them to be judged as if they were neutral.[2]

---

[1] Likewise, the Commonwealth admits that clinic employees and agents may not "express their views about abortion" within the zone.  Commonwealth Brief at 11 (second exemption).

[2] Nor can the law be justified as "neutral" if the Legislature enacted the second exemption to make clear that those who work to secure peaceful access to abortion

The Commonwealth's insistence that the Act does not target abortion-related speech is demonstrably wrong. *See* Commonwealth Brief at 22-25, 29. Because the Act does not serve a compelling state interest it cannot survive strict scrutiny and therefore is unconstitutional.

### B. The Act Cannot be Justified Without Reference to the Content of the Regulated Speech.

A government regulation is content neutral only if it is "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The justification inquiry requires a court to test the relationship between the asserted state interests and the banned activity to determine whether the justification does or does not depend on the content of regulated speech. In this case, the Commonwealth does not test the relationship between the asserted interest and the regulated activity. Instead, the Commonwealth presumes the constitutional test requires the mere statement of a neutral interest without regard to whether the manner in which the law serves that alleged interest is related to content.

---

clinics need not fear prosecution. For the government to decide that persons offering peaceful access to abortion should be immune from prosecution, but that persons offering peaceful *alternatives* to abortion can be imprisoned is the essence of a content-based judgment about speech that the First Amendment forbids. *See Mosley*, 408 U.S. at 96. For these reasons the contrary holding in *McGuire* should be reconsidered. *See* 260 F.3d at 44-45.

This approach is incorrect. Courts applying the justification test are required to analyze the relationship between the state's asserted means and ends to determine whether the justification depends on content. *See, e.g., Ward*, 491 U.S. at 792-93 (finding limitations on noise levels to avoid undue intrusion to be justified without reference to content because noise levels have "nothing to do with content"); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 298 (1984) (finding restriction on overnight sleeping "justified without reference to the content" because the asserted justifications—avoiding damage to and preserving accessibility of parks—"can as easily result from camping by demonstrators as by nondemonstrators."); *United States v. Eichman*, 496 U.S. 310, 314, 316-17 (1990) (invalidating facially neutral flag burning law because Congress's asserted interest—preserving the flag as a national symbol—was implicated only by certain acts of burning the flag, based on their communicative content, but not others).

The Commonwealth's claim is that eliminating all speakers from a 70-foot wide swath of public sidewalk will serve the asserted goals of protecting public safety and access to medical services. *See* Commonwealth Brief at 29. The "justified without reference" test, however, requires the court to test the relationship between those neutrally-stated interests and the banned activity. Here, the only conceivable reason to believe that all speakers within the 70-foot circle pose a danger to public safety or access is based on viewpoint. Indeed, the record

6

is clear that the legislature has always been acting with a focus on protests by abortion opponents. *See, e.g.*, McCullen Brief in Chief, Addendum A, at 5 (noting that Act was motivated by "solid evidence that abortion protesters are particularly aggressive"); *McGuire*, 260 F.3d at 44 (noting prior Act was aimed at "combating the deleterious secondary effects of anti-abortion protests"); Commonwealth Brief at 1, 3-5, 7-9, 15, 23, 29-30, 34. There is simply no reason to believe—and certainly no basis in the legislative record or the Commonwealth's brief to believe—that speakers on issues *other than* abortion pose any threat to public safety or access to abortion clinics when they enter the 70-foot circle.

Because the connection between the banned activity and the state's goal is, at most, only rational in the context of a single viewpoint—that of abortion opponents—the law is not justified without reference to the content of speech. The Act in this regard is quite different from those upheld in *McGuire* and *Hill*. For example, in the *McGuire* cases, the law at issue was narrowly focused only on close, unconsented approaches, 260 F.3d at 40, which arguably threatened public safety regardless of content. In *Hill*, the Court expressly found that the law's focus on close, unwelcome approaches for purposes of protest "distinguish[es] activities likely to have [negative] consequences from speech activities (such as Justice Scalia's 'happy speech,') that are most unlikely to have those consequences." 530 U.S. at 724 (internal citation omitted). Here, in contrast, Massachusetts has swept

7

in all speech—wanted, unwanted, "happy speech," speech from distances far greater than eight feet—and outlawed that speech in the 70-foot area despite the Supreme Court's statement that such a broad ban is "most unlikely" to serve the interests it identifies. The Commonwealth's stated interests simply do not apply to non-abortion-related speech. The Act is therefore not justified without reference to the content of speech, and cannot survive as a time, place, and manner regulation. *See, e.g.*, *Ward*, 491 U.S. at 791.

In the alternative, if the Commonwealth eventually contends that the Act is justified even as to speakers who are not abortion opponents (a position the Commonwealth has yet to take), the Act is nevertheless invalid as content-based. If speakers on non-abortion issues actually endanger public safety and access to medical care whenever they come within 35 feet of the entrance to a medical facility, the Act is not neutral because it only focuses on abortion clinics and not the thousands of other medical facilities in the state that are equally likely to be protested for non-abortion-related reasons such as labor picketing or animal rights.

A statute "lends itself to invidious use if there are a significant number of communications, raising the same problem that the statute was enacted to solve, that fall outside the statute's scope, while others fall inside." *Hill*, 530 U.S. at 723-24 (finding statute that applied to all health care facilities valid and content neutral because it "does not distinguish among speech instances that are similarly likely to

8

raise" the asserted interests). *See also City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429-430 (1993) (finding that a neutrally-stated interest in limiting the number of newsracks to reduce litter did not meet justification test because the ordinance distinguished between commercial and noncommercial newsracks, and therefore did not neutrally regulate speech). If non-abortion speakers cause the problems asserted by the Commonwealth, but are only banned if and when they speak near abortion facilities, the Act is impermissibly underinclusive and invalid.

## II.     THE ACT UNNECESSARILY BURDENS PROTECTED SPEECH.

In analyzing the Act, the Commonwealth attempts to shift the burden to McCullen. While it's generally true of facial challenges that the burden is on the challenger to demonstrate the law's unconstitutionality, where, as here, the legal challenge is to a law restricting speech, the burden is on *government* to bring forth facts proving the regulation burdens no more speech than necessary. *Casey v. City of Newport*, 308 F.3d 106, 111 (1st Cir. 2002) (citing *Bd. of Trustees v. Fox*, 492 U.S. 469, 480 (1989)). Moreover, where a regulation bans an entire mode of communication, as the Commonwealth does here by making large portions of public fora "speech-free zones," the burden is on government to demonstrate why less restrictive alternatives are inadequate. *Id.* at 111, 115.

The Commonwealth brushes aside this settled legal principle, insisting instead that the Legislature had the prerogative to adopt whatever regulations they deemed necessary and the Court has no authority to second-guess it. *See* Commonwealth Brief at 15, 31-34. But, as even the Commonwealth conceded in another section of its brief, that is simply not the law. *See* Commonwealth Brief at 17-18 ("this Court must also make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression") (quotation marks and citation omitted).

Indeed, as the Supreme Court has noted, "[d]eference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 843 (1978). If courts were not to analyze critically government assertions and legislative findings, the "definition and the function of the First Amendment as a check on legislative power would be nullified." *Id*. at 844. *See also Sable Commc'ns of Calif., Inc. v. FCC*, 492 U.S. 115, 129 (1989) (noting that "whatever deference is due legislative findings would not foreclose our independent judgment of the facts bearing on an issue of constitutional law"); *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803, n.22 (1989) (courts "may not simply assume that [an] ordinance will always advance the . . . interests sufficiently to justify its abridgment of expressive activity"); *Century Commc'ns Corp. v. FCC*, 835 F.2d 292, 299 (D.C.

10

Cir. 1987) (recognizing that "the Supreme Court has often noted that the substantial deference due in the administrative context has little relevance when first amendment freedoms are even incidentally at stake").

### A.     The Act Is Not Narrowly Tailored.

The Commonwealth asserts that the Act is necessary to protect public safety and access to abortion. Commonwealth Brief at 29. Assuming, but not conceding, that is true, the Act still fails the time, place, and manner test because it is not narrowly tailored to the evils the Commonwealth purports to remedy.

First, rather than even attempting to tailor the Act to its public safety and access concerns, the Commonwealth has simply chosen to outlaw all speech (at least all speech about abortion) that occurs on a stretch of public streets and sidewalks that extends to 70 feet or more. Within this zone, the Act is not a regulation on the time, place, and manner of speech—such as a regulation on how one can speak to others at close distances and without consent (as in *Hill* and *McGuire*) or how loudly one can broadcast a message (as in *Ward*)—but rather it is a complete ban on communicative activity in a public forum. Yet, "[t]he bedrock rule is that government may not prohibit all communicative activity in a public forum." *Knights of Columbus v. Town of Lexington*, 272 F.3d 25, 31 (1st Cir. 2001) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). *See also Frisby v. Schultz*, 487 U.S. 474, 481 (1988); *Bd. of Airport*

*Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 573 (1987).  The Commonwealth's insistence that the Act does not "ban" any speech but merely regulates the place where speech may occur is repudiated and foreclosed by these cases.

Rather than address the constitutional standard for narrow tailoring, the Commonwealth simply ignores it.  As the Supreme Court has stated, "[a] statute is narrowly tailored if it *targets and eliminates no more than the exact source of the evil* it seeks to remedy."  *Frisby*, 487 U.S. at 485 (emphasis added).  *See also Ward*, 491 U.S. at 800 n.7; *Casey*, 308 F.3d at 115.  A complete ban "can be narrowly tailored, *but only if each activity within the proscription's scope is an appropriately targeted evil*."  *Frisby*, 487 U.S. at 485 (emphasis added).  Yet the Commonwealth's brief entirely ignores this standard.  Here, the "exact evil" the Commonwealth seeks to prevent is harm to public safety and interference with access.  Nevertheless, the Act "targets and eliminates" all sorts of speech and activities that are positively unlikely to harm public safety or access.  These include communication with willing listeners; stationary distribution of leaflets to willing recipients; peaceful prayer; "happy speech;" and speech other than oral protest, education, and counseling.  Far from being "appropriately targeted evil[s]," these types of speech are peaceful, lawful, and constitutionally protected.

Nor is the Act narrowly tailored to persons who have previously engaged in illegal behavior as in *Madsen* and *Schenck*.  Despite the Commonwealth's attempts

12

to analogize the Act to *Madsen* and *Schenck*, both cases involved injunctions that only applied to specific parties who had previously (and repeatedly) violated the law. For example, the Court in *Madsen* noted that injunctions are issued "because of the group's past actions in the context of a specific dispute between real parties" and are not a "statute addressed to the general public." 512 U.S. at 762. In *Schenck*, the Court was addressing specific prior law violators whose conduct had resulted in five findings of civil contempt, 519 U.S. at 365-66, repeated acts of trespass, *id.* at 368, and "extraordinary" conduct requiring a specific limitation on their actions, *id.* at 383.[3]

The Act also fails the *Ward* narrow-tailoring test because the zone is far larger than necessary to serve the Commonwealth's asserted interests. In fourteen separate instances the Commonwealth concedes that the physical location where the alleged "evils" take place and need to be remedied are those areas "*immediately*" next to entrances and driveways of RHCFs. *See* Commonwealth Brief at 1, 2, 8, 9, 15, 20, 23, 24, 30, 37, 43, and 50 (emphasis added). While a police official repeatedly testified that a clear zone would make the job of

---

[3] The Commonwealth implies that these injunctions applied to the general public. *See* Commonwealth Brief at 36. That is simply false. The reference in *Schenck* to "all protesters" referred to all "defendant protesters," i.e., those prior lawbreakers who were close to, but not currently blocking an entrance. 519 U.S. at 381. It surely did not override the rest of the opinion in *Schenck* which emphasized the application of the injunction to a specific party as a result of past misconduct, nor did it rewrite Fed. R. Civ. P. 65 to make injunctions applicable beyond the parties before the court, their agents, and those acting in concert with them.

13

enforcing the law easier, nothing in the record indicates that a clear zone of 10 feet outside of all entrances would not be equally effective while preserving the vast majority of peaceful, welcome speech that occurs on the sidewalk. Put simply, 35 feet is not a distance that is narrowly tailored for a problem "immediately" adjacent to entrances and driveways, nor does such a large distance limit regulations of speech to the "exact evil" the state purports to be addressing. *Cf. Hill*, 530 U.S. at 726 (noting that even an eight-foot distance "certainly can make it more difficult for a speaker to be heard, particularly if the level of background noise is high and other speakers are competing for the pedestrian's attention."). And prohibiting passers-by from even wearing t-shirts with pro-life messages—or for that matter with "Barack Obama for President" on them—while they walk a 70-foot stretch of sidewalk obviously bears no relation to these alleged interests.

Finally, the Act fails the narrow tailoring test because the Commonwealth has made no showing why existing state and federal laws prohibiting interference with access and prohibiting violence cannot be enforced as a remedy to its purported concerns. This Court has made clear that the burden of making such a showing rests on the government. *See Casey*, 308 F.3d at 115-116 (finding that law burdens more speech than necessary because government had not adduced evidence as to why enforcement of existing laws could not address the problem with substantially less burdens on speech).

While the Commonwealth complains that the prior version of the Act was difficult to enforce, it provides no explanation as to why it has not offered evidence of even a *single conviction* under any other law protecting access and prohibiting violence at RHCFs. The prior version of the Act was supposed to be the speech-restrictive law designed to catch the "fingerlings" that might otherwise slip through laws directly targeting violence, harassment, and interference with access. *See McGuire*, 260 F.3d at 49. *See also Hill*, 530 U.S. at 729 (noting that the no-approach laws were supposed to be the "bright-line prophylactic rule" to offer clear guidance to law enforcement).

The Commonwealth attempts to use its failure to successfully prosecute even a single person over the past eight years as justification for restricting even more peaceful speech in a manner that is far less tailored than the existing laws. But the far more plausible explanation for the Commonwealth's failure to obtain a single conviction is that while speech outside abortion clinics may sometimes be contentious and uncomfortable, no violence has occurred and no access has been denied. But restricting speech on this basis is improper because,

> [a]ny word . . . that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk . . . .
> In order for the State . . . to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.

*Tinker v. Des Moines Ind. Sch. Dist.*, 393 U.S. 503, 508-09 (1969). *See also Cox v. Louisiana*, 379 U.S. 536, 551-2 (1965) (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949)) ("[A] 'function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging'").

The Act does not pass muster under the narrow-tailoring prong of the *Ward* test because it does not target the exact evil sought to be remedied.  It therefore is unconstitutional.

### B.     The Act Unnecessarily Burdens the Free Speech Rights of Third Parties.

The Commonwealth begins it response to McCullen's overbreadth claim with the suggestion that the Court decline review altogether on the ground that, if the Court finds the Act a valid time, place, and manner regulation, the Act, by definition, cannot be overbroad.  Commonwealth Brief at 44.  This is a clever gimmick but fails to appreciate the nature of an overbreadth claim.  The purpose of the overbreadth doctrine is to "prevent[] an invalid statute from inhibiting the speech of third parties who are not before the Court." *Taxpayers for Vincent*, 466 U.S. at 800.  Whereas McCullen's time, place, and manner analysis focused on the Act's effect on her own abortion speech, her overbreadth analysis considers the Act's effects on the non-abortion speech of third parties.  Of course, where a law

fails for overbreadth, it likewise fails the "narrow tailoring" prong of the time, place, and manner test.

The Commonwealth next claims "the Supreme Court has rejected an almost identical overbreadth challenge" in *Hill*.[4]  Commonwealth Brief at 44.  It then quotes *Hill* out of context, stating,

> But this "comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive." *Hill*, 530 U.S. at 731.  "The fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance. What is important is that all persons entering or leaving health care facilities share the interests served by the statute."  *Id*. at 730-31.

Commonwealth Brief at 44.  The foregoing passage from *Hill* discusses *where* the statute applied, i.e., all medical facilities and not just RHCFs. It was not discussing the statute's sweep toward expressive activities.  *See Hill*, 530 U.S. at 731.  The passage therefore has no relevance to McCullen's overbreadth challenge.[5]

The Commonwealth again quotes *Hill* out of context when it claims "'[p]laintiffs have not established "that the impact of the statute on the conduct of other speakers will differ from its impact on their own sidewalk counseling."'"

---

[4] The Act bears little resemblance to the statute upheld in *Hill*; consequently, the Commonwealth's reliance on *Hill* is misplaced.  *See infra* at 24-25.

[5] While the cited passage is not relevant to overbreadth, it does provide further confirmation that the proper constitutional analysis requires treatment of a law that focuses *only* on abortion clinics to be treated as content based.  McCullen acknowledges that the *McGuire* cases rejected this argument but those panels did not address the above language from *Hill* making clear that the reduced scrutiny of *Ward* was available in that case because of the broad policy choice (all medical facilities) that is absent here.

Commonwealth Brief at 44-45. In *Hill*, the plaintiffs raised the rights of "other protesters and counselors" whose conduct was similar to theirs and therefore was "encompassed within the statute's 'legitimate sweep.'" 530 U.S. at 732. Unlike the plaintiffs in *Hill*, McCullen's speech is very different from the speech of the third parties whose rights she raises. McCullen does not engage in commercial speech or labor picketing, she does not solicit charitable contributions or circulate petitions, she does not panhandle or perform any of the arts.

Throughout its brief, the Commonwealth makes abundantly clear that the alleged evil purportedly sought to remedy is caused by abortion-related protest activity – and abortion-related protest activity *only*. *See* Commonwealth Brief at 1, 3-5, 7-9, 15, 23, 29-30, 34. Despite the particularity of the alleged activity that serves as the underlying basis for the Commonwealth's purported concern, the Act is comprehensive in its prohibition of constitutionally-protected speech. The Act proscribes not only abortion-related speech but also every other type of speech imaginable by non-exempted speakers including commercial speech, labor picketing, charitable solicitation, petition circulating, panhandling, and performance of the arts. It even unnecessarily burdens the free speech rights of the very class it purports to protect – women seeking abortion. *See, e.g.*, Brief of Amicae Curiae Marlynda Augelli *et al.*

18

It is well-settled that a public forum occupies "a 'special position in terms of First Amendment protection'" and "the government's ability to restrict expressive activity [in it] 'is very limited.'" *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quoting *United States v. Grace*, 461 U.S. 171, 180, 177 (1983)). *See also Perry Educ. Ass'n*, 460 U.S. at 45 ("the rights of the state to limit expressive activity" in traditional public forums "are sharply circumscribed"). "In these quintessential public forums, the government may not prohibit all communicative activity." *Perry Educ. Ass'n*, 460 U.S. at 45. The Commonwealth ignored these constitutional dictates when it made large segments of the public streets and sidewalks totally off-limits for expressive activity.

The foregoing demonstrates that the overbreadth of the Act is both "real" and "substantial . . . judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The Act therefore is unconstitutionally overbroad.

## III.    THE COMMONWEALTH RELIES ON CASES THAT ARE INAPPOSITE OR READILY DISTINGUISHABLE.

### A.    *Madsen*, *Schenck*, and *Burson* are Inapposite.

Several of the cases relied on by the Commonwealth have little in common with the Act. For example, the Commonwealth places heavy emphasis on *Madsen* and *Schenck*. But the Act is a law of general application, not an injunction, as were *Madsen* and *Schenck*. Consequently, they offer very little in the way of support for

the Act for at least four reasons.  One, "statutes challenged on First Amendment grounds must be evaluated in light of the unique facts and circumstances of the case." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 521 (1981).  The "extraordinary" records of pervasive lawless conduct that formed the factual basis for the injunctions aimed at specific individuals in *Madsen* and *Schenck* were not present here.  *See Schenck*, 519 U.S. at 380-83.

Two, injunctions penalize wrongdoers based on past, proven misconduct. *See Madsen*, 512 U.S. at 766 n.3 ("an injunction issues only if there is a showing that the defendant has violated, or imminently will violate, some provision of statutory or common law, and that there is a cognizable danger of recurrent violation") (quotation marks and citation omitted).  Laws of general application, on the other hand, regulate the conduct of all citizens, even those who have never violated the law.

Three, injunctions apply only to certain individuals.  *See* Fed. R. Civ. P. 65(d) (Every order granting an injunction binds only the parties; the parties' officers, agents, servants, employees, and attorneys; and those in active concert or participation with them).  *See also G. & C. Merriam Co. v. Webster Dictionary Co., Inc.*, 639 F.2d 29, 34 (1st Cir. 1980) ("Persons beyond [the] scope [of an injunction] cannot be held to have violated it because it does not apply to them. They are free to ignore it") (quotation marks and citation omitted).

Finally, contrary to the Commonwealth's contention, it does not follow that the Act is constitutional simply because it is less onerous than the injunction upheld in *Madsen*. Indeed, if that were true, the Supreme Court would not have taken up *Hill*'s law of general application that established an 8-foot no-unwanted-approach zone which, obviously, was far less restrictive than the 36-foot no-entry-at-all zone upheld against specific repeat lawbreakers in *Madsen*. Consequently, because injunctions and laws of general application serve very different purposes, the scope of court-approved injunctions offer little guidance when it comes to determining the constitutionality of laws of general application.

The Commonwealth also relies on *Burson v. Freeman*. But *Burson* correctly recognized that the polling place buffer zone at issue was a content-based restriction on political speech and not a content-neutral time, place, and manner regulation. 504 U.S. at 197. Here, there is no suggestion by the Commonwealth that the Act could overcome the presumptive unconstitutionality of content-based regulations. If *Burson* applies at all, it is to show that the Act should be recognized for what it is—an attempt to restrict abortion-related protests by using the proxy of location—namely, whenever and wherever abortions occur—for content. *See also Carey v. Brown*, 447 U.S. 455, 459-60 and n.3 (1980) (finding regulation of speech outside of "any school involved in a labor dispute" as "discriminat[ing] between

21

lawful and unlawful conduct based upon the content of the demonstrator's communication."). *Burson*, then, lends no aid to the Commonwealth.

### B.    *Bl(a)ck Tea, Hill,* and *McGuire* are Distinguishable.

#### 1.    *Bl(a)ck Tea* is an anomaly.

The Commonwealth relies on *Bl(a)ck Tea Soc. v. City of Boston*, 378 F.3d 8 (1st Cir. 2004) as a supposed example of a constitutionally permissible buffer zone.  But *Bl(a)ck Tea* is exceedingly weak precedent for at least four reasons.  First, *Bl(a)ck Tea* considered the constitutionality of a one-time policy decision designed to protect delegates to the 2004 Democratic National Convention.  The Court noted that, "[s]ecurity at national political conventions is always tight and that was especially so this year in light of the heightened sensitivity to security concerns following the terrorist attacks of September 11, 2001."  *Id.* at 10.  The type of security risk at issue in *Bl(a)ck Tea* does not exist here.

Second, *Bl(a)ck Tea* was a review of a denial of preliminary injunction; the standard of review was abuse of discretion on a "hastily assembled record." *Id.* at 14.  Obviously, the emergency nature of the appeal left little time for the Court to grapple with or ponder the important First Amendment issues at stake.

Third, the Court expressly noted the unique circumstances underlying *Bl(a)ck Tea*'s appellate review, saying "[w]e are not faced with the question of whether the same result would be supportable in less tumultuous times or on a better-developed record."  *Id.* at 15 n.5 (citation omitted).  Abortion protest has

22

been continuous in Massachusetts for over thirty years and the record demonstrates no physical violence for the past fifteen years. The days of "rescues" and blockades that caused tumults are long past.

Fourth, for safety reasons the policy at issue in *Bl(a)ck Tea* prevented *all* persons not having business with the convention from approaching near the entrances to the convention center, and those persons that were permitted to approach were required to go through magnometers. *Id*. at 10. The Act, on the other hand, permits *anyone* to walk near RHCF entrances so long as they do not discuss abortion and are traveling to a destination other than the RHCF.

Finally, the Commonwealth cites *Bl(a)ck Tea* to rebut McCullen's contention that speakers possess a right under the First Amendment to communicate with their intended audience from a normal conversational distance and to distribute leaflets in traditional public fora, saying McCullen's argument "is foreclosed by this Court's holding that 'there is no constitutional requirement that demonstrators be granted that sort of particularized access.'" Commonwealth Brief at 40 (quoting *Bl(a)ck Tea*, 378 F.3d at 14).

McCullen will not speculate as to what the Court was thinking by invoking that language. Instead, McCullen respectfully directs the Court's attention to *Schenck*, 519 U.S. at 377, and *Hill*, 530 U.S. at 726-27 ("More significantly, this statute does not suffer from the failings that compelled us to reject the 'floating

23

buffer zone' in *Schenck*.   Unlike the 15-foot zone in *Schenck,* this 8-foot zone allows the speaker to communicate at a 'normal conversational distance.'") (citations omitted).  *See also id*. at 727 (characterizing the 8-foot floating buffer as a possibly "serious" burden on leafleting but affirming its constitutionality because the statute did not "prevent a leafletter from simply standing near the path of oncoming pedestrians and proffering his or her material, which the pedestrians can easily accept").  McCullen's concerns are echoed by an uninterested civil liberties organization.  *See* Brief of Amicus Curiae American Civil Liberties Union of Massachusetts at 6-12.

### 2.    The Act is unlike the statutes in *Hill* and *McGuire*.

The Commonwealth quotes from both *Hill* and *McGuire* in ways that make it appear those two cases are so closely aligned with the Act to be almost indistinguishable.   However, the Act not only can be distinguished from the statutes at issue in those cases, it is wholly unlike them in nature and effect.  The Act prohibits *all* expressive activity within a radius of 35-feet from the driveways, entrances, and exits of RHCFs.  *See* McCullen's Brief in Chief, Addendum B.  *Hill* and *McGuire* were 8-foot and 6-foot floating buffers that prohibited *only* close unwanted approaches.   530 U.S. at 707; 260 F.3d at 40.   *Hill* and *McGuire* permitted speakers leafleting and sign display inside their zones, 530 U.S. at 726-27; 260 F.3d at 40.  The Act does not.  *Hill* and *McGuire* permitted persons to

24

  
remain in one place inside the zone without giving ground, 530 U.S. at 707, 726-27; 260 F.3d at 40.  The Act does not.  *Hill* and *McGuire* permitted all persons to stand near the doors of RHCFs.  530 U.S. at 729-30; 260 F.3d at 40.  The Act does not.  *Hill* and *McGuire* allowed all persons to stand inside the zone near the path of passersby so they could effectively leaflet. 530 U.S. at 727; 260 F.3d at 40.  The Act does not.  *Hill* and *McGuire* permitted speech inside the zone to consenting listeners without restriction, 530 U.S. at 707-09; 260 F.3d at 40.  The Act does not.  *Hill* and *McGuire*, in every instance, permitted persons to speak to even unconsenting listeners from a normal conversational distance (less than 15 feet).  530 U.S. at 726-27; 260 F.3d at 40.  The Act does not.

Constitutionally speaking, *Hill* and *McGuire* are miles apart from the Act. The Commonwealth essentially conceded this by admitting that the Act "modif[ies] the *size and nature* of the [prior] buffer zone."  Commonwealth Brief at 1 (emphasis added).  The Commonwealth's heavy reliance on *Hill* and *McGuire* is therefore ineffectual.

## IV.    MCCULLEN'S REBUTTAL TO THE COMMONWEALTH'S STATEMENT OF FACTS.

In several instances the Commonwealth plays fast and loose with the facts. For example, the Commonwealth claims that "[w]itnesses explained that protestors *physically barred access to various clinics* by blocking driveways and doors, and not infrequently screamed at close range at patients trying to enter clinics."

Commonwealth Brief at 8 (citing App. 170-77, 180-83, 226-27, 237-38; Add. A at 16-18) (emphasis added). This is a brash overstatement. While the record does contain testimony indicating that demonstrators paced back and forth on public sidewalks across clinic driveways and stood next to the front door of RHCFs, this hardly constitutes barring access. *See* App. 170-77, 180-83, 226-27, 237-38. At most, such non-violent conduct causes a slight delay or mild inconvenience. In fact, there is not a single documented instance in the legislative record of a recent incident where a woman was prevented from obtaining reproductive health care as a result of demonstrator activity.

The Commonwealth also claims that, after passage of the Act, demonstrators engaged in essentially the same expressive activities as before. Commonwealth Brief at 13-14. That is absurd. Prior to the Act's passage, McCullen and others positioned themselves next to RHCF entrances and driveways in order to be near the path of passersby so they could effectively leaflet and speak to patients from a normal conversational distance. App. 51-53, 57, 61, and 66. Subsequent to the Act's passage they refrained from doing so altogether out of fear they would be arrested and imprisoned. *Id*. at 54, 59, 62, and 68.

Finally, the Commonwealth asserts that two legislators stood 35 feet apart in the legislative chamber and could hear each other. Commonwealth Brief at 9-10. Perhaps so. But standing 35 feet apart in the somber environment of a legislative

chamber hardly replicates the real-world in which the Act operates. First, the Act makes it unlawful to enter or remain on a public way or sidewalk within a *radius* of 35 feet of any portion of an entrance, exit or driveway of a RHCF. *See* McCullen's Brief in Chief, Addendum B. If McCullen is on one side of the buffer zone and a patient approaches from the other, the length of the buffer is actually 70 feet plus the length of the RHCF entrance. Second, the quiet environment of a legislative chamber hardly duplicates life on the streets and sidewalks of a city where rumbling trains, jet engines, construction jackhammers, cars, trucks, buses and the shouts of McCullen's opponents all exacerbate ambient noise. Case in point: the judiciary makes use of microphones in courtrooms with excellent acoustics and virtually no ambient noise. How much more difficult, then, is it to be heard in the open air where acoustics are non-existent and ambient noise is loud, plentiful, and continuous. The Commonwealth focuses on such made-for-litigation "facts" because the real world facts cannot support the severe burdens the Act places on speech. *See Hill* 530 U.S. at 726 (noting that even an eight foot distance "certainly can make it more difficult for a speaker to be heard, particularly if the level of background noise is high and other speakers are competing for the pedestrian's attention"); *McGuire v. Reilly*, 386 F.3d 45, 52 (1st Cir. 2004) ("escorts often try to surround patients and chatter loudly to drown [protesters] out").

## CONCLUSION

The Act is unconstitutional on its face and should be permanently enjoined.

Respectfully submitted,

Michael J. DePrimo, Bar # 74378
Attorney at Law
P.O. Drawer 2440
107 Parkgate Drive
Tupelo, Mississippi 38803
Tel: (662) 491-2000
Email: michaeldeprimo@gmail.com

Philip D. Moran, Bar # 23517
Philip D. Moran P.C.
265 Essex Street, Suite 202
Salem, Massachusetts 01970
Tel: (978) 745-6085
Fax: (978) 741-2572
Email: philipmoranesq@aol.com

Benjamin W. Bull, Bar # 1132885
Alliance Defense Fund
15100 North 90th Street
Scottsdale, Arizona 85260
Tel: (480) 444-0020
Fax: (480) 444-0028
Email: bbull@telladf.org

**CERTIFICATE OF COMPLIANCE**

Pursuant to F.R.A.P. 32(a)7(C), the undersigned certifies this brief complies with the type-volume limitations of F.R.A.P. 32(a)7(B).    Exclusive of the exempted portions in F.R.A.P. 32(a)7(B), this brief contains _6,677_ words.

Michael J. DePrimo

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the original and nine paper copies, as well as one

PDF copy on disk, of the foregoing Appellants' Reply Brief was furnished by UPS

Next Day Air Saver, postage prepaid, this 16th day of March, 2009, to the Clerk of

Court and a true and correct copy by U.S. Mail, postage prepaid, this 16th day of

March, 2009, to the counsel of record listed below.

Kenneth W. Salinger, Esq.
Administrative Law Division
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200 Ext. 2075
Fax: (617) 727-5785
ken.salinger@state.ma.us

Anna-Marie Tabor. Esq.
Assistant Attorney General
Civil Rights Division
One Ashburton Place
Boston, MA 02108
(617) 727-2200 ext. 2927
anna-marie.tabor@state.ma.us

Michele L. Schmidt, Paralegal

31